IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF | ) | Case No. BK 18-81127-TLS |
| | ) | |
| EAT FIT GO HEALTHY FOODS, LLC et al.[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |

**STIPULATION AND AGREEMENT EXTENDING DEADLINE TO ASSUME OR
REJECT UNEXPIRED LEASE OF NONRESIDENTIAL REAL PROPERTY**

This *Stipulation And Agreement Extending Deadline To Assume Or Reject Unexpired Lease Of Nonresidential Real Property* pursuant to 11 U.S.C. §365(d)(4)(B)(ii) (the "Stipulation") is entered into and executed by ___180 Burke, LLC___ ("Lessor"), and _Eat Fit Go Healthy Foods - Omaha, LLC_ (the "Debtor").[2] Pursuant to the below, the Parties hereto stipulate and agree and follows:

<u>RECITALS</u>

WHEREAS, the Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Nebraska (the "Bankruptcy Court") on July 31, 2018 (the "Commencement Date") identified as Case Number 18-81124.

WHEREAS, the Debtor remains in possession of its assets, and continues to operate pursuant to 11 U.S.C. §§ 1101, 1107, and 1108.

WHEREAS, the Debtor and the Lessor are parties to that certain unexpired non-residential real property lease described on Exhibit "A," which is attached and incorporated hereto, as may have been amended, modified, renewed, extended, or guaranteed (the "Lease") which Lease covers the real property described in the Lease and briefly described on Exhibit "A."

WHEREAS, on November 26, 2018, the Bankruptcy Court entered an order at Filing No. 115 filed in the bankruptcy case of Eat Fit Go Healthy Foods, LLC, Case No. 18-81127-TLS (the "Order") granting the certain *Motion To Extend Deadline To Assume Or Reject Certain Unexpired Leases Of Nonresidential Real Property* (the "Motion") at Filing No. 96 in the bankruptcy case of Eat Fit Go Healthy Foods, LLC, Case No. 18-81127-TLS, by which the Bankruptcy Court, pursuant to 11 U.S.C. §365(d)(4)(B)(i), extended the period within which the Debtor may assume or reject unexpired leases of non-residential real property, including the Lease, through and including February 26, 2018 (the "Assumption/Rejection Period").

---

[1] The Debtors in this case include: Eat Fit Go Omaha Kitchen, LLC, Eat Fit Go Kansas City Kitchen, LLC, Eat Fit Go Georgia Kitchen, LLC, Eat Fit Go Arizona Kitchen, LLC, Eat Fit Go Healthy Foods - Des Moines, LLC, Eat Fit Go Healthy Foods - Kansas City, LLC, EFG Shared Services, LLC (No Rev), Eat Fit Go Healthy Foods - Omaha, LLC, and Eat Fit Go Healthy Foods - Minnesota, LLC.

[2] Debtor and the Lessor may be referred to herein as the Parties

WHEREAS the Parties hereto have agreed, as permitted by and pursuant to 11 U.S.C. §365(d)(4)(B)(ii), to further extend the Assumption/Rejection Period as provided for herein.

**NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT IS HEREBY STIPULATED AND AGREED THAT:**

1. Extension.  Pursuant to 11 U.S.C. §365(d)(4)(B)(ii), the Assumption/Rejection Period is extended by this agreement of the Parties to the Lease, through and including the earlier of: (i) the entry of an order of the Bankruptcy Court granting Debtor's request to assume or reject the Lease pursuant to 11 U.S.C. §365; or (ii) March 31, 2018 (together, the "Extension Period").

2. Debtor's Performance Under Lease.  Unless otherwise agreed to in writing by Lessor or unless otherwise ordered by the Bankruptcy Court, Debtor shall continue to perform under, and comply with, all of Debtor's obligations and duties under the Lease during the Extension Period.

3. No Admission.  Nothing herein is intended to be or should be construed as an admission as to the validity or invalidity of any claim against Debtor, a waiver of Debtor's rights to dispute any claim, a waiver of Lessor's rights under the Lease, or an approval or assumption of any agreement, contract, or lease under 11 U.S.C. §365.  Debtor expressly reserves its rights to contest any alleged claim arising from or related to any obligation or agreement described herein under applicable bankruptcy and non-bankruptcy law.  Lessor expressly reserves its rights under the Lease, together with Lessor's rights to enforce the terms of the Lease as allowed under applicable law.

4. Authority to Sign.  Each Party has the full right, power, authority and capacity to enter into this Stipulation, and each individual executing this Stipulation on behalf of an entity represents and warrants that he or she has the full right, power, authority and capacity to sign this Stipulation on behalf of the entity for which he or she has signed this Stipulation, and no consent, approval, filing or other action is required as a condition to or in connection with the execution, delivery and performance of this Stipulation by him or her (that has not been obtained or taken).

5. Entire Stipulation; Amendments.  This Stipulation contains the entire agreement and understanding between the Parties pertaining to the subject matter herein and supersedes any and all prior and/or contemporaneous oral or written agreements and understandings, if any, of the Parties in connection therewith.  No change, alteration, modification, termination or amendment of this Stipulation shall be effective or binding unless set forth in a written instrument signed by all the Parties.

6. Binding Nature.  This Stipulation shall be binding upon and shall inure to the benefit of the Parties and their respective legal representatives, estates successors and assigns.

7. Counterparts.  This Stipulation may be executed in counterparts and each such fully-executed counterpart shall constitute an original, all of which together shall constitute one and the same written agreement, and be binding and effective as to all of the Parties. The exchange of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Stipulation by the Parties.

150332870.1

Exhibit "A" – Lease

| Property Description | Lessor Name | Lessee Name | Document Title | Lease Date |
|---|---|---|---|---|
| 34 N 179ᵗ Street Omaha, NE 68118 | 180 Burke, LLC | Eat Fit Go Healthy Foods-Omaha, LLC | Lease Agreement | July 30, 2015 |

150332870.1

8.  <u>Retention of Jurisdiction</u>.  This Bankruptcy Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Stipulation.

--- SIGNATURES BELOW ---

180 Burke, LLC , **Lessor**

By: _____

Its: _MANAGER_

Date: _JANUARY 24, 2019_

**AND**

Eat Fit Go Healthy Foods - Omaha, LLC , **Lessee**

By: _Brock Hubert_

Its: _CEO_

Date: _1-25-19_

150332870.1

# PROPERTY LEASE

This is a Property Lease ("Lease") dated as of July $30^{r}$, 2015 ("Lease Commencement Date"), between 180 Burke, LLC, Nebraska limited liability company ("Landlord") and Eat Fit Go Healthy Foods - Omaha, LLC, a Nebraska limited liability company ("Tenant").

1.    <u>LEASE PROVISIONS</u>.    In the event of any conflict between the following Lease provisions and any other provision of this Lease, such provision below shall govern.

(a)    Landlord:  180 Burke, LLC, a Nebraska limited liability company.

(b)    Landlord's Address for Notices and Rent Payments:  180 Burke, LLC, 1925 North 120th Street, Omaha, NE 68154.

(c)    Tenant's Trade Name:  Eat Fit Go.

(d)    Tenant's Address for Notices:  304 North 179th Street, Omaha, Nebraska 68118.

(e)    Personal Guarantors:    Aaron McKeever (50%)
Sardor Vakhidor (50%)

(f)    Premises: Area outlined in red on Exhibit "A" ("Premises").

(g)    Address of Shopping Center:  203 North 180th Street and 304 North 179th Street, Omaha, Nebraska 68118 ("Shopping Center").

(h)    Building:  Area outlined in yellow on Exhibit "A" containing approximately 12,697 rentable square feet at the address of 304 North 179th Street, Omaha, Nebraska 68118 ("Building").

(i)    Length of Lease Term:  Five (5) Years.

(j)    Option Terms:  One (1) Five (5) Year.

(k)    Approximate Rentable Square Feet of the Premises: 1,414.

(l)    Permitted Use of Premises: Sales of prepackaged and prepared health food and beverages and related items and no other purpose without Landlord's sole consent.

(m)    Security Deposit: $3,417.16.

(n)    Delivery of Possession Date:  August 1, 2015.

(o)    Tenant's Broker:  Holly Jones with the Lund Company who shall be paid a brokerage fee of three percent (3%) of the Rent as set forth in Section 1 (r) below to be paid one half (1/2) upon signed Lease and the remaining one half (1/2) upon Tenant's opening for business.

(p)     Tenant Improvement Allowance PSF:  $25.00.

(q)     Initial Monthly Estimated Common Area Expenses (as defined in Section 8), Insurance (which term means the commercial general liability insurance described in Section 17 and the casualty insurance described in Section 18) and Taxes (as defined in Section 26): $648.08 (estimated at $5.50 PSF for 2015 calendar year).

(r)     Rent: Approximately $ 172,925.05 total minimum rent for the Lease Term payable monthly as follows:

| | |
|---|---|
| December 1, 2015 through November 30, 2016 | $ 2,769.08 |
| December 1, 2016 through November 30, 2017 | $ 2,824.47 |
| December 1, 2017 through November 30, 2018 | $ 2,880.95 |
| December 1, 2018 through November 30, 2019 | $ 2,938.57 |
| December 1, 2019 through November 30, 2020 | $ 2,997.34 |

(s)     Rent Commencement Date: December 1, 2015.

(t)     Lease Expiration Date: November 30, 2020.

(u)     Option Term Rent: See Section 4.

(v)     Option Term Notice Period: Six (6) month's prior to the expiration of the current Lease Term, as applicable.

(w)     Tenant's Percentage Share of the Shopping Center (approximately): 5.6%.

(x)     Approximate Rentable Square Feet of the Shopping Center: 25,394.

2.     <u>LEASED PREMISES</u>.  Except as set forth below, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises that are situated within the Building located in the Shopping Center as shown on Exhibit "A."

3.     <u>LANDLORD'S WORK AND OTHER CONSTRUCTION</u>.  Landlord at its expense will perform the work designated as Landlord's Work in Exhibit "B" and is otherwise delivering the Premises in an "AS IS" condition with all faults; all other work necessary to prepare the Premises for occupancy by Tenant shall be completed by Tenant at its expense after obtaining Landlord's prior written approval of such work. Tenant shall submit to Landlord its plans for Tenant's Work in the Premises for Landlord's written approval, which approval shall not be unreasonably withheld, conditioned or delayed, and shall not commence any of its work in the Premises until such approval has been given. Tenant acknowledges that, except as expressly stated in this Lease, Landlord has made, and by this Lease makes, no representations or agreements as to (a) the remodeling, equipping, alteration, or improvement of the Premises; (b) the construction of any improvements in the Shopping Center; or (c) the tenants of the Shopping Center shown on Exhibit "A".  Landlord reserves the right from time to time in its sole discretion to make alterations and to modify the Common Areas as they may exist, from time to time, provided such alterations shall not materially affect Tenant's use of the Premises, nor impede access to the Common Areas. The exterior walls and roof of the Premises and the area beneath the floor of the Premises are not leased under this Lease, and the use thereof together with the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wire, and structural elements leading through the Premises

2

that will not materially interfere with Tenant's use thereof and serving other parts of the Shopping Center or Building is hereby reserved by the Landlord.

Tenant shall be permitted and treated to the Premises for the purpose of completing Tenant's Work and for any other purposes permitted by Landlord. Such early entry will be at Tenant's sole risk and subject to all the terms and provisions of this Lease as though the Rent Commencement Date had occurred, except for the payment of Rent which will commence on the Rent Commencement Date.

4.    TERM; OPTION TERM; LEASE YEAR. This Lease Term shall commence on the date set forth in Section 1 (s) and shall consist of the number of years set forth in Section 1 (i) plus such additional number of days as may be necessary to cause the Lease Term to end on the last day of a calendar month, unless this Lease is sooner terminated pursuant to other provisions of this Lease. Within ten (10) days after the Rent Commencement Date, Landlord and Tenant shall enter into a written memorandum setting forth the commencement date of the term of this Lease, and the other economic terms in the Economic Terms Agreement set forth in Exhibit "C". If the Premises square footage is different than in Section 1(k), all terms affected by the actual Premises size shall be modified in the Economic Terms Agreement. In the event Landlord delivers the Economic Terms Agreement to Tenant and Tenant does not respond within the time set forth above, then the Economic Terms Agreement shall be considered true and correct and legally binding on the parties.

Provided that Tenant is not then in default beyond any applicable cure period under this Lease, Tenant shall have the option to extend the Lease Term for the option term set forth in Section 1 (j) ("Extended Term") from and after the expiration of the Lease Term by giving written notice to Landlord of the exercise of such option at least the period set forth in Section 1(v) prior to the expiration of the Lease Term as extended, and reaffirmation of the guaranty, if any. If Tenant exercises an option provided in this Lease, then this Lease shall remain in effect during an Extended Term upon all of the same terms and conditions of this Lease, except that the Rent shall be increased by two percent (2%) of the previous Lease Year's Rent on the first day of the Extended Term and each Lease Year thereafter during the Extended Term.

For all purposes of this Lease, the phrase "Lease Year" shall mean the consecutive twelve (12) month period commencing on the first day of the first full calendar month of the Lease Term and each succeeding twelve (12) month period.

5.    RENT. For each Lease Year during the Lease Term, and on a pro rata basis for any period during the Lease Term prior to the commencement of the first Lease Year, Tenant shall pay to Landlord a guaranteed minimum rent in the amount set forth in Section 1 (r) ("Rent") commencing on the Rent Commencement Date. The Rent shall be payable in advance in monthly installments on the first day of each calendar month. The monthly installment of Rent for any period prior to the commencement of the first Lease Year and for any other period of less than a calendar month during the Lease Term shall be prorated on a daily basis and shall be paid by Tenant to Landlord within five (5) days after the end of the period for which it is due.

6.    TENANT IMPROVEMENT ALLOWANCE. In consideration for the performance by Tenant of certain work in the Premises and the timely fulfillment of all of the terms of this Lease, Landlord agrees to pay to Tenant an allowance (the "Tenant Improvement allowance") of the amount set forth in Section 1(p) multiplied by the square feet of the Premises which shall be paid to Tenant within thirty (30) days of the completion of the following items: (i) Rent Commencement Date; (ii) receipt by Landlord from Tenant of the Security Deposit; (iii) receipt of first month's Rent and first month's estimated Tenant's Pro Rata Share of the Operating Expenses; (iv) receipt of a copy of the certificate of occupancy

3

for the Premises; (v) receipt of certificate of insurance naming Landlord as an additional insured; (vi) a copy of the final full notarized lien waiver signed by Tenant's contractor; (vii) fully signed Economic Terms Agreement as set forth in Exhibit "C"; (viii) Tenant's opening for business; and (ix) written confirmation that utilities have been switched to Tenant.

7.    COMMON AREAS.  In addition to the occupancy of the Premises, Tenant and Tenant's employees, agents, customers, and invitees also shall have the right to the non-exclusive use of automobile parking areas, landscaped areas, access roads, service drives, driveways, and sidewalks that are located in the Shopping Center.  Such parking areas, landscaped areas, access roads, service drives, driveways, sidewalks and any area not occupied by a building are collectively referred to as "Common Areas".  Such use of the Common Areas by Tenant and Tenant's employees, agents, contractors, customers, licensees and invitees at all times shall be (i) subject to such reasonable rules and regulations attached as Exhibit "E" and updated from time to time by Landlord which rules and regulations shall apply to all other tenants of the Shopping Center and be evenly enforced by Landlord; and, (ii) in common with other tenants or occupants of the Shopping Center and their respective employees, agents, customers, and invitees.  Tenant shall not use any portion of the Common Areas for the conduct of its business without the prior written consent of Landlord, which may be withheld in its sole discretion.

Notwithstanding anything set out in this Lease to the contrary, it is agreed that: (i) all Common Areas shall be subject to the exclusive control and management of Landlord, and Landlord shall have the right at any time, once or more often, to change the size, area, level, location and arrangement of the access roads, parking areas, and other Common Areas thereon and therein and to permit the owners or occupants of land located outside the Building and Shopping Center and their invitees to use the Common Areas; and (ii) Landlord shall have the right to temporarily close all or any portion of said parking areas and other common facilities in order to make repairs, changes and additions thereto so long as Landlord provides Tenant with no less than ten (10) business days advance written notice.

8.    COMMON AREA MAINTENANCE.    Except as otherwise provided in this Lease, Landlord shall operate, manage, equip, light, maintain, repair and replace the Common Areas during the Lease Term in accordance with reasonable standards of cleanliness and maintenance comparable to other retail buildings of the same type, location and size.  Tenant, at its expense, shall keep the Common Areas free of litter, trash, and debris generated by or resulting from the operation of Tenant's business in and about the Premises and shall keep the sidewalks adjacent to the Premises free of ice, snow, debris and temporary or moveable obstructions. Tenant shall pay to Landlord, as additional rent, an amount (the "Common Area Charge") for each calendar or partial year during the Lease Term equal to "Tenant's Share," as defined below, of all costs and expenses in operating, managing, equipping, policing and protecting, lighting, repairing, replacing, resurfacing, restriping, and maintaining the Common Areas (collectively the "Common Area Expenses").  Such costs and expenses shall include, but not be limited to: cleaning, trash removal (including providing dumpsters for tenants use), fire protection, snow and ice removal, landscaping, planting and replanting, holiday decorating and lighting, gas, water and sewer charges, premiums for liability, property damage, fire, and workmen's compensation insurance (to the extent not covered by Tenant's Liability Insurance Contribution under Section 17 and Tenant's Casualty Insurance Contribution under Section 18), salaries of management personnel specifically attributable to the Shopping Center, unemployment taxes, social security taxes, personal property taxes, fees for required licenses and permits, supplies, maintenance and repair of plumbing, electrical, and fire protection systems, storm and sanitary sewers and other utility systems to the point where such systems enter the Building, reasonable costs of painting the exterior of the Building, roof repair and replacement, required off-site and storm water detention facilities, if any, maintenance and repair of the sprinkler system or any part thereof (whether performed in the Common Areas, the Premises, or any other site within the Shopping Center), repair and replacement of parking lots, private streets, sidewalks and curbs, pest control,

4

installation, repair and replacement of the monument sign (if all tenants of the Building are permitted to place their sign thereon), directional signs, rental charges for and depreciation of owned equipment and machinery employed directly or indirectly in the operation of the Common Area, capital expenditures required by any governmental authority whether or not applicable to the Building or Common Area at the time the Shopping Center was initially constructed, reasonable management fee not to exceed six percent (6%) of the Rent and an administrative charge equal to fifteen percent (15%) of the cost and expense of operating and maintaining the Common Areas, repair, maintenance and cleaning of all the Common Areas, reasonable reserves for replacement of all roofs and parking lots in the Shopping Center, and all reasonable costs, charges, and expenses incurred by Landlord in connection with any change of any company providing electrical, gas, telephone, cable, fiber optic, or water service to the Building, including without limitation, maintenance, repair, installation, and service costs associated therewith, and any business owner association expenses assessed to the Shopping Center. Notwithstanding the foregoing contents of this Section, Common Area Expenses shall not include: (i) the initial cost of any construction of the Shopping Center or any part thereof; (ii) expenses or brokerage fees and commissions for the sale or leasing of space in the Building, including commissions legal expenses, or advertising; (iii) such portion of any expense for which Landlord is entitled to reimbursement by insurance proceeds, condemnation awards, other tenants, or any other source; (iv) cost of performing additions, alterations, improvements, or individual services for other tenants or vacant or vacated space; (v) any payments required in connection with any debt or ground lease encumbering the Shopping Center; (vi) costs and expenses of enforcing lease provisions against other tenants in the Building, including legal fees; (vii) expenses resulting from a violation of Landlord of the terms of any lease of space in the Building or of any ground lease or mortgage to which this Lease is subordinate; (viii) such portion of any Common Area expense representing a discount, rebate, or refund; (ix) the cost of capital improvements; (x) expenses for repairs, replacements, and general maintenance which is caused by fire, windstorm, casualty or any other insurable occurrence; (xi) principal and interest payments; (xii) depreciation of the Shopping Center improvements or its contents or components; accounting and legal fees relating to the ownership, construction, leasing or sale of the Shopping Center; (xiii) all expenses directly resulting from the negligence or willful misconduct of the Landlord, its agents, servants or other employees; (xiv) all bad debt loss, or rent loss; (xv) services provided by Landlord's affiliates to the extent such costs are in excess of that which would be incurred in an arm's length transaction; (xvi) costs attributable to faulty, defective or improper construction or design of the Premises or the Shopping Center; (xvii) costs or expenses attributable to the negligent or willful acts or omissions of Landlord, its agents, employees or contractors; (xviii) Landlord's general corporate overhead and general and administrative expenses; (xix) costs arising from another tenant's or any of its agents or contractor's material negligence or intentional acts; (xx) costs arising from Landlord's charitable or political contributions; (xxi) fines, penalties and late payment charges incurred by Landlord due to violations of law or violations of permits by Landlord pertaining to the Shopping Center. In the event any item of Common Area Expenses serves or benefits one or more properties in addition to all or part of the Shopping Center, the expense attributable to such item included in Common Area Expenses shall be equitably prorated by Landlord.

Tenant's Share of the costs and expenses referred to in this Section shall be that portion of the whole that the rentable square foot area of the Premises (the "Numerator") bears to the aggregate rentable square foot area of the Shopping Center as of January 1 of each calendar year (the "Denominator"). The annual Common Area Charge to Tenant shall be paid in monthly installments, on the first (1st) day of each calendar month, in advance, based upon Landlord's estimate of the annual Common Area Expenses. If Landlord provides parking lot lighting in the Shopping Center after the normal operational hours of the other tenants of the Shopping Center at Tenant's request, then Tenant shall pay to Landlord for such extended parking lot lighting, as additional rent, such extra amount (in addition to the basic Common Area Charge) as Landlord from time to time reasonably may determine to be attributable to such extended

parking lot lighting; Tenant shall pay such extra amount monthly in advance concurrently with Tenant's payments of the monthly installments of Rent starting on the Rent Commencement Date.

At the end of each year, an analysis of the total year's actual Common Area Expenses, Taxes, and Insurance will be provided to Tenant ("End of Year Analysis"). If the actual Common Area Expenses, Taxes, and Insurance were more than the estimated Common Area Expenses, Taxes, and Insurance for Tenant's Share, then Tenant shall pay the difference between the actual Common Area Expenses, Taxes, and Insurance and the estimated Common Area Expenses, Taxes, and Insurance within thirty (30) days of its written notice thereof for Tenant's Share. If the actual Common Area Expenses, Taxes, and Insurance were less than the estimated Common Area Expenses, Taxes, and Insurance, then Landlord shall apply such difference as a credit towards the following year's estimated Common Area Expenses, Taxes, and Insurance for Tenant's Share.

In the event this Lease terminates at any time other than the last day of a calendar year, the Common Area Expenses, Taxes, and Insurance shall be determined as of, and prorated through, the date of termination. At the end of the calendar year in which any termination occurs, if Tenant's payments of estimated Common Area Expenses, Taxes, and Insurance exceeded the actual prorated Common Area Expenses, Taxes, and Insurance, then Landlord, after prior written notice to Tenant, shall apply the excess as a credit against Tenant's other obligations under this Lease and provide the Tenant with a check for the remaining amount, if any within thirty (30) days of the end of the calendar year. However, if Tenant's payments of estimated Common Area Expenses, Taxes, and Insurance were less than the actual prorated Common Area Expenses, Taxes, and Insurance for Tenant's Share, then Landlord shall notify Tenant the amount of the difference owed Landlord, and Tenant shall within thirty (30) days of its written receipt of such notice provide Landlord with the balance due Landlord.

Notwithstanding the foregoing, certain expenses concerning the operation of the Common Area including but not limited to a common area grease trap, shall only be paid by those tenants utilizing such grease trap or other service, all based on the quotient of rentable square footage of the Premises divided by the rentable square footage of all the tenants utilizing such service. Such expenses as set forth in this paragraph shall be paid by Tenant in addition to the Common Area Charge and other charges contained in this Lease.

Tenant shall have the ongoing right to audit Landlord's books and records of Landlord's Common Area Expenses for the Shopping Center each year within one hundred and twenty (120) days of Tenant's receipt of the End of Year Analysis for such prior calendar year, provided such audit is conducted pursuant to the following terms and conditions; (a) once commenced, such audit shall be completed in a diligent and expeditious manner; (b) Tenant shall supply Landlord with a copy of the result of the audit within sixty (60) days after Tenant's receipt of same; (c) no audit shall be conducted if Tenant has previously conducted an audit for the same time period; (d) (i) such audit shall be conducted during normal business hours, at a mutually agreed upon time, at Landlord's business address or at such other location as Landlord normally keeps its books and records of such Common Area Expenses or (ii) at Tenant request Landlord shall furnish records electronically or via mail to Tenant's notice address within 30 days of Tenant's request; (e) any information obtained by Tenant as a result of such audit shall be held in strict confidence by Tenant and shall not be disseminated further except to Tenant's accountants, attorneys and lenders; (f) no subtenant shall have any right to conduct an audit and no assignee shall conduct an audit for any period during which such assignee was not in possession of the Leased Premises. Any audit shall be at Tenant's sole cost and expense, provided that, in the event that such audit reveals Landlord overstated Tenant's share of Common Area Expenses in an amount equal to or greater than six percent (6.0%), Landlord shall pay to Tenant, within thirty (30) days after receipt of an invoice therefore from Tenant, Tenant's costs

incurred in the performance of said audit not to exceed Five Hundred and no/100 Dollars ($500.00) as well as the amount of any overpayment by Tenant. The provisions of this subparagraph shall survive the termination or expiration of this Lease.

9.    PERMITTED USE.    Tenant shall use the Premises only for the permitted use set forth in Section 1(l), and no other purpose without the approval of Landlord in its sole discretion. Tenant agrees at all times to conduct its business in the Premises in a dignified, ethical, responsible, and reputable manner consistent with the highest standards of service and merchandising and at all times to comply with all laws, ordinances, and governmental regulations affecting the Premises and its cleanliness, safety, occupancy, and use. Tenant shall prohibit its customers from loitering or congregating in the Common Areas and from becoming a nuisance or otherwise disturbing the other tenants of the Building and their respective customers, employees, and invitees. Tenant agrees not to do or omit to do anything that would cause an increase in the premiums of the casualty insurance that Landlord maintains on the Shopping Center over and above the premiums that otherwise would be in effect for such insurance.

10.    OPERATION OF BUSINESS.    Tenant shall (a) continuously, actively, and diligently use, occupy and conduct its business in the Premises; (b) remain open for business during customary business days and hours for similar businesses in the city or trade area where the Shopping Center is located; (c) adequately staff its store as may be necessary to operate the business; (d) keep its display windows and signs, if any, well lit during all business hours; (e) keep the Premises and both the exterior and interior portions of windows, doors, and other glass or plate glass fixtures therein in neat, clean, sanitary, and safe conditions; (f) warehouse, store, or stock only such goods, wares, and merchandise in the Premises as Tenant intends to offer for sale at retail in the Premises; (g) neither solicit business nor distribute advertising matter in the Common Areas; (h) not place an excessive weight upon the floor of the Premises; (i) not erect any interior or exterior signs that can be seen from the outside, without first obtaining Landlord's written consent; (j) not place or permit any radio or television antenna, loud speaker, or sound amplifier, or any phonograph or other devises similar to any of the foregoing, on the roof or outside of the Premises or at any other place where it may be seen or heard outside of the Premises; and, (k) not permit noise, sounds, activities, odors, or disturbances within the Premises that interfere or are likely to interfere with the businesses of other tenants in the Shopping Center.

11.    LANDLORD'S COVENANTS.    Landlord covenants that it is or will be the owner of the Shopping Center and that Landlord has full power and authority to make this Lease with Tenant. Landlord further covenants that Tenant, upon the complete and timely payment of all Rent and performance of all of Tenant's other obligations under this Lease, shall peacefully and quietly have, hold, and enjoy the occupancy of the Premises throughout the Lease Term or until this Lease is sooner terminated in accordance with its provisions, without any disturbance from Landlord or anyone claiming, by, through, or under Landlord. Landlord covenants that HVAC system for the Premises will be in good working order and repair for one (1) year following the Rent Commencement Date.

12.    LIENS.    Tenant shall have no authority to cause or permit a mechanic's, construction, or other lien to arise or be perfected with respect to the Premises or any part thereof and shall so advise any contractor performing any work or providing any materials for Tenant in or with respect to the Premises. If any mechanic's, construction, or other lien is filed against the Shopping Center or any part thereof for any reason whatsoever by reason of Tenant's acts or omissions or because of a claim against Tenant, then Tenant shall cause such lien to be canceled and discharged of record by bond or otherwise within thirty (30) days after written request by Landlord.

13.    MAINTENANCE AND REPAIRS.    Except as otherwise provided in this Lease, Landlord shall keep and maintain the foundation, exterior walls and other structural portions of the

7

Premises in good condition and repair at all times during the Lease Term and shall comply with all applicable laws, ordinances, rules and regulations of any federal, state, or local governmental agency or subdivision having jurisdiction over the Shopping Center, except for damage thereto caused by the negligent or intentional acts or omissions of Tenant or any of Tenant's contractors, employees, agents, customers, or invitees. All costs and expenses incurred by Landlord under this Section 13 shall be included in Common Area Charges after the initial construction of the buildings. Tenant shall not penetrate or affix anything to the roof of the Building without the prior written consent of Landlord, which consent may include the location of such penetrations and the requirement that Landlord's approved contractor be used to perform such work; notwithstanding such consent, Tenant shall be responsible for and shall at its expense repair any damage to the roof of the Premises resulting from any penetration of the roof of the Premises made by Tenant or its agents or contractors for the purpose of installing vents, exhaust fans, or similar devices serving the Premises or for any other purpose.  Tenant, at its expense, shall repair any damage to any portion of the Premises caused by the acts, negligent or intentional, or omissions of Tenant or any of Tenant's contractors, employees, agents, customers, or invitees.  Except for those items for which Landlord is responsible pursuant to the first sentence of this Section, Tenant, at its expense, shall keep and maintain the Premises in good, safe, and sanitary condition and repair at all times during the Lease Term in such manner as Landlord and any insurer of the Premises reasonably may require and also as may be required to comply with all applicable laws, ordinances, rules, and regulations of any federal, state, or local governmental agency or subdivision having jurisdiction over the Premises.  Tenant's responsibilities under this Section shall include but are not limited to all plate glass windows and window frames, and all door frames and hardware serving the Premises and the fixtures, equipment, utilities, and other systems serving or constituting a part of the Premises (including but not limited to the lighting, heating, air conditioning, ventilating, plumbing, electrical, sanitary sewer within the Premises to the point at which such sewer enters the Building in which the Premises are situated, and all other mechanical systems and equipment serving the Premises). Tenant, at its expense, promptly shall make any and all such repairs and replacements that may be required to comply with the obligations of Tenant under this Section, in each case in a good and workmanlike manner, using materials, fixtures, and equipment whose quality is at least equal to that of the materials, fixtures, and equipment being repaired or replaced.  Tenant will solely be responsible for the maintenance, repair and replacement of the HVAC units throughout the Lease Term.  On or before the Rent Commencement Date and throughout the Lease Term, Tenant shall contract with a reputable heating and air conditioning contractor who shall provide at least quarterly maintenance inspections, service, repair, and replacements of all parts (including filters) to the heating and air conditioning equipment serving the Premises.  Within sixty (60) days of the beginning of each Lease Year during the Lease Term or upon request by Landlord, Tenant shall provide Landlord evidence of the existence of such maintenance contract and shall provide Landlord with copies of inspection reports and maintenance activities.

14.    SIGNS AND TRADE FIXTURES.  Tenant shall install upon the exterior of the Premises a sign ("Tenant's Sign") relating solely to Tenant's business in the Premises that (i) complies with all applicable laws, ordinances, and governmental regulations; (ii) will likely cause no damage to the Premises or the Building in which the Premises are located; and, (iii) will comply in all respects with the sign criteria prescribed by Landlord as set forth in Exhibit "F" ("Building Sign Criteria"), attached to this Lease. Prior to installing Tenant's Sign, Tenant first shall submit to Landlord plans for such sign, showing the location of such sign, all details (to scale) and colors thereof, and shall obtain Landlord's prior written approval of such sign. Tenant shall remove such sign as set forth in Section 58 upon the earlier of the Lease Expiration Date or upon the termination of Tenant's right to possession without termination of the Lease.  Such restoration and repainting shall be (a) performed by a contractor approved by Landlord in writing by Landlord, and (b) accomplished in accordance with Landlord's specifications and requirements.  Tenant shall not place or erect any sign or other devices upon any of the Common Areas. Tenant may install in the Premises and remove therefrom such trade fixtures as Tenant may deem

necessary or appropriate to its business operations. Any damage to the Premises that may be caused by the removal of any of Tenant's trade fixtures shall be repaired by Tenant at its expense immediately upon the removal of any of such trade fixtures. In addition, in the event that Landlord installs a Shopping Center sign on or about the Shopping Center other than an entrance monument sign that contains the name of the Shopping Center, Landlord agrees that Tenant shall have the right to space on such sign in at least the proportion that the Premises bears to the aggregate rentable square foot area of the Building.

15.    ALTERATIONS BY TENANT. Tenant, at its expense, during the Lease Term may make such non-structural alterations to the interior of the Premises without Landlord's consent as it deems appropriate, provided: (i) the work is subject to the requirements set forth in the Work Agreement set forth in Exhibit "B"; (ii) the structural integrity of the Premises is not thereby affected or diminished; (iii) the roof of the Premises is not affected; (iv) the exterior appearance (including the store front) of the Premises is not thereby altered or changed; and, (v) the cost of any such alteration does not exceed Twenty Thousand Dollars ($20,000.00). In all other instances, Tenant shall secure the prior written approval of Landlord before making any alterations, which approval shall not be unreasonably withheld, conditioned or delayed. In all cases, Tenant must obtain Landlord's written consent before making any roof penetrations for the purpose of installing vents, exhaust fans, or similar devices to serve the Premises or for any other purpose. At the time Landlord's approval of any alterations is sought, Tenant shall submit to Landlord plans and specifications for such work, together with a statement of the estimated cost of such work. All such alterations shall be completed in a good and workmanlike manner with first-class materials and workmanship. Tenant shall make no additions or alterations whatsoever to the exterior of the Premises without the prior written consent of Landlord. Any additions or alterations made to the interior of the Premises by Tenant shall remain a part of the Premises and be surrendered upon the expiration or termination of this Lease.

16.    INDEMNIFICATION. Tenant agrees to indemnify Landlord against and to hold Landlord harmless from any and all claims or demands of any third party arising from or based upon any alleged act, omission, or negligence of Tenant or Tenant's contractors, agents, invitees, customers, employees, or anyone else for whom Tenant may be responsible. In the event that Landlord shall, without fault on its part, be made a party to any litigation commenced by any third party against Tenant, then Tenant shall indemnify and hold Landlord harmless from such litigation and shall pay all costs, expenses, and reasonable attorneys' fees incurred or paid by Landlord in connection with such litigation, together with any judgments rendered against Landlord. Landlord agrees to indemnify Tenant against and to hold Tenant harmless from any and all claims or demands of any third party arising from or based upon any alleged act, omission, or negligence of Landlord or Landlord's agents, employees, or anyone else for whom Landlord may be alleged to be responsible. In the event that Tenant shall, without fault on its part, be made a party to any litigation commenced by any third party against Landlord, then Landlord shall indemnify and hold Tenant harmless from such litigation and shall pay all costs, expenses, and reasonable attorney's fees incurred or paid by Tenant in connection with such litigation, together with any judgments rendered against Tenant.

17.    PUBLIC LIABILITY INSURANCE. Landlord at all times during the Lease Term and any other period of occupancy of the Premises by Tenant shall obtain and keep in force with respect to the Common Areas a Commercial General Liability insurance policy in an amount determined by Landlord and in a form customarily written for the protection of owners, landlords, and tenants of real estate, which insurance shall provide coverage for both Landlord and Tenant of not less than $5,000,000 for each occurrence of bodily injury or property damage; provided, that Tenant shall pay to Landlord for each calendar year during the Term, as additional rent, Tenant's "Liability Insurance Contribution" (as defined in the following sentence). For purposes of this Lease, Tenant's "Liability Insurance Contribution" for each calendar year during the Term shall be the Tenant's Share, as defined in Section

9

8, of the premiums actually paid by Landlord during such calendar year for the insurance coverage referred to in this Section; provided, that not more than twelve (12) months' premiums shall be taken into account by Landlord for purposes of determining Tenant's Liability Insurance Contribution for any calendar year; and, provided further, that if Landlord pays more than twelve (12) months' premiums during any calendar year, then the premiums for the period in excess of twelve (12) months (to the extent not previously taken into account for purposes of this Section) shall be carried forward to the next calendar year or years and shall be taken into account by Landlord for purposes of computing Tenant's Liability Insurance Contribution for such next calendar year or years. Tenant shall pay to Landlord, concurrently with Tenant's payments of the monthly installments of Rent, an amount equal to one-twelfth (1/12) of Tenant's estimated Liability Insurance Contribution for the current calendar year, as determined annually and communicated to Tenant in writing by Landlord; within sixty (60) days after the end of each calendar year, Tenant shall pay to Landlord any unpaid portion of its actual Liability Insurance Contribution for such calendar year or shall be entitled to a credit from Landlord for any excess Liability Insurance Contribution actually paid by Tenant for such calendar year. Tenant's Liability Insurance Contribution for the first and final calendar years during the Term shall be prorated if such first or final calendar years during the Term contain less than twelve (12) full months.

Tenant at its expense, at all times during the Lease Term and any other period of occupancy of the Premises by Tenant shall obtain and keep in force with respect to the Premises Commercial General Liability insurance in a form customarily written for the protection of tenants of real estate, with Landlord as an additional insured and Tenant as a named insured, which insurance shall provide coverage of not less than $2,000,000.00 for each occurrence of bodily injury or property damage. The policies for all such insurance shall provide that they may not be canceled without at least thirty (30) days prior written notice to Landlord. Prior to Tenant's taking possession of the Premises, Tenant shall furnish to Landlord appropriate certificates evidencing that such insurance is in force and that Landlord is named as an additional insured thereunder.

18.    CASUALTY INSURANCE. Landlord at all times during the Lease Term and any other period of occupancy of the Premises by Tenant shall obtain and keep in force with respect to the Shopping Center (i) a Special Form insurance policy insuring against physical loss or damage and (ii) insurance against loss of rents, in amounts and with a co-insurance feature determined by Landlord; provided, that Tenant shall pay to Landlord for each full or partial calendar year during the Lease Term, as additional rent, Tenant's Casualty Insurance Contribution (as defined in the following sentence). For purposes of this Lease, Tenant's "Casualty Insurance Contribution" for a calendar year during the Term shall be the Tenant's Share, as that term is defined in Section 8 of this Lease, of the premiums actually paid by Landlord during such calendar year for the insurance coverages referred to in this Section; provided, that not more than twelve (12) months' premium shall be taken into account by Landlord for purposes of determining Tenant's Casualty Insurance Construction for any calendar year; and, provided further, that if Landlord pays more than twelve (12) months' premiums during any calendar year, then the premiums for the period in excess of twelve (12) months (to the extent not previously taken into account for purposes of this Section) shall be carried forward to the next calendar year or years and shall be taken into account by Landlord for purposes of computing Tenant's Casualty Insurance Contribution for such next calendar year or years. Tenant shall pay to Landlord, concurrently with Tenant's payments of the monthly installments of Rent starting on the Rent Commencement Date, an amount equal to one-twelfth (1/12) of Tenant's estimated Casualty Insurance Contribution for the current calendar year, as determined annually and communicated to Tenant in writing by Landlord; within thirty (30) days after receipt of Landlord's statement of insurance premiums, Tenant shall pay to Landlord any unpaid portion of its actual Casualty Insurance Contribution for such calendar year or shall be entitled to a credit from Landlord for any excess Casualty Insurance Contribution actually paid by Tenant for such calendar year. Tenant's Casualty Insurance Contribution for the first (1st) and final calendar year during the Lease Term shall be prorated

10

if such first or final calendar year during the Lease Term contains fewer than twelve (12) full months. Tenant understands and acknowledges that the insurance that this Section requires Landlord to obtain and keep in force will not cover any of Tenant's property, including but not limited to leasehold improvements and betterments.

Tenant agrees, at its expense, during the Lease Term and any other period of occupancy of the Premises by Tenant, to obtain and keep in force with respect to Tenant's leasehold improvements and betterments, inventory, fixtures and equipment, signs (including any exterior identification signs), and other personal property in the Premises, Special Form insurance for the replacement value of such property; Landlord shall be included as an additional insured under the policies providing such insurance with respect to Tenant's leasehold improvements, and Tenant shall furnish Landlord with an appropriate certificate evidencing that all such insurance is in force and that Landlord is an additional insured thereunder as to such leasehold improvements; and, such policies shall provide that they may not be canceled without at least thirty (30) days' prior written notice to Landlord.

All insurance required by either party under this Lease will contain a waiver of subrogation and Landlord and Tenant shall, upon request from the other, promptly provide to such requesting party proof that such a waiver is in effect on all insurance required hereunder.

19.    DAMAGE BY INSURED CASUALTY. If the Premises shall be partially or wholly damaged or destroyed by fire or any other casualty covered by the insurance maintained by Landlord pursuant to Section 18, then Landlord shall proceed to repair and restore the Premises to at least the condition the Premises were in immediately prior to such damage or destruction; provided, that Landlord's work shall not include the repair or restoration of any improvements installed or other work done by Tenant in or about the Premises. If the Building or the Premises is more than fifty percent (50%) damaged or destroyed by fire or any other casualty covered by such insurance, then Landlord shall have the option either to cancel this Lease by notice to Tenant in writing within sixty (60) days after the occurrence of such damage or destruction or to repair and restore the Premises or the Building to such condition it was in immediately prior to such damage or destruction, in which latter event this Lease shall continue in full force and effect; provided, that Landlord's work shall not include the repair or restoration of any improvements installed or other work done by Tenant in or about the Premises. If Landlord repairs or restores the Premises or the Building, as the case may be, pursuant to this Section, then Tenant at its expense promptly shall repair, restore, or replace all of its leasehold improvements and betterments, trade fixtures, and personal property damaged or destroyed by such fire or other casualty.

20.    DAMAGE BY UNINSURED CASUALTY.    If the Building shall suffer damage by virtue of any casualty not covered by the insurance maintained by Landlord pursuant to Section 18, then Landlord at its option either (a) may repair and restore the Building so as to be fit for occupancy within a reasonable time after the occurrence of such damage or (b) within sixty (60) days after the occurrence of such damage may terminate this Lease by giving Tenant notice in writing of such termination. If Landlord exercises its option to repair and restore the Building pursuant to this Section, then it shall give Tenant written notice of the exercise of such option within sixty (60) days after the occurrence of such damage and then shall proceed with reasonable diligence to make such repairs and restoration; provided, that Landlord's work shall not include the repair or restoration of any improvements installed or other work done by Tenant in or about the Premises. In such latter event, Tenant, at its expense, promptly shall repair, restore, or replace all of its leasehold improvements and betterments, trade fixtures, and personal property damaged by such casualty. If the uninsured damage referred to in this Section is caused by the negligent or intentional act or omission of Tenant or any of Tenant's contractors, employees, agents, customers, or invitees, then notwithstanding any other provision of this Section, Tenant at its expense forthwith shall repair such damage.

11

21.    ABATEMENT OF RENT.  In the event of any damage to or destruction of the Premises that makes the Premises in whole or in part unfit for use by Tenant in the normal course of its business in the Premises, then the Rent, or a proportionate part thereof based upon that portion of the Premises that is unfit for use by Tenant in the normal course of its business, shall abate until the Premises have been repaired or restored by Landlord in accordance with Section 19 or Section 20, as the case may be.

22.    PARKING.  Tenant and its employees shall park their motor vehicles only in the areas of the Shopping Center specifically designated from time to time by Landlord for that purpose that are currently located along 180th Street starting from south to north.  At Landlord's request, Tenant agrees to furnish Landlord with a list of the automobile license plate numbers of Tenant's employees.

23.    ASSIGNMENT AND SUBLETTING.  Tenant shall have no right to assign, mortgage, or encumber this Lease or to sublet the whole or part of the Premises, transfer this Lease by operation of law, sale, transfer of ownership or otherwise, or permit any other person except agents and employees of Tenant to occupy the Premises, or any part thereof, without the prior written consent of Landlord, which shall be in its sole discretion. In the event Landlord provides its consent, Tenant and its guarantors shall remain primarily liable to Landlord for the payment of the Rent and the performance of all of Tenant's other obligations under this Lease for the remainder of the Lease Term, and reimburse Landlord for the legal fees incurred by Landlord in connection with the transaction in the amount of One Thousand Dollars ($1,000.00).  Tenant shall not allow, or permit any transfer of this Lease, or of any interest in or rights under this Lease, by operation of law and shall not mortgage, pledge, or encumber this Lease, or any interest herein.

24.    ENTRY BY LANDLORD.  Landlord shall have the right to enter upon the Premises at all reasonable hours for the purpose of inspecting the Premises, for the purpose of making repairs, additions, utility lines and conduits or alterations thereto, or for any other lawful purpose; provided, that such entry shall not unreasonably interfere with the conduct of Tenant's business.  For a period commencing six (6) months prior to the expiration of this Lease or when any existing option has expired or when Tenant is in default of this Lease, Landlord may have reasonable access to the Premises for the purpose of exhibiting the Premises to prospective tenants thereof.

25.    UTILITIES.  Tenant shall pay for all gas, water, electricity, telephone, and other utility services used or consumed in or about or furnished to the Premises during the Lease Term and shall pay all sewer use fees or similar charges made or imposed with respect to or against the Premises during the Lease Term. Tenant shall hold Landlord and the Premises harmless from all liens, charges, and costs with respect to such items.  Tenant agrees that it will not install any equipment that would exceed or overload the capacity of any utility facilities serving the Premises and that if any equipment installed by Tenant requires additional utility facilities, such additional utility facilities shall be installed at Tenant's expense in accordance with plans and specifications approved in writing in advance by Landlord.  Except for the gross negligence or intentional acts of Landlord or its agents, Landlord shall not be liable for any interruption in the supply of any utilities, and Landlord does not guarantee the availability of any utilities. Tenant's payments for utility services shall be made directly to the utility or to the provider of such service if the services are separately metered or billed to Tenant by such utility or other provider.  If Landlord provides any of such utility services to Tenant because they are not or cannot be separately metered or billed to Tenant, then Tenant shall pay to Landlord, within ten (10) days after receiving a statement therefor from Landlord, Tenant's equitable share of the billing received by Landlord for such utility service, which share shall be determined by Landlord in its reasonable discretion, taking into account such factors, including but not limited to the nature of Tenant's business, as Landlord reasonably may consider

12

to be appropriate. Landlord reserves the reasonable right to select and change the gas, water, electric, telephone, cable, fiber optic, and other utility service providers that service the Shopping Center.

26.    REAL ESTATE TAXES. Landlord agrees to pay, prior to delinquency, the general real estate taxes and installments of special taxes, assessments, or levies of any kind (however denominated) payable during the Lease Term (collectively referred to in this Section as the "Taxes") on the land and improvements constituting the Shopping Center; provided, that Tenant shall pay to Landlord for each Lease Year, as additional rent, Tenant's Tax Contribution (as defined in the following sentence). For purposes of this Lease, Tenant's "Tax Contribution" for a Lease Year shall be the Tenant's Share, as that term is defined in Section 8, of the Taxes actually paid by Landlord during such Lease Year, regardless of the tax period to which such Taxes relate; provided, that not more than twelve (12) months' Taxes shall be taken into account by Landlord for purposes of determining Tenant's Tax Contribution for any Lease Year; and, provided further, that if Landlord pays more than twelve (12) months' Taxes during any Lease Year, then the Taxes for the period in excess of twelve (12) months (to the extent not previously taken into account for purposes of this Section) shall be carried forward to the next Lease Year or Lease Years and shall be taken into account by Landlord for purposes of computing Tenant's Tax Contribution for such next Lease Year or Lease Years. Tenant shall pay to Landlord, concurrently with Tenant's payments of the monthly installments of Rent starting on the Rent Commencement Date, an amount equal to one-twelfth (1/12) of Tenant's estimated Tax Contribution for the current Lease Year, as determined annually and communicated to Tenant in writing by Landlord; within sixty (60) days after the end of each Lease Year, Tenant shall pay to Landlord any unpaid portion of its actual Tax Contribution for such Lease Year or shall be entitled to a credit from Landlord for any excess Tax Contribution actually paid by Tenant for such Lease Year. Tenant's Tax Contribution for the final Lease Year shall be prorated if such final Lease Year contains less than twelve (12) full months. Tenant agrees to pay when due all property taxes of any kind that during the Lease Term may be assessed against any personal property, fixtures, or leasehold improvements of Tenant at any time located in or about the Premises. Tenant agrees to pay, either as Common Area Charge or upon receipt of an invoice from Landlord, Tenant's Share of any fees and expenses charged by Landlord's tax consultants, if any, and/or fees and expenses (including, without limitation, attorneys' fees and accountants' fees) incurred by Landlord in connection with the pursuit of any reduction, refund, or revaluation of the real estate taxes.

27.    HOLDOVER. In the event that Tenant remains in possession of the Premises after the expiration or termination of this Lease, then Tenant shall be deemed to be occupying the Premises as a Tenant from month-to-month, subject to all of the conditions, provisions, and obligations of this Lease, but without any rights to extend the Lease Term; provided, that the Rent payable by Tenant during any such period of holdover shall be computed at the rate of one hundred fifty percent (150%) multiplied by the Rent payable by Tenant during the Lease Year most recently ended. Landlord's acceptance of Rent from Tenant in such event shall not alter the status of Tenant as a month-to-month tenant whose occupancy of the Premises may be terminated by Landlord at any time upon one month's notice in advance.

28.    WAIVERS. One or more waivers by Landlord or Tenant of a breach of any covenant or condition by the other of them shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by Landlord or Tenant to or of any act by either requiring the other's consent or approval shall not be deemed to waive or render unnecessary either party's consent to or approval of any subsequent similar act by the other party. No waiver or consent of either party shall be binding unless in writing, and Landlord's acceptance of Rent with knowledge of the existence of any breach of this Lease by Tenant shall not constitute a waiver of such breach.

29.    WAIVER OF CLAIMS. Each party hereby waives any and all claims for or rights of recovery that such party or anyone claiming through such party may have against the other party (or such

13

other party's officers, agents, or employees) for or with respect to any loss of or damage to such waiving party's property or for any business interruption that is insured or indemnified under valid insurance policies, whether or not such loss, damage, or business interruption is caused by the negligence of such other party or such other party's officers, agents, employees, or any other party or such other party's officers, actions, employees, or any other person or persons for whose actions such other party may be responsible or liable; provided, that the foregoing waiver shall be effective only to the extent of the insurance proceeds actually collected under such policies in respect of such loss, damage, or business interruption and only when permitted by the applicable insurance policy. Such waiver of claims and rights by Tenant also shall operate as a similar waiver in favor of the other tenants of the Building and the respective officers, agents, and employees of such other tenants.

30.     NOTICES. Whenever under this Lease a provision is made for notice of any kind, such notice and the service thereof shall be deemed sufficient if such notice is in writing addressed to Landlord or Tenant, as the case may be, at the address for each set forth in Section 1 and is delivered personally or sent by a nationally recognized courier service such as Federal Express or by United States certified mail with postage prepaid. Either party may by notice to the other party change the address at which it wishes to receive any notice given under this Lease. Notice shall be deemed delivered (i) on the third day following the date of mailing, (ii) one day after the date of deposit with a nationally recognized courier service, or (iii) the date of personal delivery, as the case may be.

31.     RELATIONSHIP OF PARTIES. Nothing contained in this Lease shall be deemed or construed by Landlord or Tenant, or by any third party, to create the relationship of principal and agent or of partnership or of joint venture between Landlord and Tenant, it being understood and agreed that neither the method of computation of Rent, nor any other provision contained in this Lease, nor any act of Landlord or Tenant shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

32.     NO LIABILITY OF LANDLORD. Landlord shall not be responsible or liable to Tenant or anyone claiming through Tenant for any loss or damage that may be caused by or through the acts or omissions of persons occupying premises adjacent to the Premises or in any other part of the Shopping Center (or of their customers, employees, agents, or invitees) or for any expense, loss, or damage sustained by Tenant or anyone claiming through Tenant from (a) the bursting, stoppage, or leaking of water, gas, sewer or steam pipes, downspouts, tanks, drains, or fixtures, wherever located; (b) broken glass, (c) water, snow, or ice upon the Shopping Center or any portion thereof; (d) theft or other dishonest act by anyone other than Landlord; (e) water, wind, or other weather or natural condition or event; or, (f) defects in the Premises or any fixtures or equipment therein for which Landlord is not responsible under the terms of this Lease.

33.     BANKRUPTCY. In the event Tenant becomes the subject of voluntary or involuntary proceedings under the federal bankruptcy statutes then in effect, Landlord shall have all of the rights and remedies that are available to a landlord under such statutes in such an event. Such event also shall constitute a default under this Lease, and Landlord thereupon may exercise all of its rights and remedies under this Lease unless prohibited from doing so by such statutes.

34.     DELAYS IN PERFORMANCE. The performance of Landlord and Tenant of any of their respective obligations or undertakings provided for in this Lease (except the payment of Rent or any other sums of money payable by Tenant under this Lease) shall be excused and no default shall be deemed to exist in the event and so long as the performance of any such obligation or undertaking is prevented, delayed, retarded, or hindered by any act of nature, weather conditions, fire, earthquake, flood, explosion, war, riot, failure of transportation, strikes, lockouts, action of labor unions, condemnation, laws, orders of

14

government or civil or military authorities, inability to procure labor, equipment, facilities, materials, or supplies in the open market, or any other cause beyond the reasonable control of Landlord or Tenant, as the case may be.

35.    <u>MANNER AND PLACE OF PAYMENTS</u>.  All payments of Rent and any other sums payable by Tenant to Landlord under this Lease shall be made by Tenant to Landlord without demand, deduction, or set-off at the address set forth in Section l(b) or at such other place as Landlord from time to time may designate in writing.

36.    <u>DELINQUENT PAYMENTS</u>.  If any Rent or other sums payable by Tenant under this Lease are not paid within five (5) days after such Rent or other sums are due, then Tenant agrees to pay Landlord a late charge of ten percent (10%) of the past-due payment in addition to a daily rate of One Hundred Dollars ($100.00) per day after the fifth (5th) day until such payment in the form of a cashier's or certified check is received by Landlord.  If Landlord engages an attorney or collection agency to collect any delinquent payment from Tenant or to enforce the performance by Tenant of any other obligation of Tenant that is delinquent under this Lease, then Tenant also shall indemnify and reimburse Landlord, on written demand, to the extent permitted by law, an amount equal to the attorneys' fees, court costs, and other collection expenses incurred by Landlord with respect to the collection of such delinquent payment or the enforcement of such delinquent performance, whether or not suit is filed against Tenant for such purpose.  If Tenant is late for three (3) or more months in making any of its payments of Rent due under this Lease in any twelve (12) month period during the Lease Term, then Landlord, in addition to Landlord's other rights and remedies under this Lease, thereafter shall have the right to require Tenant to make all Rent payments under this Lease quarterly in advance rather than monthly in advance so that Landlord will continue to always have three (3) consecutive months prepaid Rent and other monetary expenses to Landlord.

37.    <u>DEFAULT</u>.  If Tenant defaults in the payment of any Rent or other sums due and payable by Tenant to Landlord under this Lease for a period of more than five (5) days after the particular payment was due, or if Tenant violates or defaults in the performance of any covenant, agreement, or other condition contained in this Lease (other than the payment of Rent or other sum payable under this Lease) for a period of more than thirty (30) days after written notice of such violation or default has been given by Landlord to Tenant, which the parties agree such notice shall not be deemed a termination of the Lease (or, in the case of a default not curable within thirty (30) days, if Tenant shall fail to commence to cure such default within such thirty (30) days and thereafter proceed diligently to complete the cure thereof), or any other default or breach hereunder, then Landlord, at its option, in addition to any other remedies available, either at equity or law, may commence an action for restitution of the Premises in any court having jurisdiction over such cause of action and terminate this Lease.  Tenant shall continue to have the quiet enjoyment of the Premises until such time as the completion of the action for the restitution of the Premises.  Any costs and expenses incurred by Landlord (including, without limitation, reasonable attorneys' fees) in enforcing any of its rights or remedies under this Lease shall be deemed to be an amount in addition to Rent or any other monetary obligations contained herein and shall be repaid to Landlord by Tenant upon demand.  Tenant further agrees that surrendering of possession of the Premises or the termination of the Lease shall not affect the accrual of any such liabilities that accrue following the termination of the Lease.

If this Lease is terminated by Landlord pursuant to this Section 37, Tenant nevertheless shall remain and immediately be liable for (a) all monetary obligations and other damages that may be due or sustained prior to such termination, all reasonable costs, fees, and expenses including but not limited to, reasonable attorneys' fees, costs, and expenses incurred by Landlord in pursuit of its remedies hereunder, or costs and expenses in re-letting the Premises to others, including but not limited to a reasonable

15

brokerage commission, reasonable alterations, repairs, replacements and improvements made by Landlord in connection with the re-letting of the Premises as Landlord may consider desirable or necessary (collectively "Termination Damages"), and (b) additional damages (the "Liquidated Damages"), which shall be an amount equal to the Rent and all operating expenses that, but for termination of this Lease, would have become due during the remainder of the Term. Such Termination Damages and Liquidation Damages shall be paid by Tenant to Landlord immediately upon termination of the Lease without waiting for the end of the Term hereof. Upon the re-letting of the Premises or portion thereof, Landlord shall retain the Termination Damages and provide Tenant with the difference between the Liquidated Damages and the net present value (using a discount rate of the then current yield of actively traded U.S. Treasury Bonds with ten (10) year maturities, as published in the Federal Reserve Statistical Release for the week prior to the termination of the Lease) of the Rent and any additional remuneration that Landlord will receive during such period from others to whom the Premises may be rented.

If Landlord has breached or failed to comply with any provision of this Lease applicable to Landlord, Tenant shall give written notice to Landlord describing the alleged breach or noncompliance. Landlord will not be deemed in default under this Lease if Landlord cures the breach or noncompliance within 30 days after receipt of Tenant's notice or, if the same cannot reasonably be cured within such 30-day period, if Landlord in good faith commences to cure such breach or noncompliance within such period and then diligently pursues the cure to completion. If Landlord breaches or fails to comply with any provision of this Lease applicable to Landlord, and such breach or noncompliance is not cured within the period of time described above or Landlord is not diligently pursuing the cure to complete in a reasonable manner, then Tenant may (a) incur any expense necessary to perform the obligation of Landlord specified in such notice; and/or (b) sue for injunctive relief; and/or (c) sue for specific performance; and/or (d) sue for damages; and/or (e) avail itself of any other remedy provided herein or available at law or in equity. The performance of each and every agreement herein contained on the part of Landlord shall be a condition precedent to the right of Landlord to collect Rent and other charges hereunder or to enforce this Lease against Tenant. Tenant's remedies provided for herein shall not be deemed to be exclusive of any other remedies available at law or in equity, and all of Tenant's remedies shall be cumulative.

38.    MITIGATION OF DAMAGES. Landlord shall use commercially reasonable efforts to mitigate any damages resulting from a default of the Lease. Landlord's obligation to mitigate damages after a default by Tenant under this Lease that results in Landlord regaining possession of all or a part of the Premises shall be satisfied in full if Landlord undertakes to lease the Premises to another tenant (a "Substitute Tenant") in accordance with the following criteria: (i) Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenants for the Premises until Landlord obtains full and complete possession of the Premises including, without limitation, the final and unappealable legal right to relet the Premises free of any claim of Tenant; (ii) Landlord shall not be obligated to offer the Premises to any prospective tenant when other premises in the Shopping Center suitable for that prospective tenant's use are currently available, or will be available within the next three (3) months; (iii) Landlord shall not be obligated to lease the Premises to a Substitute Tenant for a rental less than the current fair market rental then prevailing for similar retail/office buildings in the same market area as the Shopping Center; (iv) Landlord shall not be obligated to enter into a new lease under terms and conditions that are unacceptable to Landlord under Landlord's then-current leasing policies for comparable space in the Shopping Center; (v) Landlord shall not be obligated to enter into a lease with any proposed Substitute Tenant that does not have, in Landlord's reasonable opinion, sufficient financial resources or operating experience to operate the Premises in a first-class manner; (vi) Landlord shall not be required to expend any amount of money to alter, remodel, or otherwise make the Premises suitable for use by a Substitute Tenant unless: (a) Tenant pays any such sum to Landlord (which payment shall not be in lieu of any damages or other sums to which Landlord may be entitled to as a result of Tenant's default under this Lease); or (b) Landlord, in Landlord's sole discretion, determines that any such expenditure is financially

16

justified in connection with entering into any lease with such Substitute Tenant; and (vii) Landlord shall not be obligated to enter into a lease with any Substitute Tenant whose use would: (a) disrupt the tenant mix or balance of the Shopping Center, (b) violate any restriction, covenant, or requirement contained in the lease of another tenant of the Shopping Center, or (c) adversely affect the reputation of the Shopping Center.

Upon compliance with the above criteria regarding the reletting of the Premises after a default by Tenant, Landlord shall be deemed to have fully satisfied Landlord's obligation to mitigate damages under this Lease and under any law or judicial ruling effect on the date of this Lease or at the time of Tenant's default; and Tenant waives, to the fullest extent legally permissible, any right to assert in any action by Landlord to enforce the terms of this Lease, any defense, counterclaim, or rights of setoff or recoupment respecting the mitigation of damages by Landlord, unless and to the extent Landlord maliciously or in bad faith fails to act in accordance with the requirements of this Section 38.

39.    NO PERSONAL LIABILITY.  Notwithstanding any other provision of this Lease, Tenant agrees that it will look solely to the equity, estate, and property of Landlord in the land and buildings comprising the Shopping Center (subject to prior rights of the holder of any mortgage or deed of trust thereon) for the collection of any judgment requiring the payment of money by Landlord in the event of any default on the part of Landlord in the observance or performance of any of the terms, covenants, and conditions of this Lease to be observed or performed by Landlord; and, Tenant understands and agrees that no other assets of Landlord shall be subject to levy, execution, or other process for the satisfaction of any such judgment or for the enforcement of any rights or remedies of Tenant.

40.    SUBORDINATION.  Landlord may assign its rights under this Lease as security to the holders of one or more mortgages (which term shall include a mortgage, deed of trust, or other encumbrance) now or hereafter in force against the Premises or the Shopping Center.  Tenant hereby subordinates its rights under this Lease to the lien of one or more mortgages (which term shall include a mortgage, deed of trust, or other encumbrance) now or hereafter in force against the Premises or the Shopping Center and to all advances made or hereafter to be made upon the security thereof; provided, that any such mortgage shall provide, or the mortgagee shall agree, that the mortgagee, in the event of its acquiring title to the Premises or the Shopping Center, whether through foreclosure, judicial, process, power of sale, or otherwise, shall recognize the validity of this Lease so long as Tenant (a) is not in default beyond any applicable grace period under this Lease at the time such mortgagee acquires title to the Premises or the Shopping Center and (b) agrees to attorn to such mortgagee as if it were the original landlord under this Lease.

41.    EMINENT DOMAIN.  If the whole of the Premises or the Building or the parking area in the Shopping Center shall be taken under the power of eminent domain, then this Lease shall terminate and expire as of the date upon which possession must be surrendered to the public authority involved; the Rent and any other sums payable under this Lease shall be prorated as of such date; and Landlord and Tenant shall be released from any further liability under this Lease.  If more than twenty-five percent (25%) but less than all of the floor area of the Premises or of the Building shall be taken or condemned, or if more than twenty-five percent (25%) of the parking area in the Shopping Center is taken through condemnation or eminent domain proceedings and Landlord does not within ninety (90) days begin and thereafter complete the construction of or obtain substitute parking replacing at least seventy five percent (75%) of the parking so taken using double decking, contiguous land, or underground areas, then either Landlord or Tenant may terminate this Lease by serving upon the other party a written notice of termination effective as of the date upon which possession must be surrendered to the public authority involved.  In the event that such option to terminate is exercised, the Rent and any other sums payable under this Lease shall be prorated as of such date of surrendering possession, and Landlord and Tenant

17

shall be released from any further liability under this Lease. If any portion of the Premises or the Shopping Center is taken for public use and if neither party is entitled to exercise or does exercise its option to terminate this Lease as permitted above in this Section, then the Rent shall be reduced as of the date upon which possession must be surrendered to the public authority involved in the proportion that the actual floor area in the Premises taken bears to the total floor area originally demised in the Premises. Landlord promptly shall repair, restore, or rebuild for occupancy by Tenant the portion of the Premises not so taken. If, during the repair, restoration, or rebuilding required, the Premises are not usable in the opinion of Landlord or Tenant, then Landlord and its contractors temporarily shall have possession of the Premises during the period of repair, restoration, or rebuilding, and the reduced rent provided for in this Section shall abate during such period of temporary possession by Landlord. All compensation and damages awarded or other sums or awards paid on account of any condemnation or taking under the power of eminent domain of the Premises, the Common Areas, or the Shopping Center, or any portion of portions thereof, shall belong to and be the property of Landlord whether such damages or other sums are awarded as compensation for the loss, taking, or diminution in value of any fee, leasehold, easement, or other interest in the Premises, the Common Areas, the Shopping Center, or otherwise. Tenant shall not have any claims against Landlord, and Tenant shall be entitled to any separate claim or award made by the condemning authority for or on account of any loss or expense that Tenant may sustain or incur in removing Tenant's merchandise, trade fixtures, or equipment from the Premise or for any loss of or damage to such items of Tenant's personal property, or any other damages related to Tenant's business, including, but not limited to, Tenant's loss of business or leasehold interest. Nothing contained in this Section shall be construed to release any liability of Tenant to Landlord that arose prior to the effective date of any termination of this Lease pursuant to this Section.

42.    CONTINUOUS OCCUPANCY. Tenant agrees to continuously, actively, diligently use and occupy throughout the Lease Term, the Premises and to conduct its business therefrom during all normal business hours, except when the Premises are untenantable by reason of the occurrence of any damage thereto or the destruction thereof; and Tenant's failure to comply with the preceding provisions of this section shall constitute a default under this Lease and shall give Landlord all rights and remedies set forth in Section 37 including the right to terminate the Lease. In the event that Tenant does not so occupy the Premises and conduct its business therefrom, then Tenant shall pay monthly as additional rent (over and above and in addition to the Rent and any other sums required to be paid by Tenant) during any such period of non-occupancy or non-conduct of its business a sum equal to one hundred twenty five percent (125%) of the Rent payable during such period.

43.    SALE OR UNDERLYING LEASE. In the event of a sale or transfer of all or any portion of the Shopping Center or any undivided interest therein, or in the event of the making by Landlord of an underlying lease of all or substantially all of the Shopping Center, or in the event of an assignment or transfer of the leasehold estate under any such underlying lease, the respective grantor, transferor, landlord, or assignor, as the case may be, thereafter shall be entirely relieved of all obligations to be performed by Landlord under this Lease to the extent of the interest in or portion of the Shopping Center so sold, transferred, or leased; and, without further agreement between any of the Parties to this Lease and the purchaser or transferee in the event of any such sale or transfer or the tenant or its assignee in the event of any such underlying lease, as the case may be, such purchaser, transferee, tenant, or tenant's assignee shall be deemed to have assumed and agreed to carry out all of the obligations of Landlord under this Lease. As long as any such underlying lease shall be in force and effect, the Parties to this Lease expressly understand and agree that there shall be no liability under this Lease on the part of the grantor, transferor, landlord, or assignor, as the case may be. Notwithstanding the foregoing provisions of this Section 43, the grantor, transferor, landlord, or assignor, as the case may be, referred to in this Section 43 shall not be relieved of any liability to Tenant arising or occurring prior to the sale, transfer, or lease referred to in this Section.

18

44.    ESTOPPEL CERTIFICATES.  Tenant, from time to time, but no more often than twice annually, and within ten (10) business days from receipt of written request from Landlord, agrees to execute, acknowledge, and deliver to Landlord, in a form reasonably satisfactory to Landlord, a written statement certifying that Tenant has accepted the Premises, to Tenant's knowledge that this Lease is unmodified and in full force and effect (or, if there have been modifications, to Tenant's knowledge that this Lease is in full force and effect as modified, setting forth the modifications), that Landlord has performed all of its obligations under this Lease to Tenant's knowledge and is not in default under this Lease, the date to which the Rent and other sums payable by Tenant under this Lease have been paid in advance (if any), the commencement and termination dates of the Lease Term, and such additional facts as reasonably may be required by Landlord.  Tenant understands and agrees that any such statement delivered pursuant to this Section may be relied upon by any prospective purchaser of the Premises, any mortgagee, beneficiary under a deed of trust, prospective mortgagee of the Premises, or prospective beneficiary under a deed of trust, and their respective successors and assigns, if any.

45.    SECURITY DEPOSIT.  Tenant shall deposit with Landlord as a security deposit under this Lease the amount set forth in Section 1(m).  Such security deposit shall be held by Landlord, without interest, as security for the faithful performance by Tenant of all the terms of this Lease to be observed and performed by Tenant.

46.    LANDLORD'S RIGHT TO CURE.  Landlord may, but shall not be obligated to, cure any default by Tenant in the performance of any of Tenant's obligations under this Lease, including but not limited to Tenant's failure to pay any taxes, obtain any insurance, make any repairs, or satisfy any lien claims, after complying with the notice provisions contained in Section 37; in the event that Landlord elects to so cure any default by Tenant, then all costs and expenses paid by Landlord in so curing such default, including but not limited to reasonable attorneys' fees, shall be deemed to be additional Rent due immediately after such payment by Landlord, together with interest thereon at a rate of ten percent (10%) per annum (except in the case of such attorneys' fees) from the date of such payment by Landlord to the date of repayment by Tenant to Landlord.

47.    CUMULATIVE RIGHTS.  The rights, options, elections, and remedies of Landlord and Tenant contained in this Lease shall be cumulative and may be exercised on one or more occasions; and none of them shall be construed as excluding any other or additional right, priority, or remedy allowed or provided by law.

48.    BINDING AGREEMENT.  All rights and liabilities given to or imposed upon Landlord or Tenant in this Lease shall extend to and bind their respective heirs, executors, administrators, personal representatives, successors, and assigns.  No rights, however, shall inure to the benefit of any assigns of Tenant unless the assignment thereof to such assignee has been approved in writing by Landlord.

49.    SECTION TITLES.  The titles of the various sections of this Lease have been inserted merely as a matter of convenience and for reference only and shall not be deemed in any manner to define, limit, or describe the scope or intent of the particular Sections to which they refer or to affect the meaning or construction of the language contained in the body of such sections.

50.    SEVERABILITY.  If any provision of this Lease shall be declared legally invalid or unenforceable, then the remaining provisions of this Lease nevertheless shall continue in full force and effect and shall be enforceable to the fullest extent permitted by law.

51.   TIME OF ESSENCE.  Time is of the essence concerning this Lease, and all provisions of this Lease relating to the time of performance of any obligation under this Lease shall be strictly construed.

52.   DEFINITIONS.  Except as otherwise expressly stated in this Lease, the "Lease Term" shall include the original term and any additional period as to which this Lease may be extended, and references to this "Lease" shall include this document and any properly executed written amendment thereof or supplement thereto.

53.   GOVERNING LAW.  This Lease shall be governed by and construed in accordance with the laws of the State of Nebraska.

54.   BROKERS.  Tenant warrants it has had no dealings with any broker or agent in connection with the negotiation or execution of this Lease other than the broker set forth in Section 1(o). Tenant agrees to indemnify Landlord against, and to hold Landlord harmless from, any expense or liability for commissions or other compensation or charges claimed by any other such broker or agent with respect to the lease. Tenant understands and acknowledges that some or all of the owners of the Shopping Center possess a Nebraska Real Estate License.

55.   NUMBER AND GENDER.  Where the context of this Lease requires, singular words shall be read as if plural, plural words shall be read as if singular, and words of neuter, masculine, or feminine gender shall be read as appropriate.

56.   ENTIRE AGREEMENT; SUCCESSORS AND ASSIGNS.  Landlord and Tenant hereby agree that this document contains the entire agreement between them and that there are no other agreements, written or verbal, between them pertaining to the Premises or the subject matter hereof. This Lease may not be amended or supplemented orally but only by an agreement in writing that has been signed by the party against whom enforcement of any such amendment or supplement is sought. This Lease shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and assigns (to the extent permitted by this Lease) of the parties, if any, and, if this Lease is executed by more than one individual, regarding each separate party, then each of such individuals shall be jointly and severally liable for the obligations of the respective party hereunder.

57.   LANDLORD'S USE OF COMMON AREAS.  Landlord reserves the right, from time to time, to utilize portions of the Common Areas for outdoor shows, displays, the leasing of kiosks, or such other uses that in Landlord's judgment will attract the public, provided, however, that access to the Premises is not unreasonably restricted and the parking facilities are not unreasonably burdened by such activities and so long as there remains at least four (4) parking stalls per thousand square feet of gross rentable area of the Shopping Center during such activities.

58.   SURRENDER.  Prior to the earlier of the Lease Expiration Date or upon the termination of Tenant's right to possession without termination of the Lease, Tenant shall quit and surrender the Premises to Landlord without delay, and in good order, condition and repair, ordinary wear and tear excepted in a broom clean condition.  Conditions existing because of Tenant's failure to perform maintenance, repairs or replacements as required of Tenant under this Lease shall not be deemed "ordinary wear and tear".  Tenant shall also surrender all keys for the Premises to Landlord at the place then fixed for the payment of Rent and shall inform Landlord of all combinations of locks, safes and vaults, if any in the Premises. Such surrender of the Premises shall be accomplished without the necessity for any payment therefore by Landlord.

Prior to the earlier of the Lease Expiration Date or upon the termination of Tenant's right to possession without termination of the Lease, Tenant shall remove any and all trade fixtures, equipment and other unattached items which Tenant may have installed, stored or left in the Premises, including but not limited to, shelves, show cases, chairs and unattached movable machinery purchased or provided by Tenant and which are susceptible of being moved without damage to the Building. Tenant shall repair any damage to the Premises caused by its removal of such fixtures and movables. Tenant shall also be required to remove all signage from the storefront and windows, and restore windows, canopy and exterior of the Building including but not limited to, caulking, patching of EFIS and paint matching the exterior (where signage was attached) to its original condition. Tenant shall not remove any plumbing or electrical fixtures or equipment, heating or air conditioning equipment, floor coverings (including, but not limited to, wall to wall carpeting), walls or ceilings, all of which shall be deemed to constitute a part of the freehold and/or leasehold interest of Landlord, nor shall Tenant remove any fixtures or machinery that were furnished or paid for by Landlord. If Tenant shall fail to remove its trade fixtures or other property as provided for herein, such fixtures and other property not removed by Tenant shall be deemed abandoned by Tenant and at the option of Landlord shall become the property of Landlord, or at Landlord's option, may be removed by Landlord at Tenant's expense, or placed in storage at Tenant's expense, or sold or otherwise disposed of, in which event the proceeds of such sale or imposition shall belong to Landlord.

59.    HAZARDOUS MATERIALS.

(a)    Definition. As used in this Lease, the term "Hazardous Material" means any flammable items, explosives, radioactive materials, hazardous substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "infectious wastes," "hazardous materials," or "toxic substances" now or subsequently regulated under any federal, state, or local laws, regulations, or ordinances including, without limitation, oil, petroleum-based products, paints, solvents, lead, cyanide, DDT, printing links, acids, pesticides, ammonia compounds, and including any different products and materials that are subsequently found to have adverse effects on the environment or the health and safety of persons.

(b)    General Prohibition. Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated, discharged, released, spilled, or disposed of on, in, under, or about the Premises or within the Shopping Center by Tenant, its affiliates, agents, employees, contractors, sublessees, assignees, or invitees other than those products used or carried by Tenant in the normal course of its business operations and provided such products are stored and disposed of in a commercially reasonably and lawful manner. Tenant shall indemnify, defend, and hold Landlord and its partners, members, officers, directors, successors, and assigns harmless from and against any and all actions (including, without limitation, remedial or enforcement actions of any kind, administrative or judicial proceedings, and orders or judgments arising out of or resulting therefrom), costs, claims, damages (including, without limitation, punitive damages), expenses (including, without limitation, reasonable attorneys', consultants', and experts' fees, court costs, and amounts paid in settlement of any claims or action), fines, forfeitures, or other civil, administrative, or criminal penalties, injunctive or other relief (whether or not based upon personal injury, property damage, or contamination of, or adverse effects upon, the environment, water damage, or contamination of, or adverse effects upon, the environment, water tables, or natural resources), liabilities, or losses arising from a breach of this prohibition by Tenant, its affiliates, agents, employees, contractors, sublessees, assignees, or invitees.

(c)    Notice. In the event that Hazardous Materials are discovered upon, in, or under the Premises or within the Shopping Center, and any governmental agency or entity having jurisdiction over the Premises or the Shopping Center requires the removal of such Hazardous Materials, Tenant shall be responsible for removing those Hazardous Materials arising out of or related to the use or occupancy of

the Premises or the Shopping Center by Tenant or its affiliates, agents, employees, contractors, sublessees, assignees or invitees, but not those of its predecessors or those of Landlord. Notwithstanding the foregoing, Tenant shall not take any remedial action in or about the Premises or the Shopping Center without first notifying Landlord of Tenant's intention to do so and affording Landlord the opportunity to protect Landlord's interest with respect thereto. Tenant immediately shall notify Landlord in writing of: (i) any spill, release, discharge, or disposal of any Hazardous Material in, on, or under the Premises or the Shopping Center or any portion thereof; (ii) any enforcement, cleanup, removal, or other governmental or regulatory action instituted, contemplated, or threatened (if Tenant has notice thereof) pursuant to any Hazardous Materials laws or regulations; (iii) any claim made or threatened by any person against Tenant, the Premises, or the Shopping Center relating to damage or contribution against Tenant, the Premises, or the Shopping Center relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from or claimed as a result from any Hazardous Materials; and (iv) any reports made to any governmental agency, including any complaints, notices, warnings, reports, or asserted violations in connection therewith. Tenant also shall supply to Landlord, as promptly as possible, and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings, or asserted violations relating in any way to the Premises, the Shopping Center, or Tenant's use or occupancy thereof.

(d)    Survival. The respective rights and obligations of Landlord and Tenant under subsections (a) through (c) immediately above shall survive the expiration or earlier termination of this Lease.

60.    EXCLUSIVE USE, COVENANTS AND EASEMENTS.

(a)    Covenants. Notwithstanding anything to the contrary contained herein, this Lease is subject to and made on the understanding that Landlord has or will grant certain exclusive use rights to other tenants, owners, or occupants of the Shopping Center pursuant to the other leases in the Shopping Center. The Shopping Center is also subject to and restricted by the Declaration of Covenants dated February 21, 2005, filed in the Douglas County Register of Deeds at Instrument 2005019508 (the "Covenants"). Tenant shall not use the Premises for any reason for the uses listed in Exhibit "G" or exclusives granted in the future to tenants in the Shopping Center (hereinafter the "Exclusive Covenants"), or violate any of the Use Restrictions set forth in the Covenants (the "Use Restrictions").

(b)    Violation of Covenants. Tenant acknowledges that Tenant's use and/or occupancy of the Premises in violation of any current or future Exclusive Covenants or Use Restrictions would subject Landlord to substantial damages and Tenant agrees that any violation by Tenant of any Exclusive Covenants or Use Restrictions shall constitute a default hereunder entitling Landlord to immediately upon delivery of notice to Tenant to terminate with thirty (30) days advanced written notice to Tenant this Lease, or to obtain relief from a court of competent jurisdiction enjoining Tenant from violating such Exclusive Covenants or Use Restrictions or to exercise any of the remedies stated herein and any other remedies available under the law of the State where the Premises are located.

(c)    Tenant's Exclusive. As long as Tenant is not in default and Tenant is continuously operating under the approved Use, Landlord will not lease space within the Shopping Center to any other retailer/service provider whose primary line of business is providing the sale of premade and prepackaged food prepared outside of the Premises. Notwithstanding the foregoing, such exclusive shall not apply to any restaurant or other tenant that prepares food inside the Premises for the sale on or off Premises consumption.

61.    ACH TRANSACTIONS. The parties agree that Landlord shall automatically withdraw all Rent, Common Area Charges, Taxes and Insurance from Tenant's designated checking account

22

pursuant to the terms contained in the Automated Funds Transfer ("AFT") Authorization Agreement as set forth in Exhibit "H" on the first day of each month (or the next business day if the 1st is on a day that the financial institutions are closed). Tenant acknowledges and agrees that in addition to the late payments set forth in Section 36, Tenant shall be responsible for a Three Hundred and no/100 Dollar ($300.00) penalty for any deduction request that is dishonored due to insufficient funds and Landlord shall be entitled to such funds on the next automatic withdrawal that has sufficient funds.

62.    FINANCIAL STATEMENTS.  Upon Landlord's written request from time to time, but no more frequently than annually, Tenant shall, within thirty (30) days after receipt of Landlord's request therefore, furnish Landlord with a copy of Tenant's most current financial statements outlining Tenant's then current financial condition as well as financial statements outlining the then current financial condition of any guarantor of this Lease. Landlord shall maintain all financial information provided in a confidential manner.

63.    ODORS.  Tenant expressly agrees to prevent the permeation or spread of odors from the Premises which interfere or are likely to interfere with the business of the other tenants in the Building. Tenant shall install a ventilation system in the Premises which is sufficient to insure that odors do not permeate through the walls or ceiling of the Premises into adjacent bays of the Building. In the event such odors should permeate or spread, Tenant agrees, at its own expense, to timely make all necessary repairs or take other remedial action to insure the containment of such odors and to indemnify and hold Landlord harmless from all damages, liabilities, costs and expenses incurred by Landlord, including without limitation reasonable attorneys' fees which in any way result from the permeation or spread of odors from the Premises.

64.    NO PRESUMPTION AGAINST DRAFTER.  Landlord and Tenant understand, agree and acknowledge that this Lease has been fully negotiated by both parties and that in any controversy, dispute or contest over the meaning, interpretation, validity or enforceability of the Lease or any of its terms or conditions, there shall be no interference, presumption, or conclusion drawn whatsoever against either party having drafted this Lease or any portion thereof.

65.    ATTORNEYS' FEES.  In the event of litigation relating to the subject matter of this Lease, the non-prevailing party shall reimburse the prevailing party for all reasonable attorneys' fees and costs resulting therefrom.

66.    AUTHORITY.  Tenant represents and warrants that it is duly formed and in good standing, and has full corporate or partnership power and authority, as the case may be, to enter into this Lease and has taken all corporate or partnership action, as the case may be, necessary to carry out the transaction contemplated herein, so that when executed, this Lease constitutes a valid and binding obligation enforceable in accordance with its terms. Tenant shall provide Landlord with corporate resolutions or other proof in a form acceptable to Landlord, authorizing the execution of the Lease at the time of such execution.

67.    INTENTIONALLY OMITTED.

68.    LEASE GUARANTY.  This Lease shall be conditioned upon execution and delivery of the Guaranty affixed hereto as Exhibit 'I' by all Guarantors.

69.    ODOR/EXHAUST PROBLEMS.  As a result of the intended use, there may be the potential of exhaust or odor problems. Landlord shall notify Tenant, in writing, of any odor problem. If said odor condition is not cured within thirty (30) days after notification, Landlord shall take any necessary action to eliminate odor condition and the cost of any such remedies shall be borne by Tenant.

23

In the event Landlord notifies Tenant in writing that odors are emanating from the Premises, Tenant shall, within thirty (30) days after such notice from Landlord, commence to install, at its sole cost and expense, reasonable control devices or procedures to eliminate such odors and shall complete such installations within five (5) days thereafter;  or if said installation cannot be completed within such five (5) day period, then Tenant must complete such installation as expeditiously as possible by diligently and in good faith proceeding to completion.

In the event that Tenant fails to stop odors from emanating from the Premises, in accordance with this Paragraph hereof, Landlord may, at its sole discretion: cure such failure on the part of Tenant to eliminate such odors and thereafter add the cost and expense incurred by Landlord therefore to the next monthly installment of Rent; and/or treat such failure on the part of Tenant to eliminate such odors as an Event of Default of this Lease, entitling Landlord to execute any or all of its remedies pursuant to the terms of this Lease.

Tenant shall, at its sole cost and expense, install and maintain adequate equipment (including, without limitation, adequate exhaust fans and ductwork in connection therewith and other ventilation system) for kitchen areas and other areas of the Premises so as to keep any odors from entering the Common Area, or other tenants' premises;  such equipment shall be subject to Landlord's prior written approval with respect to manufacture, design, installation, and maintenance, and shall comply with all legal requirements.  Tenant must construct the Premises so that odors do not escape into the Common Areas or other tenants' premises.

70.    ROOF GREASE GUARD.  Tenant shall be required to install a Grease Guard, Inc., "Grease Containment System", (or similar system pre-approved by Landlord) and shall provide Landlord with the correct model number of the unit. Tenant must apply for said unit by contacting Grease Guard, Inc., at (847) 931-9500.  Tenant shall be required to check the condition of the filters, depending on the nature of the food and the amount of cooking, and shall replace when saturated. The Grease Containment System is to be manufactured, sized, engineered, installed, and maintained per Grease Guard, Inc. specifications. Tenant shall design their system with a limited negative pressure. Make-up air and exhaust systems must be interlocked together.  System design is subject to Landlord approval.

Food service operations will be responsible for correction or modifying their existing mechanical systems in the event that any objectionable odors occur. Should odors become objectionable, one or more of the following methods of odor control will be required; vertical discharged fans; higher stacks on fans; charcoal filters; air washer; and/or thermal oxidizers.

Exhaust fans handling grease laden vapors shall be equal to Jenn-Air BRID Series, U.L. listed classification vertical discharge type with grease container accessory which shall be cleaned at regular intervals.

Fans to have grease collecting pan around the perimeter base of fans.  Pans to have grease absorbing filter specifically "Grease Guard", as manufactured by Grease Guard Inc.  All exhaust fans exhausting grease vapors must also provide a grease containment system specifically "Grease Guard", as manufactured by Grease Guard Inc. (800-284-8273).

71.    COOKING VENTILATION SYSTEM INSPECTION.  Tenant agrees, at Tenant's said cost, to retain the services of a licensed cooking ventilation service contractor, at least quarterly per calendar year, to clean, inspect and maintain both the equipment in Tenant's cooking area and the exterior portion of Tenant's ventilation system, to insure its proper functioning and safe operation.

24

72.     PARKING AREA LIABILITY. No representation, guaranty or warranty is made or assurance given that the communications or security systems, devices or procedures of the parking areas will be effective to prevent injury to Tenant or any other person or damage to or loss (by theft or otherwise) of any of Tenant's property or of the property of any other person, and Landlord reserves the right to discontinue or modify at any time such communications or security systems or procedures without liability to Tenant.

73.     NON EXCLUSIVE 15 MINUTE ONLY PARKING STALL.  Landlord shall have painted "15 Minute Only" on the parking stall to the east of the handicap stalls in front of the Premises within thirty (30) days of the Lease.  Such parking stall shall be non-exclusive and not monitored by Landlord, Tenant or any of its agents, but for the common use of all customers of the Shopping Center.

74.     EXHIBITS.  The following Exhibits are a part of this Lease and have been attached to this Lease prior to its execution:

A -     Shopping Center Site Plan
B -     Landlord's Work
C -     Economic Terms Agreement
D -     Intentionally Omitted.
E -     Rules and Regulations
F -     Building Signage Criteria
G -     Covenants and Use Restrictions
H -     Automated Funds Transfer Authorization Agreement
I -     Guaranty
J -     Conceptual Exterior Elevations

Executed on ___July 30_____, 2015.

LANDLORD: 190 Burke, LLC
a Nebraska limited liability company

By:_____
         Scott Brown, Manager

TENANT:

Eat Fit Go Healthy Foods – Omaha, LLC, a
Nebraska limited liability company

By:_____

25

EXHIBIT "A"
**SITE PLAN**



"Premises"



WEST VILLAGE POINTE - FLOOR PLAN - BUILDING 2 - LEASE SUITE 202

SCALE: 1/16" = 1'-0"

| | PLAN | | WEST VILLAGE POINTE | | Reed Design |
| A1.0 | BUILDING_02 | | RETAIL CENTER | | ARCHITECTS |

<u>EXHIBIT "B"</u>
**LANDLORD'S & TENANT'S WORK**

I.     GENERAL CONDITIONS:

A.    Tenant shall be responsible for retaining an architect at its cost and expense ("Tenant's Architect") for the interior design and construction drawings for Tenant's Work as the term is defined in Section V below.

B.    Before commencing construction drawings, Tenant and Tenant's Architect shall review construction details and connections and the working conditions at the site with the Landlord.

C.    Tenant's layout drawings and specifications shall be submitted in final form to Landlord for review and approval prior to releasing to Tenant's Contractors for bidding. Tenant's layout and details shall be examined with specific regard to individuality of shop design, conformance to sign restrictions, and conformance to requirements as hereinafter set forth.

D.    Tenant shall secure approval of its Contractors from Landlord.

E.    Tenant shall take out and pay for all permits required by state or local authorities including City of Omaha Building Permit and Certificate of Occupancy, and shall be responsible for compliance with all applicable Codes and Ordinances.

F.    Landlord, Tenant or any utility company shall have the right, subject to Landlord's prior approval, to run utility lines, pipes, conduits or ductwork, where necessary, through ceiling spaces or spaces adjacent to columns or other parts of the Premises, and to maintain the same in a manner which does not interfere unnecessarily with the Tenant's use of the Premises.

G.    If Tenant includes the construction of his store front as part of its own work, Tenant shall, during its construction period, if any other tenant in the shopping center is then open to the public for business, erect a barricade enclosure outside the store front to enclose its construction area.

H.    Tenant shall provide its own temporary heat in the Premises if necessary during its construction period. Tenant or Tenant's Contractor shall arrange with the Power Company for direct billing for all power consumed by Tenant or Tenant's Contractor.

I.    No mechanical installation shall be permitted which is incompatible with the original project concepts of architectural, structural, electrical or mechanical designs. Persons involved in design and installation shall carefully determine the exact location and nature of all air intakes, exhaust, pipe mains and the like that will place specific requirements and arrangements or either, on the system design. Mechanical and electrical systems shall be designed to use the energy sources and medias available.

J.    Tenant's air conditioning system shall be operated to maintain at least the minimum design conditions during all days and hours the Premises shall be open for business. Tenant shall maintain above freezing temperatures in the Premises at all times to prevent damage.

K.    Tenant shall procure and maintain insurance, as required in this lease, during the period of Tenant's work.

L.    Landlord shall have the right to require Tenant to furnish a bond or other security in forms satisfactory for the prompt and faithful performance of Tenant's work, conditioned that it will save Landlord harmless from the payment of any claim either by way of damages or liens on account of bills for labor or material in connection with Tenant's work.

M.    Landlord's Work and Tenant's Work shall be completed with first class materials and workmanship.

N.    For all purposes herein, when Landlord's approval is sought, such approval shall not be unreasonably withheld, conditioned or delayed.

II.     ELECTRICAL:

27

All electrical work shall be in accordance with state and local authorities and codes. Electric power metering shall be by individual arrangement with the Omaha Public Power District.

III. MECHANICAL SYSTEM DESIGN:

A. General Design:
The proposed design of any mechanical system shall be properly integrated into the building design and aesthetic treatment. The mechanical system design criteria governing the design of each specific system shall be governed by the following information:

1. No system shall be permitted that requires unusual modifications to the existing structure or relocation of existing equipment or piping of other tenants in the building.
2. No system design shall be permitted to unbalance the normal operation of any system to which it is connected or adjacent.
3. Openings shall not be cut in the structure that are not approved by Landlord. The existing openings and sleeves shall be used wherever possible.
4. Heavy equipment shall not be placed on the building so as to damage the roof or cause objectionable noise transmission into other tenant spaces or spaces occupied by Landlord.
5. Vibration isolation shall be provided in ducts and piping to prevent noise transmission to other parts of the building.
6. All items mounted on the roof or outside the building shall be approved by Landlord as to location, size, and aesthetic effect.
7. No air discharge louvers shall be allowed to discharge into normal pedestrian areas.

B. Heating, Air Conditioning, & Ventilation:
1. Fire dampers shall be installed by Tenant where required by local code.
2. Domestic water shall not be used for condensing purposes in any air conditioning system.
3. Ventilation equipment and systems shall be of a type that can be integrated into the original building design concepts.
4. All exhaust air openings shall be approved by Landlord.
5. No exhaust system shall be permitted to cause excessive air pressure unbalanced between itself and other systems in the building.
6. Contaminated or odorous exhausts shall be exhausted at a point approved by Landlord and, if required by Landlord, shall be filtered to remove any objectionable odors.

C. Plumbing:
1. Plumbing installation shall conform to state and local codes and shall be of a type that can be integrated into the original building design concepts.
2. All connections between copper and steel piping or copper bearing equipment and steel equipment shall be electrically isolated with proper fittings.
3. No system installed within the Premises shall be permitted to use domestic water for any purpose other than domestic use in the toilet areas, drinking water and housekeeping purposes unless otherwise approved in writing by Landlord.

IV. LANDLORD'S WORK:

Landlord shall cause its contractor to construct the Building in a good and workmanlike manner in compliance with all applicable building and health code requirements, as follows:

A. **Interior Floors**. 4" concrete slab with welded wire mesh and the floor to be same level as exterior sidewalks leading to entry doors with the rear 20' dirt.

B. **Exterior.** See Exhibit "J" for conceptual exterior improvements.

28

C.    **Parking Areas and Walkways**. Concrete sidewalks and asphalt parking lot with 3'concrete apron.

D.    **Utilities**. The following will be installed to the rear of the Premises: (i) 1.5" domestic water supply line stub out into the Premises, average at pressure of 55-75 psi, with shutoff valve; (ii) one (1) 120/208V, 3 phase, 4W, mlo 200 electrical panel connected to main building or local utility company power supply (service to include disconnect, CT block, meter, and other items required by code); and (iii) 4" sanitary waste line brought within Premises at suitable depth to drain per local building and health codes.

E.    **Demising Wall.** Landlord to frame and install the steel studs for the demising wall with all other work to the demising wall to be constructed by Tenant at its expense. Wall shall be constructed to meet an STC (Sound Transmission Coefficient) rating of 55 or greater and joint sealants installed at the top and bottom of the wall and on both sides of the wall.

F.    **Meters**. Landlord shall have the utilities separated except the gas meter which shall be performed by Tenant at the time of connecting the roof top HVAC unit and Tenant to install EMON sub-meter to connect to the main water meter. The sanitary sewer will be shared with all building tenants.

G.    **Roof.** The roof will be a rubber membrane roof over roof insulation. Any penetrations to the roof will be performed by Landlord's roofing contractor to not void the roof warranty. Size and location must be approved by Landlord prior to beginning work. Any mechanical exhaust penetrations shall be a minimum of 10 feet from any fresh air intake equipment for the Premises or the adjacent space. No mechanical equipment shall be located within 12 feet of the edge of the Building without the prior approval from Landlord.

    a.)    Landlord to furnish an accessible location on roof above Tenant's Premises for the installation of roof-mounted equipment including, but not limited to, hoods, fan and make up air, refrigeration condensers, receiving antennae, etc. This area will be accessible with a permanently fixed interior roof ladder located in mechanical room. Tenant shall be provided a key to access the mechanical room. Ladder to be accessible 24 hours a day.

    b.)    Sound, watertight roof covering which may be penetrated and flashed using standard roofing methods for the installation of above equipment.

    c.)    Roof system will include minimum R-19 insulation, or per local code, whichever is the higher R- value. The preferred location for the insulation is between the roof deck and roof membrane. The only alternate location is tight to the roof deck inside the building.

    d.)    Landlord to design roof structure to accommodate 1000 lb dead load, make up air unit as shown on Tenant's plans. Landlord and Tenant to coordinate all roof penetrations and final position of Tenant's equipment. Equipment shall be placed in areas as indicated on the shell roof plans and shall be coordinated with building shell structural engineer of record. Structural modifications to accommodate tenant-provided equipment shall designed by shell building engineer of record at tenants expense

H.    **Exterior Walls.** Subject to exterior wall construction, assuming a masonry exterior wall, 3-5.8" studs.

I.      **Grease Interceptor.** Landlord will install a shared grease trap to be shared and paid pro rata maintenance costs by the Tenants utilizing such trap. Landlord shall have a four (4) inch branch line from grease interceptor to Premises. Location of sanitary and grease lines will be coordinated with Tenant's plans and stubbed up to finish floor level with a clean-out cover.

J.      **Heating, Ventilating Air Conditioning.** One (1) 5 ton roof top unit, electrical outlet on roof, gas lines hooked up to unit and hanging from ceiling.

        a.)     Units set in place with roof curb, main plenum drops through roof, manufacturer warranty on system and digital Honeywell Vision Pro 8000 programmable thermostats with remote temperature sensor or comparable. RTU will include duct detector per fire alarm code. Location of unit will be defined on the plans provided by Landlord.

        b.)     Roof top units will be fully functional unit with gas heat, and electrical air conditioning. All electrical and plumbing connections (including power from Tenant's panel, gas pipe, and condensate drain) installed per code and manufacturer's specifications.

        c.)     Supply and return-air drops into Premises. No ductwork will be provided to the Premises.

Landlord will assign the HVAC unit one (1) year warranty to Tenant.

K.      **Handicap Accessibility.**

        a.)     All means of ingress/egress shall be at street/walkway level or have handicap accessible elevator/ramp installed per federal handicap codes with all applicable clear space, radius landings and railings. The front and rear entrances must be acceptable to local handicap inspectors.

        b.)     All ADA requirements shall be met by Landlord.

L.      **Fire Protection.** Up-head sprinkler coverage distributed throughout the Premises. If required by code. Provisions have been made under shell scope to sprinkle the space in accordance with minimum code and will be coordinated through the fire sprinkler contractor. As-built drawings will be provided by fire sprinkler contractor and any modifications from the original fire sprinkler scope of work shall be paid for by tenant.

M.      **Restrooms.** Restrooms will be constructed by Tenant to be ADA compliant and located at the rear of the Premises.

V.      TENANT'S WORK:

     All work which is required to complete the Premises and not identified as Landlord's Work shall be the responsibility of Tenant and performed by Tenant at Tenant's sole expense ("Tenant's Work") unless Tenant requests in writing for Landlord to complete such items at Tenant's direct expense to the contractor including, but not limited to, the canopy or any other costs specifically associated with the drive through for the Building. It is further understood and agreed by and between the Landlord and Tenant that the Landlord will permit Tenant and its agents to enter the Premises in order that the Tenant may perform, at its own cost and expense, through its own contractors such Tenant Work as Tenant may desire. The foregoing license to enter is conditioned upon Tenant's workmen and mechanics working in

harmony with the Landlord. If at any time such entry shall unreasonably cause disharmony or interference therewith, this license may be withdrawn by Landlord upon twenty-four (24) hours written notice to Tenant. Workmen's Compensation and Public Liability Insurance and Property Damage Insurance, all in amounts and with companies and on forms satisfactory to Landlord, shall be provided and at all times maintained by Tenant's contractors engaged in the performance of the work, and before proceeding with the work, Certificates of such Insurance shall be furnished to Landlord. Tenant's contractors shall provide and maintain the following types and minimum amounts of coverage:

Worker's Compensation – Nebraska Statutory Limits
Public Liability/Property Damage – minimum of $2,000,000.00

The Insurance Carriers shall have minimum ratings of "Best B+". Said Certificates of Insurance must contain provisions to notify the Landlord thirty (30) days prior to cancellation and/or prior to any changes or amendments to the insurance coverage provided. Said liability insurance coverages shall also name and so designate the Landlord as additional party insured.

Such Tenant entry to the Premises shall be deemed to be under all of the terms, covenants and conditions of this Lease except for the payment of Rent. Landlord shall not be liable in any way for any injury, loss or damage which may occur to any of Tenant's construction work, refurbishings, decorations or improvements, the same being solely at Tenant's risk unless caused by the negligence or willful misconduct of Landlord. The provision of this section is specifically subject to the provisions of the Lease.

All costs of Tenant's construction work, refurbishings, decorations and improvements made by Tenant's contractors shall be paid by the Tenant including, but not limited to, permits and licenses as may be required in connection with such construction work, refurbishings, decorations and improvements, and no liens may be charged against the Shopping Center or Premises because of such construction work, refurbishings, decorations and improvements. In no event shall Tenant's early entry for purposes of performing Tenant's construction work be deemed to be beneficial occupancy of the Premises by the Tenant.

All contractors and subcontractors engaged by Tenant shall be licensed contractors and subcontractors, having good labor relations, capable of performing quality workmanship and working in harmony with Landlord's contractors and other contractors or subcontractors on the job. Landlord shall have the right to reasonably approve Tenant's contractors and subcontractors.

All construction work, refurbishings, decorations and improvements which may be made upon the Premises by the Tenant shall immediately become the property of the Landlord, except office furniture, office equipment and trade fixtures used in connection with the Tenant's business. Work performed by Tenant's contractors shall not in any way increase the rate of fire insurance on the Premises nor shall the Tenant's contractors bring or keep anything therein which will in any way increase the rate of the fire insurance on the Shopping Center, or obstruct or interfere with the right of other tenants, or in any way injure or annoy them, or conflict with the laws relating to fire, or with the regulations of the Fire Department, or with any insurance policy upon the Shopping Center or any part thereof, or conflict with any of the rules and ordinances of the Board of Health, City of Omaha Building and Inspection Department or other Departments of the City of Omaha, the County of Douglas, the State of Nebraska or the Federal Government.

All Tenant Work, refurbishings, decorations and improvements shall require the installation of new, first quality materials at least comparable to the quality installed in the Building when it was

31

constructed and shall be completed by Tenant in a continuous, expeditious and workmanlike manner. Such Tenant Work shall be installed in compliance with the specifications approved in writing by Landlord or approved substitutions in writing by Landlord. Tenant shall not penetrate the roof of the building or cause any contractor to access the roof. Any Tenant Work and any other work requested by Tenant involving the roof must be performed by Landlord's roofing contractor, or a contractor approved in writing by Landlord. If Tenant's Contractor performs any work on the roof, Tenant shall be responsible for any damages to the roof, Building, or Premises caused by Tenant or its contractor, including but not limited to, any roof puncture/penetration. In no event shall Tenant puncture/penetrate the roof without the express sole written consent of Landlord.

The Tenant shall have the exclusive responsibility to comply with the Americans with Disabilities Act relative to the Tenant's Work, refurbishings, decorations and improvements.

Tenant's Work, refurbishings, decorations and improvements may begin upon the substantial completion of the Landlord's Work as set forth herein together with the receipt by the Landlord from the Tenant of a complete set of plans and specifications prepared by the Tenant and approved in writing by the Landlord, which approval will not be unreasonably withheld, conditioned or delayed, pursuant to the review process contained below in Section 6, setting forth in sufficient detail the Tenant's Work, refurbishings, decorations and improvements to be completed by the Tenant in the Premises, said set of plans and specifications to be titled "Tenant's Work Approved for Construction" signed and dated by Tenant. Daily site cleanup is required.

Prior to commencement of Tenant's Work, Tenant shall cause its contractor(s) to obtain all governmental permits and approvals to complete the tenant improvements and forward copies to Landlord.

Tenant agrees that Landlord shall not be liable and Tenant shall indemnify Landlord against any damage to Tenant's contractor(s) or contractor's employee's property, or any equipment entrusted to Tenant's contractor(s) by others, and for the loss or damage to any of Tenant's contractors property or equipment by theft or otherwise.

Tenant shall provide HVAC to the Premises at locations on the roof approved in writing by the Landlord with any roof penetrations to be performed by Landlord's roofing contractor to not void the roof warranty.

At Tenant's cost and expense and part of Tenant's improvements, Tenant shall be responsible for installing a sub meter off the main water line.

VI.    REVIEW AND APPROVAL OF PRELIMINARY DRAWINGS AND CONSTRUCTION DRAWINGS PRIOR TO CONSTRUCTION:

A.    **Submission of Preliminary Drawings**. Within sixty (60) calendar days after Tenant's receipt of Landlord's construction drawings, Tenant shall submit to Landlord for its reasonable approval, Tenant's preliminary drawings ("Preliminary Drawings") for Tenant's Work including the exterior signage. The aforesaid Preliminary Drawings (i) shall adapt the Premises to specific site characteristics, (ii) comply with local building codes and requirements and all laws, and (iii) conform to Landlord's specific design, materials and signage requirements.

B.    **Review and Approval of Preliminary Drawings**. Within seven (7) calendar days of

32

Landlord's receipt of the Preliminary Drawings, Landlord shall, by giving written notice to Tenant, either approve the Preliminary Drawings or disapprove the same and specify in detail the reasons for such disapproval. If Landlord gives notice of its disapproval, Tenant shall re-submit revised Preliminary Drawings within ten (10) days thereafter for approval and the procedure shall continue until all of the disapproved items shall have been resolved.

C.      **Submission of Construction Documents**.  Within sixty (60) calendar days after receipt of Landlord's notice of approval as to the Preliminary Drawings, Tenant shall submit to Landlord for its reasonable written approval, Tenant's construction documents ("Construction Documents") for Tenant's Work which shall adapt the Premises to specific site characteristics, (ii) comply with building codes and requirements and all laws, and conform to Landlord's specific design, materials and signage requirements.

D.      **Approval of the Construction Documents**.  Within seven (7) calendar days of Landlord's receipt of the Construction Documents, Landlord shall, by giving written notice to Tenant, either approve the Construction Documents or disapprove the same and specify in detail the reasons for such disapproval.   If Landlord gives notice of its disapproval, Tenant shall re-submit the Construction Documents within ten (10) days thereafter for approval and the procedure shall continue until all of the disapproved items shall have been resolved.   Once the Construction Documents are approved, Landlord or Landlord's architect shall stamp or mark same identifying the approved Construction Documents which shall remain on Tenant's Premises at all times until Tenant opens for business.

E.      **Failure to Commence Construction**.  In the event Tenant fails to commence construction of the Tenant Work within ninety (90) calendar days after Landlord's approval of the Construction Documents, Landlord may at any time thereafter, at its option, terminate the Lease by written notice to Tenant and have all the remedies available contained in the Lease and by Nebraska law.

EXHIBIT "C"
## ECONOMIC TERMS AGREEMENT

This Economic Terms Agreement made this _____ day of July, 2015, by and between **180 BURKE, LLC,** a Nebraska limited liability company (hereinafter referred to as "Landlord") and Eat Fit Go Healthy Foods – Omaha, LLC a Nebraska limited liability company (hereinafter referred to as "Tenant").

### WITNESSETH:

**WHEREAS,** on _____, Landlord and Tenant entered into a lease agreement (the "Lease) relating to certain premises located at 304 North 180th Street, Omaha, Nebraska.

**WHEREAS,** the Landlord has delivered the Premises to Tenant; and

**WHEREAS,** the Landlord and Tenant desire to confirm the finalized economic terms of the Lease.

**NOW THEREFORE,** in consideration of the mutual covenants herein contained, the Lease executed by the parties, Landlord and Tenant agree as follows:

1.  The Rent Commencement Date is _____.

2.  The Lease Term shall expire on _____.

3.  Square footage of Premises: 1,414.

4.  Monthly Rent schedule:

    | | |
    |---|---|
    | December 1, 2015 through November 30, 2016 | $ 2,769.08 |
    | December 1, 2016 through November 30, 2017 | $ 2,824.47 |
    | December 1, 2017 through November 30, 2018 | $ 2,880.95 |
    | December 1, 2018 through November 30, 2019 | $ 2,938.57 |
    | December 1, 2019 through November 30, 2020 | $ 2,997.34 |

    Option Term:

    | | |
    |---|---|
    | December 1, 2020 through November 30, 2021 | $ 3,057.29 |
    | December 1, 2021 through November 30, 2022 | $ 3,118.44 |
    | December 1, 2022 through November 30, 2023 | $ 3,180.81 |
    | December 1, 2023 through November 30, 2024 | $ 3,244.42 |
    | December 1, 2024 through November 30, 2025 | $ 3,309.31 |

5.  Security deposit: $ _____.

6.  Estimated 2015 monthly Common Area Expenses, Insurance and

Taxes:_____.

7.    Tenant Improvement Allowance: $_____.

8.    The Lease and any addendums therewith are in full force and effect and hereby ratified and confirmed.

**IN WITNESS WHEREOF,** the Landlord and Tenant have caused this Economic Terms Agreement to be duly executed on the date first written above.

**LANDLORD:**
**180 BURKE, LLC,** a Nebraska
limited liability company


By:_____ _____
Name:  Scott Brown
Title:  Manager
Date:_____

**TENANT:**
[Tenant], a _____


By:_____
Name:_____
Title:_____
Date:_____

<u>EXHIBIT "D"</u>
**INTENTIONALLY OMITTED.**

EXHIBIT "E"
## RULES AND REGULATIONS

1.     **Keys.**  Tenant shall rekey the Premises after execution of the Lease and provide Landlord a copy for emergency purposes.  Once rekeyed, Tenant shall not change locks or install additional locks on doors without the prior written consent of Landlord. All keys to the Premises shall be surrendered to Landlord upon termination of this Lease.

2.     **Compliance with Landlord's Construction and Installation Regulation.**  Tenant shall refer all contractor's representatives and installation technicians rendering any service for Tenant at the Premises to Landlord before performance of any contractual service. Tenant's contractors and installation technicians shall comply with Landlord's rules and regulations pertaining to construction and installation. This provision shall apply to all work performed on or about the Premises including installation of telephones, telegraph equipment, electrical devices and attachments and installations of any nature affecting floors, walls, woodwork, trim, windows, ceilings, roof, equipment of all types or any other physical portion of the Premises or Project.

3.     **Hazardous Materials.**  Tenant shall not place on the Premises or in any part of the Shopping Center or use in or about the Premises or use any explosives, gasoline, kerosene, acids, caustics, flammable explosives or hazardous material without the written consent of Landlord.

4.     **Trash.**  All garbage and refuse shall be kept in the kind of container specified by Landlord, and shall be placed in the dumpsters located behind the Premises and prepared for collection in the manner and at the times and places specified by Landlord.  All trash shall be removed from the Premises through the rear doors of the Shopping Center and not through the front doors and shall not be stored anywhere outside of the Shopping Center except in the dumpsters as set forth herein.  Tenant shall not burn any trash or garbage of any kind in or about the Premises or the Shopping Center.  Tenant shall pay Tenant's Share of the cost of trash service as a Common Area Expense as defined in the Lease.  If Tenant is permitted under this Lease to handle foodstuffs, garbage and refuse shall be stored and daily removed from Premises in leak proof, airtight containers.  If any leakage occurs, Tenant shall promptly clean and remove any evidence of such leakage at its expense. Tenant shall immediately clean up and remove spills and debris in connection with its disposal of waste at or from the Premise.

5.     **Animals.**  No dogs, cats, fowl or other animals shall be brought into or kept in or about the Premises.

6.     **Common Area.**  Tenant shall not use the Common Areas, including areas adjacent to the Premises (except any outdoor seating area approved by Landlord pursuant to Paragraph 8 below), for any purpose other than ingress and egress, and in accordance with all other applicable provisions of this Lease, including these Rules and Regulations.  Without limiting the generality of the foregoing, Tenant shall not use the Common Areas to canvass, solicit business or information from, or distribute any article or material to, other tenants,

occupants or invitees of the Shopping Center, without the express written consent of Landlord. Tenant shall not allow anything to remain in or to obstruct any passageway, sidewalk, court, corridor, stairway, entrance, exit, elevator, shipping area, or other area outside the Premises (except as set forth in Paragraph 8 hereof). Janitorial closets, utility closets, telephone closets, broom closets, electrical closets, storage closets, and other such closets, rooms and areas shall be used only for the purposes and in the manner designated by Landlord, and may not be used by Tenant, or its contractors, agents, employees, or other parties without Landlord's prior written consent.

7.     **Plumbing Facilities.**  The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, agents or invitees shall have caused it.

8.     **Signage.**  Tenant shall not have any signs attached to the storefront glass except to the entry door which may contain Tenant's signage that is approved in writing by Landlord. Tenant acknowledges that Landlord will not permit any neon signs on the storefront or entry door. All signage shall comply with Landlord's sign policy. Tenant shall not place any window tinting or window coverings on the storefront glass of the Premises or any other change of the appearance to the storefront glass other than displays of merchandise without the written approval of Landlord.

9.     **Parking.**  Landlord reserves the right to designate tenant employee parking areas which are currently the perimeter stalls of the Shopping Center. The parking spaces located in front and near the Premises are for customer parking only. No other tenant specific designated parking stalls will be provided.

10.     **Smoking.**  No smoking in front or inside of the Premises. Smoking is only permitted in designated areas outside in the rear of the building.

11.     **Pest Control.**  Tenant shall, at its sole cost, arrange for pest control at such intervals as may reasonably be necessary. Tenant shall provide Landlord with evidence of Tenant's compliance with this provision within 5 days after Landlord's request.

12.     **Display of Merchandise.**  Tenant shall not place or maintain any permanent or temporary fixture or other item or display any merchandise: (i) outside of the Premises; or (ii) anywhere within 3 feet of the entrance of the Premises. All displays of merchandise shall be tasteful and professional.

13.     **Deliveries.**  Deliveries of furniture, inventory and all other items shall be brought into the Shopping Center at Tenant's sole risk. Such deliveries shall be made only through the service rear entrances of Tenant's Premises and shall complete all deliveries prior to 10:00 a.m. of each day. Landlord may inspect items brought into the Shopping Center or Premises with respect to weight or dangerous nature or compliance with this Lease or applicable Laws. Tenant

shall move all inventories, supplies, furniture, equipment and other items directly into the Premises immediately upon receipt.

Tenant shall attempt to prevent delivery trucks or other vehicles servicing the Premises from parking or standing in front of, or at the rear of the Premises from 10:00 A.M. to 9:00 P.M. of each day. Loading and unloading must be performed with vehicles parked parallel to the loading and at the rear of the Building.

14. **Roof; Awnings and Projections.** Tenant shall not install any aerial, antennae, satellite dish or any other device on the roof, exterior walls or Common Areas of the Shopping Center without obtaining Landlord's prior written consent, provided that Tenant shall be permitted to install, at Tenant's sole cost and expense, cable television service to the Premises. Tenant may install and have access to rooftop HVAC equipment only to the extent approved in writing or required by Landlord from time to time in connection with Tenant's obligations under this Lease. No awning or other projection shall be attached by or for Tenant to the exterior walls of the Premises or the Building. Any item set forth in this paragraph installed without the prior written consent of Landlord shall be subject to removal by Landlord without notice to Tenant all at Tenant's sole cost and expense.

15. **Overloading Floors.** Tenant shall not overload any floor or part thereof in the Premises, Building or Shopping Center, including any public corridors or elevators therein, and Landlord may designate the location of safes, vaults and all other heavy articles and require supplementary supports of such material and dimensions as Landlord may deem necessary to properly distribute the weight at Tenant's expense (including expenses for structural review and engineering).

16. **Prohibited Activities.** Tenant shall not: (i) use strobe, flashing lights or rotating spotlights in or on the Premises (or other areas of the Shopping Center) or in any signs for the Premises; (ii) use, sell or distribute leaflets, handbills, bumper stickers, other stickers or decals, balloons or other such articles in the Premises (or other areas of the Shopping Center); (iii) operate any loudspeaker, telephone set, radio, CD player or other musical instrument or device that can be heard from outside the Premises; (iv) do or permit anything in or about the Premises that is unlawful, immoral, obscene, pornographic, or which tends to create or maintain a nuisance or do any act tending to injure the reputation of the Building; (vi) cause, conduct, permit or advertise any auction or closing-out or wholesale business in the Shopping Center; or any distress sale, fire sale, bankruptcy sale, liquidation, relocation sale, closing sale, going-out-of-business sale, or any other sale that in Landlord's opinion, adversely affects the reputation of the Building; nor (vii) do or permit anything to be done upon the Premises or any other areas of the Shopping Center in any way tending to disturb, bother or annoy any other tenant at the Building or the occupants of the neighboring property.

17. **Conduct of Business.** Tenant agrees at all times to conduct its business in a dignified, ethical, responsible, and reputable manner consistent with the highest standards of service and merchandising; and to store or stock only such goods, and merchandise in the Premises as Tenant intends to offer for sale at retail in the Premises.

18.    **Further Rules and Regulations.**  Landlord reserves the right to make such other and further reasonable rules and regulations as in its judgment may from time to time in writing be necessary for the safety, care and cleanliness of the Premises and for the preservation of good order therein.

19.    **Responsibility for Compliance.**   Tenant shall be responsible for ensuring compliance with these Rules and Regulations, as they may be amended from time to time, by Tenant's employees and, as applicable, by Tenant's agents, invitees, contractors, subcontractors and suppliers.

EXHIBIT "F"
## BUILDING SIGNAGE CRITERIA
### Exterior Sign Specifications

The purpose of the sign criteria is to establish standards and guidelines for design, fabrication and installation of tenant signage.

GENERAL REQUIREMENTS:

1. Tenant will be responsible for all design and installation of all signage at its sole cost and expense.
2. Tenant will submit to Landlord copies of fabrication drawings for Landlord's review and approval. These drawings must show the proposed sign in elevation of the full extent of the Tenant's store front leased area and a full specification drawing is necessary to describe the method of assembly and electrical components used.
3. All permits and approvals as required by local building or sign codes shall be obtained and paid for by the Tenant at its sole cost.
4. Illuminated store front signs shall be wired back to the Tenant's electrical panel.
5. The following are prohibited:
   a. Flashing or blinking sign.
   b. Channelume letters utilizing armour ply backing.
   c. Descriptions of services, products or merchandise other than the Tenant's trade name.
   d. Banners, flags or pennants.
   e. Trailer signs or box type signs and marquee type signs.
   f. Projection signs, roof signs or animated or audible devices.
   g. No paper, cloth, cardboard, decal or similar signs shall be applied to any store front or window.
6. Tenant shall maintain all signs in good appearance and illumination and shall be responsible for penetrations, leaks or damage caused by sign to Landlord's property.
7. All illumination signs must bear the UL label and the installation must comply with all building and electrical codes.
8. Tenant shall install on the store front the numbers only for the street address of the Premises. Size, type and color of the numbers shall be in conformance with other tenant spaces and as approved by Landlord.
9. The provisions of this Exhibit, at Landlord's sole discretion, may be modified for any major tenant or free standing building that may be located in the Shopping Center.
10. All signs shall be reviewed by Landlord for conformance with these criteria and overall design quality. Approval or disapproval of signs based on aesthetics of design shall remain in the sole discretion of Landlord.
11. Total building signage shall not exceed .035 / 1,000 square feet of the Premises measured under city of Omaha signage guidelines.
12. All Tenant signage, hours of operation, payment options and services rendered is to be white vinyl letters on plexiglass attached to interior side of door only. No vinyl signage on storefront windows.

41

13. Slate color pull down fabric shad is the building standard.  No other window shade will be allowed.  Tenant to purchase.  Spec – draper flex shade with bead chain clutch operator using sheerweave SW 4800 V12 slate fabric with 1% openness.  Space between shades to align with storefront glass panel.  Purchase contact: Leeann Niepokoj@contract interiors, 4042 South 108th Street, Omaha, Nebraska 68137, (402.331.1200).

14. All window displays, posters, etc. to be held at least 12" from glass and not attaching to glass.

15. Exposed neon "Open" sign hung in window.  Must be building standard and red in color.

16. No backs of any display fixture / shelving may be exposed or block storefront window unless visually screened with appropriate material.  Submit to Landlord for approval.

17. Storefront window is not to have any paint, decorations and coverings – clear visibility into store must be maintained at all times. Storefront glazing is 1" tempered glass.

18. To prevent frost and fog formation along storefront glass, the Tenant is required to install adjustable linear slot diffusers along the entire length of the storefront glass with an output rate of 800-1000 CFM from adjustable style linear slot diffusers.

19. Tenant to submit an electronic set of building elevation and specifications for Landlord's approval.


## CONFIGURATION:

1. Sign shall be in the form of individual, full metal channel letters, illuminated from the interior, mounted to buildings.

2. The overall length of the sign shall not exceed 80% of the leased frontage and the sign must be centered vertically within the sign bank, and shall also be centered on the sign bank between side leased lines and not encroach upon 5 feet of the end space of the Premises.  The sign area square footage shall not exceed 75% of the total length of the leased frontage.

3. Maximum sign height is 36 inches (i.e. one line of 36 inch high letters or two lines of 16 inch letters with 4 inches of space between or any combination that does not exceed 36 inches in height from top to bottom of overall signage).  Signs will be a minimum of 4 inches deep and a maximum of 6 inches deep.

## FABRICATION:

1. The individual channel letters are to be either pre-finished factory baked enamel coating over aluminum or galvanized zinc chromate with two coats of sanding primer or one coat of Dupont Centurl (polyurethane) enamel.

2. The channel letter shall be of aluminum either .063 thick, heliarc welded construction, .040 thick, with returns pop riveted to aluminum letter backs, with no pop rivets visible.  Aluminum backs arc to match sidewall thickness.

3. Color of sidewalls to be dark bronze to match aluminum store front.

4. Interiors of letters to be white or a color approved by the Landlord in writing.

5. Letter faces are to be two layers of 1/8 inch acrylic, #2412 bronze outside layer and #2159 or #2447 white inside layer.

6. Letter faces shall be retained with a one inch "jewel lite" or equal, acrylic over metal trim molding, color to match signage sidewalls.

7. Neon shall be 15 mm, 6500 white, with 30 m.a. transformers.

8. All fasteners, screws, bolts and spacers used in fabrication of sign shall be non-ferrous and/or non-corrosive.

9. Sign shall be attached to fascia with lag screws into lead expansion shields. Wiring from letters shall pass first through conduit, through the fascia to the transformer located behind the fascia or parapet wall. From the transformers, wiring will then go through rigid thick wall conduit to the Tenant's electrical panel. Where façade is penetrated for mounting and conduit, these penetrations shall be made weather tight by sign contractor.

10. Letters are to be held off the façade by ½ inch neoprene spacers, to allow water and debris to pass freely behind.

OPERATION:

1. Tenant shall operate signs by means of a photoelectric cell which turns on at dusk and a time clock which will turn the signs off at 11:00 P.M.

EXHIBIT "G"
## COVENANTS AND USE RESTRICTIONS
### PROHIBITED USES

In addition to the prior provisions of this Lease with regard to prohibited uses, Tenant agrees neither it nor its successors or approved assignees and sublessees will use any part of the Premises and adjacent property, in any event for any other Exclusive Uses provided by Landlord in leases to other tenants in the Shopping Center including but not limited to:

**RESTRICTIONS CONTAINED IN THE COVENANTS FILED AT INSTRUMENT 200519508:** (a) any office building in which more than fifty (50%) percent of the gross building area of any such building is used to provide medical services; (b) any industrial building of a type which is described as an "industrial use" in the industrial zoning classifications or districts of the Omaha Zoning Code; (c) any of the following uses: (i) chiropractic office, or (ii) dental office, or (iii) any specialty clinic providing physician originated or approved medical treatment, or (iv) for any medical office which provides medical services which are customarily associated and identified with medical services provided by or in hospitals in Omaha, Nebraska, if more than five thousand (5,000) square feet of floor area is devoted to such use by any such office or clinic.

**RESTRICTIONS CONTAINED IN THE PURCHASE AGREEMENT BETWEEN VILLAGE WEST, LLC, AND 180 BURKE, LLC DATED AUGUST 11, 2014:** The Property shall not be occupied or used for any of the following uses (i) for any purpose or use which violates the provisions of Article 5 of the Declaration dated February 21, 2005 recorded on February 22, 2005 in the Miscellaneous records of the Douglas County Register of Deeds as Instrument No. 2005019508; or (ii) as a discount store; or (iii) as a supermarket or grocery store; or (iv) for the operation of a drug store; or (v) or a so called pharmacy or prescription ordering, processing or delivery facility, whether or not a pharmacist is present at such facility, or for any purpose requiring the presence of a qualified pharmacist or other person authorized by law to dispense medical drugs, directly or indirectly, for a fee or remuneration of any kind, except as may be incidentally sold or dispensed in conjunction with medical, dental, veterinarian or other services; or (vi) as a facility dispensing gasoline or petroleum products or as a convenience food mart, or combination of both; or (vii) any clinic or facility providing abortion services; or (viii) as a general merchandise store that exceeds five thousand (5,000) square feet or department store; or (ix)as an automobile or truck repair or services (including lubrication) facility; or (x) any health spa, fitness center or workout facility that exceeds five thousand (5,000) square feet; or (xi) as a beauty school or barber school or technical school or other place of instruction; or (xi) sale of beauty supplies to the extent the shelving devoted to such sales measured horizontally on the floor exceeds 100 lineal feet; or (xii) child day care center or pre-school facility.

<u>Restricted Temporary Uses</u>.  No portion of the Property shall be used for: traveling carnivals, fairs, auctions, shows, kiosks, booths for the sale of fireworks, sales by transient merchants using vehicles, booths, or tents, or any other outdoor promotions of any nature.

<u>Prohibited Uses</u>.

44

(i)      Any use which emits an obnoxious odor, noise, or other excessive or unreasonable sound which can be heard or smelled outside of any building within the Property;

(ii)      Any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation;

(iii)      Any pawnshop, army surplus store, salvage store, or "second hand" store whose principal business is selling used merchandise, thrift shops, Salvation Army type stores and "goodwill" type stores;

(iv)      Any mobile home park, trailer court, labor camp, junkyard or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction or maintenance);

(v)      Any dumping, disposing, incineration, or reduction of garbage (exclusive of approved enclosed garbage containers located at the rear or side of any Building within the Property);

(vi)      Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

(vii)      Any central laundry, dry cleaning plant, laundromat, or laundry pick-up facility, but a drop/off pick up laundry business such as Max I Walker or Camelot Cleaners is a permitted use provided no cleaning is performed on the Property;

(viii)      Any automobile, truck, trailer, boat, mobile home or recreational vehicle sales, leasing, display, storage or body shop repair operation or gas station;

(ix)      Any bowling alley or skating rink;

(x)      Any movie theater or live performance theater, banquet hall, auditorium or other place of public assembly;

(xi)      Any church, school or religious reading room;

(xii)      Any animal raising facility;

(xiii)      Any mortuary or funeral home;

(xiv)      Any establishment selling or exhibiting (a) pornographic, or (b) any merchandise or material commonly used with or in consumption of any narcotic, dangerous drug or other controlled substance, including without limitation, any hashish pipe, waterpipe, bong, cilium, pipe screens, rolling papers, rolling devices, coke spoons, or roach clips;

45

(xv) Any bar, tavern, restaurant or other establishment whose reasonably projected annual revenues from the sale of alcoholic beverages for on-premises consumption exceeds forty (40%) of the gross revenues of such business.

(xvi)   Any flea market, laser tag or virtual reality facility, game room, amusement or video arcade, pool or billiard hall, car wash, gun range, dance hall, discotheque, or massage parlor;

(xvii)   Any training or educational facility, including, but not limited to, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provide, however, this prohibition shall not be applicable to on-site employee or customer training by the Owner of the Property incidental to the conduct of its business; and

(xviii)  Any gambling activity, facility or operation, including but not limited to, off-track or sports betting parlor; table games such as black-jack or poker; slot machines; or bingo hall.

**ELKHORN RIDGE VISION**: Landlord, as further consideration for Tenant's entering into this lease, agrees that as long as the Premises are occupied by Tenant, its successors, or assigns for operation of an eye care sales and services and all other related uses normally associated with an optometrist practice and eyeglass retail store convenience store ("Optometrist Practice"), neither Landlord nor its subsidiaries, affiliates, successors, or assigns, or any entity in which they or any of them have an interest will demise, lease, sublease, use, or permit the use of for the purpose of an Optometrist Practice, any part of any property now or hereafter owned, acquired, or leased by them or any of them within the Shopping Center.

**SCOOTERS COFFEE**:  As long as Tenant is not in material default and Tenant is continuously operating under the approved Use, Landlord will not lease space within the Shopping Center to any other retailer/service provider whose primary line of business is the sale of coffee or smoothies.  Notwithstanding the foregoing, Landlord shall be allowed to lease any space in the Shopping Center to any business who receives twenty percent (20%) or less of their gross sales from the sale of coffee and specialty coffee or forty percent (40%) or less of their gross sales from the sale of smoothies.

**ACCESS BANK**: As long as Tenant is not in default and Tenant is continuously operating under the approved Use, Landlord will not lease space within the Shopping Center to any other person, company, or organization including its or their parent, subsidiary, affiliate, branch or otherwise related that is or intends to engage in any activity of a commercial bank, savings association, mortgage company, credit union or other federally insured financial institution (collectively "Exclusive Use") other than as an ancillary use defined as twenty percent (20%) or less of gross revenues derived from such use at the Shopping Center.  Tenant acknowledges and agrees that Landlord may lease space in the Shopping Center to any tenant that provides financial planning, wealth management, tax services, insurance, and any other similar products or services, provided any such gross revenues derived from the Exclusive Use are twenty percent (20%) or less of the such tenant's gross revenues at the location in the Shopping Center.  The intent of the parties is

46

to exclude tenants such as and similar to the following: (i) SAC Federal Credit Union; (ii) Wells Fargo (bank or mortgage); (iii) First National Bank; or (iv) Eagle Mortgage. Notwithstanding the foregoing, it is the further intent of the parties to allow Landlord to lease space in the Shopping Center to companies (including but not limited to) such as and similar to the following: (i) TD Ameritrade; (ii) H&R Block; (iii) Morgan Stanley; (iv) Edward Jones; (v) State Farm Insurance; and (vi) RBC Wealth Planning.

**THE UROLOGY CENTER, P.C.:**    As long as Tenant is not in default and Tenant is continuously operating under the approved Use, Landlord will not lease space within the Shopping Center to any other medical office provider whose primary line of business is urology and all other related uses normally associated with a urology practice.

**JERSEY MIKE'S:**    As long as Tenant is not in default and Tenant is continuously operating under the approved Use, Landlord will not lease space within the Shopping Center to any other business whose gross sales are in excess of forty percent (40%) derived from the sale of submarine style sandwiches for either on or off site consumption, including competitors such as Which Wich, Potbelly, Subway, Mr. Goodcents, Pickleman's, Lenney's Sub Shop, Jimmy John's, Milio's Sandwiches, Blimpie, Jason's Deli, Panera or Firehouse Subs.

**MODERN GRILLE:**        As long as Tenant is not in default and Tenant is continuously operating under the approved Use, Landlord will not hereafter lease any space within the Shopping Center to a tenant whose primary business is a fine dining restaurant that offers table service (waiters and waitresses) serving traditional American classic food (salads, chicken, steak, seafood).  As used herein, "primary business" means that fifty percent (50%) of the gross food sales of the other tenant are derived from traditional American classic food (salads, chicken, steak, seafood) offered by table service (waiters and waitresses).  Notwithstanding the foregoing, this exclusive shall not apply to any of the following: (i) spaces 2,000 square feet or less; (ii) restaurants that do not engage waiters or waitresses and sales are from the counter commonly known as fast casual restaurants; (iii) table service restaurants whose primary business is other than traditional American classic food (salads, chicken, steak and seafood) including, but not limited to, ethnic restaurants (Greek, Italian, Indian, Mexican, French, etc.); and (iv) casual dining restaurants contained in the Wikipedia website or commonly known in the industry as casual dining.

<u>EXHIBIT "H"</u>
## AUTOMATED FUNDS TRANSFER ("AFT") AUTHORIZATION

LANDLORD:  **180 BURKE, LLC ("Landlord")**

By signing this form, I hereby authorize Landlord or its agent to initiate debit entries from my financial institution account identified below for payments due to Landlord.  I authorize my financial institution identified below to debit my account for these payments.  I agree that my financial institution will not be liable for any deduction request not honored, and I understand and agree that I am ultimately responsible for any amounts that I owe Landlord.  I understand that Landlord will charge me a fee, and that I am obligated to pay that fee for any dishonored debit request. This authority shall remain in effect until I give Landlord written notice of a change or modification to the account which notice shall be provided with at least thirty (30) days before the effective date of termination.  I understand that Landlord reserves the right to terminate the processing of payments through this ATF arrangement at any time.  I also understand that we will not receive written notices each month of the amount due. I understand that the origination of the ACH transactions to my account must comply with the provisions of U.S. law and will be initiated on the 1st day of each month unless such day falls on day that the Bank is not open and then it will be the next business day.

BANK NAME _____

ADDRESS _____

CITY _____ STATE _____ ZIP _____

TRANSIT/ABA NO. _____ ACCOUNT NO. _____

NAME OF ACCOUNT _____

TAX ID NO. OR SOCIAL SECURITY NUMBER _____

This authority is to remain in full force and effect throughout the Lease Term unless Landlord and Tenant agree in writing to modify otherwise.

Date_____

Signature _____

Print Name and Title _____

**NOTE: Please attach a voided deposit ticket below.**

**Deposit Ticket**

48

EXHIBIT "I"
**GUARANTY**

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce 180 Burke, LLC, to enter into a certain Shoppes at Village Pointe West Lease (the "Lease") with Eat Fit Go Healthy Foods – Omaha, LLC ("Tenant"), the undersigned hereby jointly and severally, absolutely, irrevocably and unconditionally guarantee to Company the full and complete payment and performance of all of the duties, obligations, liabilities, indemnifications and responsibilities of Tenant under the Lease (collectively, the "Obligations") and further covenants and agrees:

1.      No act or thing need occur to establish the liability of the undersigned hereunder, and no act or thing, except full payment and discharge of all Obligations, shall in any way exonerate the undersigned or modify, reduce, limit or release the liability of the undersigned hereunder.

2.      This is an absolute, unconditional and continuing guaranty of payment of the Obligations.

3.      The undersigned will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the undersigned against any person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

4.      The undersigned will pay or reimburse Landlord for all costs and expenses (including reasonable attorney fees and legal expenses) incurred by Landlord in connection with the protection, defense or enforcement of this Guaranty in any litigation or bankruptcy or insolvency proceedings.

5.      The liability of the undersigned shall not be affected or impaired by any of the following acts or things (which Landlord is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this Guaranty, without notice to or the approval by the undersigned): (i) any acceptance, discharge, release or termination of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Tenant, any delay or lack of diligence in the enforcement of the Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue, Tenant or any other guarantor or other person liable in respect of any Obligations; (v) any discharge of any Obligations or acceptance of any instrument in renewal thereof or substitution therefor; (vi) any failure to obtain collateral security (including rights of set off) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure or enforce any collateral security or modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or evidence thereof; (ix) any order of application of any payments or credits upon Obligations.

6.      The undersigned waive any and all defenses, claims and discharges of Tenant, or any other obligor, pertaining to Obligations, except the defense of discharge by payment and performance in full. Without limiting the generality of the foregoing, the undersigned will not assert, plead or enforce against Landlord any defense, waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, usury, minority, illegality or unenforceability which may be available to Tenant or any other person liable in respect of any Obligations, or any setoff available against Landlord to Tenant or any such other person, whether or not on account of a related transaction.

7.      The undersigned waive presentment, demand for payment, notice of dishonor or nonpayment and protest. Landlord shall not be required first to resort for payment of the Obligations to Tenant or other persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this Guaranty.

8.      If any payment applied by Landlord to Obligations is hereafter set aside, recovered, rescinded or required to be returned for any reason, (including without limitation, the bankruptcy, insolvency or reorganization

49

of Tenant or any other obligor), the Obligations to which such payment was applied shall for the purposes of this Guaranty be deemed to have continued in existence, notwithstanding such application, and this Guaranty shall be enforceable as to such Obligations as fully as if such application had never been made.

9.       The liability of the undersigned under this Guaranty is in addition to and shall be cumulative with all other liabilities of the undersigned to Landlord as guarantor or otherwise, without limitation as to amount.

10.      This Guaranty shall be enforceable against each person signing this Guaranty, even if only one person signs and regardless of any failure of other persons to sign this Guaranty. If there be more than one signer, all agreements and promises herein shall be construed to be, and are hereby declared to be, joint and several in each and every particular and shall be fully binding upon and enforceable against either, any, or all of the undersigned. This Guaranty shall be effective upon delivery to Landlord, without further act, condition or acceptance by Landlord, shall be binding upon the undersigned and the heirs, representatives, successors and assigns of the undersigned and shall inure to the benefit of Landlord and its participants, successors and assigns. Any invalidity or unenforceability of any provision or application of this Guaranty shall not affect other lawful provisions and applications hereof, and to this end the provisions of this Guaranty are declared to be severable. This Guaranty may not be waived, modified, amended, terminated, released, or otherwise changed, except by a writing signed by the undersigned and Landlord. This Guaranty is issued in the State of Nebraska and shall be governed by its laws. The undersigned waive any notice of Landlord's acceptance thereof and waive the right to a trial by jury in any action based on or pertaining to this Guaranty. Time is of the essence.

11.      **NOTWITHSTANDING ANYTHING TO THE CONTRARY, EACH GUARANTOR SHALL BE RESPONSIBLE FOR FIFTY PERCENT (50%) OF ANY OBLIGATIONS.**

IN WITNESS WHEREOF, this Guaranty has been duly executed by the undersigned.

Name:   Aaron McKeever                          Name:   Sardor Vakhidor
Social Security No.: 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                Social Security No.: 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
Date:                                           Date:

50

EXHIBIT "J"
## CONCEPTUAL EXTERIOR ELEVATIONS



# GUARANTY

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce 180 Burke, LLC, to enter into a certain Shoppes at Village Pointe West Lease (the "Lease") with Eat Fit Go Healthy Foods – Omaha, LLC ("Tenant"), the undersigned hereby jointly and severally, absolutely, irrevocably and unconditionally guarantee to Company the full and complete payment and performance of all of the duties, obligations, liabilities, indemnifications and responsibilities of Tenant under the Lease (collectively, the "Obligations") and further covenants and agrees:

1.      No act or thing need occur to establish the liability of the undersigned hereunder, and no act or thing, except full payment and discharge of all Obligations, shall in any way exonerate the undersigned or modify, reduce, limit or release the liability of the undersigned hereunder.

2.      This is an absolute, unconditional and continuing guaranty of payment of the Obligations.

3.      The undersigned will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the undersigned against any person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

4.      The undersigned will pay or reimburse Landlord for all costs and expenses (including reasonable attorney fees and legal expenses) incurred by Landlord in connection with the protection, defense or enforcement of this Guaranty in any litigation or bankruptcy or insolvency proceedings.

5.      The liability of the undersigned shall not be affected or impaired by any of the following acts or things (which Landlord is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this Guaranty, without notice to or the approval by the undersigned): (i) any acceptance, discharge, release or termination of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Tenant, any delay or lack of diligence in the enforcement of the Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue, Tenant or any other guarantor or other person liable in respect of any Obligations; (v) any discharge of any Obligations or acceptance of any instrument in renewal thereof or substitution therefor; (vi) any failure to obtain collateral security (including rights of set off) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure or enforce any collateral security or modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or evidence thereof; (ix) any order of application of any payments or credits upon Obligations.

6.      The undersigned waive any and all defenses, claims and discharges of Tenant, or any other obligor, pertaining to Obligations, except the defense of discharge by payment and performance in full.  Without limiting the generality of the foregoing, the undersigned will not assert, plead or enforce against Landlord any defense, waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, usury, minority, illegality or unenforceability which may be available to Tenant or any other person liable in respect of any Obligations, or any setoff available against Landlord to Tenant or any such other person, whether or not on account of a related transaction.

7.      The undersigned waive presentment, demand for payment, notice of dishonor or nonpayment and protest. Landlord shall not be required first to resort for payment of the Obligations to Tenant or other persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this Guaranty.

8.      If any payment applied by Landlord to Obligations is hereafter set aside, recovered, rescinded or required to be returned for any reason, (including without limitation, the bankruptcy, insolvency or reorganization of Tenant or any other obligor), the Obligations to which such payment was applied shall for the purposes of this

Guaranty be deemed to have continued in existence, notwithstanding such application, and this Guaranty shall be enforceable as to such Obligations as fully as if such application had never been made.

9.      The liability of the undersigned under this Guaranty is in addition to and shall be cumulative with all other liabilities of the undersigned to Landlord as guarantor or otherwise, without limitation as to amount.

10.      This Guaranty shall be enforceable against each person signing this Guaranty, even if only one person signs and regardless of any failure of other persons to sign this Guaranty.  If there be more than one signer, all agreements and promises herein shall be construed to be, and are hereby declared to be, joint and several in each and every particular and shall be fully binding upon and enforceable against either, any, or all of the undersigned.  This Guaranty shall be effective upon delivery to Landlord, without further act, condition or acceptance by Landlord, shall be binding upon the undersigned and the heirs, representatives, successors and assigns of the undersigned and shall inure to the benefit of Landlord and its participants, successors and assigns.  Any invalidity or unenforceability of any provision or application of this Guaranty shall not affect other lawful provisions and applications hereof, and to this end the provisions of this Guaranty are declared to be severable.  This Guaranty may not be waived, modified, amended, terminated, released, or otherwise changed, except by a writing signed by the undersigned and Landlord.  This Guaranty is issued in the State of Nebraska and shall be governed by its laws.  The undersigned waive any notice of Landlord's acceptance thereof and waive the right to a trial by jury in any action based on or pertaining to this Guaranty.  Time is of the essence.

11.      **NOTWITHSTANDING ANYTHING TO THE CONTRARY, EACH GUARANTOR SHALL BE RESPONSIBLE FOR FIFTY PERCENT (50%) OF ANY OBLIGATIONS.**

IN WITNESS WHEREOF, this Guaranty has been duly executed by the undersigned.

Name:   Aaron McKeever
Social Security No.:  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
Date:  July 30, 2015

Name:   Sardor Vakhidor
Social Security No.:  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
Date:  July 30, 2015