## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of February 15, 2019 (the "**Effective Date**"), by and between Eat Fit Go Omaha Kitchen, LLC, Eat Fit Go Kansas City Kitchen, LLC, Eat Fit Go Georgia Kitchen, LLC, Eat Fit Go Arizona Kitchen, LLC, Eat Fit Go Healthy Foods - Des Moines, LLC, Eat Fit Go Healthy Foods - Kansas City, LLC, EFG Shared Services, LLC (No Rev), Eat Fit Go Healthy Foods - Omaha, LLC, Eat Fit Go Healthy Foods - Minnesota, LLC, and Eat Fit Go Healthy Foods, LLC (collectively, the "**Seller**") and Panorama Wellness, Inc. ("**Purchaser**") with reference to the following.

RECITALS

A.       Seller has commenced cases (lead case number 18-81127-TLS) (the "**Bankruptcy Case**") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* as amended (the "**Bankruptcy Code**") by filing voluntary petitions in the United States Bankruptcy Court for the District of Nebraska (the "**Bankruptcy Court**"). The date of commencement of the Bankruptcy Case is referred to in this Agreement as the "**Petition Date**."

NOW, THEREFORE, in consideration of the foregoing and the agreements of the parties set forth herein, Seller and Purchaser agree as follows:

1.    PURCHASE AND SALE OF ASSETS.

1.1 Purchased Assets. On and subject to the terms and conditions stated in this Agreement, at Closing, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, free and clear of all Encumbrances (other than Assumed Liabilities), all of the Assets, including, without limitation, all of Seller's right, title, and interest in, to and under the Assets identified on Exhibit "A" and the following:

1.1.1    all furniture, fixtures, Inventory, raw material, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and all other tangible personal property;

1.1.2    all Books and Records (other than those described in Section 1.2.4, which shall be Excluded Assets);

1.1.3    the Contracts (as defined below), including the leases of real property listed on Exhibit "B" ("**Assumed Leases**"), including any security deposits or other deposits delivered in connection therewith;

1.1.4    (i) all of Seller's Intellectual Property, and (ii) all rights as to, Actions, and/or remedies against infringements, dilutions, misappropriations, and other violations thereof, rights of priority and protection of interests therein and all tangible embodiments thereof;

1.1.5    all permits that relate in any way to the business or the Assets (to the extent transferrable to Purchaser);

4842-3765-2569.v5

**EXHIBIT A**

1.1.6    all insurance benefits, rights and proceeds, and other refunds, rebates, discounts and credits, performance and other bonds, security and other deposits, advance payments, prepaid expenses and any other prepayments in favor of Seller to the extent relating to the business, the Assets or the Assumed Liabilities;

1.1.7    all goodwill associated with the business or the Assets;

1.1.8    (i) all Actions, whether known or unknown, that Seller may have against Purchaser, its Affiliates (including against Panorama Point Partners and Stephen George, if any), or Brock Hubert if Purchaser hires Mr. Hubert after Closing, and (ii) all Actions, whether known or unknown, that Seller may have against any third parties in respect of the Assets or the Assumed Liabilities;

1.1.9    other than those described in Section 1.2.6, all rights, privileges, and Actions in respect of prepayments, refunds, warranty claims, indemnification agreements in favor of Seller with, and indemnification and similar rights against, third parties, and any other rights or claims with respect to the business, the Assets, or Assumed Liabilities; and

1.1.10    all accounts receivable (including from franchisees and non-franchisees), save for credit cards receivable;

1.1.11    all other assets of Seller that are not Excluded Assets.

1.2 <u>Excluded Assets</u>.  The following assets are excluded from the Assets, are not a part of the transaction and shall remain assets of Seller after the Closing (collectively, the "**Excluded Assets**"):

1.2.1    all contracts of Seller (whether written or oral) other than the Contracts;

1.2.2    the Purchase Price and all cash, negotiable instruments and cash equivalents, bank accounts,  securities, instruments and other investments of Seller as of the Closing;

1.2.3    all equity securities or other interests in Seller or any of its Affiliates;

1.2.4    (i) all corporate minute books, corporate seals, stock transfer books, minute books and other corporate books and records relating solely to Seller's organization and existence, (ii) Books and Records related solely to Excluded Assets or Excluded Liabilities, (iii) a copy of Books and Records which by law Seller is required to retain, and (iv) Books and Records prepared primarily in connection with this Agreement and which are subject to privilege;

1.2.5    the rights that accrue or will accrue to Seller under this Agreement;

1.2.6    all Actions not included in Section 1.1, including Sections 1.1.4, 1.1.8, and 1.1.9, including but not limited to all Actions involving Aaron McKeever, Sam Vakhidov, Jennifer Cain, franchise agreements, leases (other than the Assumed Leases), and all rights, claims and Actions arising under or related to Chapter 5 of the Bankruptcy Code, except for any Actions included within Section 1.1.4, 1.1.8, and 1.1.9; and

1.2.7   credit card receivables.

## 2.   ASSIGNMENT AND ASSUMPTION OF EXECUTORY CONTRACTS.

2.1 Assignment and Assumption at Closing.   Purchaser and Seller hereby agree that at the Closing, and upon all of the terms and subject to all of the conditions of this Agreement, pursuant to section 365 of the Bankruptcy Code, Seller shall assign to Purchaser, and Purchaser shall assume from Seller, all rights and obligations arising under only those contracts, if any, and real estate leases listed and described on Exhibit "B" (collectively, the "**Contracts**").  At the Closing, to the extent not previously paid, Purchaser shall pay or cause to be paid through the Purchase Price (and shall reimburse or cause to be reimbursed to Seller on an after-Tax basis any amounts paid after the date hereof in respect of) any and all cure costs (that are listed on Exhibit "B") in respect of all of the Contracts that are required to be paid pursuant to Section 365 of the Bankruptcy Code (the "**Cure Amounts**").  Seller represents that the cure costs included on Exhibit B are true and correct to the best of its knowledge and belief and agrees that any net increase in the Cure Amounts will be deducted from the amount to be received by the bankruptcy estate as part of the allocation of the Purchase Price and will not increase the Purchase Price.

2.2 Assumed Liabilities; Excluded Liabilities.   Notwithstanding any provision in this Agreement to the contrary, Purchaser shall assume only the Cure Amounts listed on Exhibit "B" and liabilities arising out of or related to the ownership and operation of the Assets, solely to the extent arising after the Closing Date (and for the avoidance of doubt, excluding any liability arising out of or related to any breach, default (whether monetary or non-monetary), act or omission that occurred prior to the Closing Date) (collectively, the "**Assumed Liabilities**").  All other liabilities shall be retained by and remain liabilities of Seller (the "**Excluded Liabilities**").  Neither Purchaser nor any of its Affiliates shall assume, and shall not be deemed to have assumed, and shall not be responsible for the payment, performance, or discharge of, any Excluded Liabilities. The Excluded Liabilities include, without limitation, the following:

2.2.1   all liabilities which are not Assumed Liabilities;

2.2.2   all liabilities related to, asserted in, or arising out of the Bankruptcy Case (other than Cure Amounts listed on Exhibit "B" relating to Contracts, if any), including, but not limited to, scheduled claims, proofs of claim that were or could have been filed (assuming proper notice) in the Bankruptcy Case, and claims pursuant to Section 503 or Section 507 of the Bankruptcy Code;

2.2.3   all liabilities arising out of or related to any (i) Excluded Asset or (ii) contracts or agreements of Seller that are not included in the Contracts and listed on Exhibit "B";

2.2.4   all statutory liens against the Assets (and related liabilities), including Tax, artisan's, carriers', warehousemen's, materialmen's and mechanics' liens;

2.2.5   all liabilities related to any indebtedness of Seller;

2.2.6   all liabilities arising out of or related to Actions (whether initiated prior to or after the Closing) arising out of acts, omissions or events that occurred on or prior to the Closing Date;

2.2.7    all penalties, fines, settlements, interest, costs and expenses incurred as a result of any actual or alleged violation by Seller of any law on or prior to the Closing Date;

2.2.8    all liabilities for taxes arising out of or attributable to the Assets or the business for any taxable years or other taxable periods (or portions thereof) that end on or before the Closing Date; and

2.2.9    all liabilities related to any employee or employee benefit plan.

In the event of an inconsistency or conflict between the scope or meaning of "Assumed Liabilities" and "Excluded Liabilities," the scope or meaning of "Excluded Liabilities" shall govern and control.  If any liability may be interpreted as both an Assumed Liability and an Excluded Liability, it shall be treated as and deemed to be an Excluded Liability.

2.3 Further Conveyances and Assumptions. From time to time following the Closing, Seller and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge, and deliver all such further conveyances, notices, assumptions, assignments, releases, and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated by this Agreement, except that nothing in this Section 2.3 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

3.  CONSIDERATION.

3.1 Payment.  The purchase price (the "**Purchase Price**") for the Assets will be the sum of $265,000.00 U.S. Dollars *plus* the Inventory Payment Amount (as defined below) and the release of the Panorama Claim that amounts to an additional $67,287.48 of consideration.  The Purchase Price will be payable by wire transfer of immediately available funds at the Closing described below.  The Parties intend for the Purchase Price to be apportioned as follows:

3.1.1    $170,731.55, plus 30% of the the Inventory Payment Amount,  to Access Bank for a release of its security interest, together with any other claims that Access Bank may have, against the Assets;

3.1.2    $30,000.00 to the bankruptcy estate of the Seller, for the purchase of the Actions specified in Section 1.1.8;

3.1.3    $40,000.00 to the bankruptcy estate of the Seller, in lieu of Seller seeking any surcharge against Access Bank's collateral;

3.1.4    70% of the Inventory Payment Amount to the bankruptcy estate of the Seller;

3.1.5    The AR Payment to the bankruptcy estate of the Seller; and

3.1.6    $24,268.45 to the landlords listed on Exhibit B as "Cure Amounts" to cure defaults, if any, under Assumed Leases.

3.2 <u>Deposit</u>.  Purchaser has delivered to Seller, to be held in deposit with Access Bank, a federally-insured commercial bank (the "**Bank**"), the sum of $39,750.00, or fifteen percent (15%) of the Purchase Price, in the form of cash or other immediately available funds (together with all interest thereon, the "**Deposit**") in a non-comingled, interest bearing account.  At Closing, the Seller shall credit it against the Purchase Price or shall return the Deposit before then as set forth herein.

3.3 <u>Limitation on Purchaser Liability</u>.  For the avoidance of doubt, Purchaser shall have no liability with respect to any costs, fees, or expenses of any nature incurred by the Seller following the Closing.

3.4 [deleted].

4.   <u>REPRESENTATIONS AND WARRANTIES</u>.

4.1 <u>Seller's Representations and Warranties</u>.   Seller represents to Purchaser as of the Effective Date:

4.1.1    Except as permitted under the Final Bidding Procedures Order identified below, Seller has not entered into and shall not negotiate a sale of the Assets with any other person or entity or enter into any other contract to sell the Assets.

4.1.2    Seller is not a "foreign person," "foreign trust" or "foreign corporation" within the meaning of the United States Foreign Investment in Real Property Tax Act of 1980 and the Internal Revenue Code of 1986, as subsequently amended.

4.1.3    The Seller has filed a motion under Section 363 of the Bankruptcy Code seeking to sell the Assets to the Purchaser, subject to higher and better offers.

4.1.4    Except as provided herein, the transaction contemplated herein, including the sale of the Assets, shall be and hereby is without any other representation or warranty of any kind, express or implied, AS IS, WHERE IS, with all faults, with no express or implied warranty of title, liens, merchantability, or fitness for a particular use.

4.2 <u>Purchaser's Representations and Warranties</u>.  Purchaser represents to Seller that, as of the Effective Date:

4.2.1    <u>Organization</u>.  Purchaser is duly formed, validly existing and in good standing under the laws of the state of its organization.

4.2.2    <u>Authority/Consent</u>.  Purchaser possesses all requisite power and authority, has taken or will by Closing have taken all actions required by its organizational documents and applicable law, and has obtained all necessary consents, to execute and deliver this Agreement and to consummate the transactions contemplated in this Agreement.

4842-3765-2569.v5
150532791.3

4.2.3  <u>Nature of Transaction</u>.  The purchase of the Assets is not contingent upon financing of any nature or kind.

4.2.4  <u>No Reliance</u>. Purchaser acknowledges that, except as otherwise expressly provided in this Agreement or any documents to be delivered to Purchaser hereunder, it (a) has entered into this Agreement with the intention of making and relying upon its own investigation or that of third parties with respect to the physical, environmental, economic and legal condition of the Assets and (b) is not relying upon any statements, representations or warranties of any kind, other than those specifically set forth in this Agreement or in any document to be delivered to Purchaser at the Closing, made by the Seller or anyone acting or claiming to act on the Seller's behalf.

## 5.  <u>COVENANTS PRIOR TO CLOSING</u>.

5.1 <u>Receipt of Governmental Notices</u>.  Prior to Closing, Seller shall provide Purchaser with copies of any written notices that Seller receives with respect to (i) any special assessments or proposed increases in the valuation of the Assets or (ii) any violation of any environmental law or any zoning, health, fire, safety or other law, regulation, or code applicable to the Assets.

5.2 <u>Litigation</u>.  Seller will advise Purchaser promptly of any litigation, arbitration proceeding, or administrative hearing which concerns or affects the Assets in any manner and which is instituted after the Effective Date.

5.3 <u>Insurance</u>.  Prior to Closing, Seller will maintain Seller's existing insurance coverage with respect to the Assets.

5.4 <u>Property Information</u>. Prior to Closing, Seller shall provide all information requested by Purchaser regarding the Assets ("**Property Information**"), subject to the confidentiality provisions hereof.

5.5 <u>Conduct of Business Prior to Closing</u>.  (A) Except as (i) expressly required by this Agreement  or applicable law, (ii) as required by Order of the Bankruptcy Court, (iii) consented to in writing by Purchaser, from the date of this Agreement until the Closing, Seller will (a) conduct the business in the ordinary course; (b) use commercially reasonable efforts to maintain and preserve intact its current organization and operations and to preserve its rights, goodwill and customer, supplier, and other relationships; (c) maintain in good condition and repair (ordinary wear and tear excepted), the Assets; (d) preserve and main its good and normal relations with its customers, suppliers and vendors and others having dealings with the business; (e) continue to maintain the Books and Records on a basis consistent with past practices; and (f) consult with Purchaser concerning the Sale Order and the bankruptcy proceedings and the Bankruptcy Case in connection therewith, provide Purchaser with copies of all filings of any kind (including motions, applications, pleadings, notices, proposed Orders and other documents) relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court, and incorporate in such filings all reasonable comments provided by Purchaser and its counsel prior to the filing thereof. This covenant shall expire and be of no further force or effect as of and after the Closing.

(B) Except as (i) expressly required by this Agreement or applicable law or (ii) consented to in writing by Purchaser, Seller shall not, with the prior written consent of Purchaser, (a) make any modification to any Assumed Lease.  In addition between the date of this Agreement and the Closing, unless Purchaser has previously consented in writing, Seller shall not defer payment or satisfaction of any rent payment that shall increase any Cure Amount set forth on Exhibit B. This covenant shall expire and be of no further force or effect as of and after the Closing.

6.  <u>CONDITIONS PRECEDENT TO CLOSING</u>.

6.1 <u>Conditions Precedent to Purchaser's Obligations to Close</u>.  Purchaser's obligation to purchase the Assets is subject to satisfaction on or before the Closing Date (as such date may be extended as provided herein) of the following conditions, any of which may be waived in writing by Purchaser in Purchaser's sole and absolute discretion:

6.1.1  <u>Covenants</u>.  Seller shall have performed and observed in all material respects all covenants of Seller under this Agreement.

6.1.2  <u>Representations and Warranties</u>.  All representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects as if made on the Closing Date.

6.2 <u>Conditions Precedent to Seller's Obligation to Close</u>.  Seller's obligation to sell the Assets is subject to satisfaction, on or before the Closing Date (as such date may be extended as provided herein) of the following conditions, any of which may be waived in writing by Seller in Seller's sole and absolute discretion:

6.2.1  <u>Covenants</u>.  Purchaser shall have performed and observed, in all material respects, all covenants of Purchaser under this Agreement.

6.2.2  <u>Representations and Warranties</u>.  All representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects as if made on the Closing Date.

6.3 <u>Failure of a Condition</u>.

6.3.1  In the event that any condition precedent to Closing has not been satisfied on or before the Closing Date, then the party whose conditions to Closing have not been satisfied (the "**Unsatisfied Party**") shall give notice to the other of the condition or conditions which the Unsatisfied Party asserts are not satisfied.  In such notice the Unsatisfied Party shall also elect either (i) to extend the Closing Date for a reasonable period of time (not to exceed twenty (20) days) to allow the satisfaction of the applicable condition, or (ii) to terminate this Agreement, whereupon (a) all Property Information provided to Purchaser by Seller, including copies thereof in any form whatsoever, including electronic form, shall be returned to Seller, along with any and all tests and studies of the Property performed by or on behalf of Purchaser, and (b) neither party shall have any further rights or obligations hereunder (other than any obligations of either party that expressly survive termination), except if such failure of a condition is due to a default by one of the parties, in which event the non-defaulting party shall have those rights and remedies set forth in Article 9.

150532791.3                                                 4842-3765-2569.v5

6.3.2    If the transaction contemplated by this Agreement closes, then the parties shall be deemed to have waived any and all unmet or unsatisfied conditions, other than any unmet or unsatisfied conditions arising out of a breach by either party of any of its representations and warranties hereunder of which the other party has no knowledge as of Closing.

6.4 <u>Bankruptcy Conditions</u>. The obligations of each Party to consummate the transactions contemplated by this Agreement are subject to an order of the Bankruptcy Court approving the provisions in section 6.4.1, as set forth below.

6.4.1    <u>Entry of Order Approving Sale</u>. By February 19, 2019, unless extended by agreement of Seller and Purchaser, the Bankruptcy Court shall have entered a final non- appealable order authorizing the free-and-clear sale of the Assets to Purchaser pursuant to this Agreement (the "**Sale Order**"), which among other things, pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

6.4.1.1 approves this Agreement and authorizes the sale of the Assets by Seller to Purchaser on the terms set forth herein;

6.4.1.2 provides that the sale of the Assets vests Purchaser with all right, title and interest of Seller in, to and under the Assets free and clear of all encumbrances and on an "AS IS" and "WHERE IS" basis, without any representations or warranties of any kind (including no representations or warranties as to merchantability, fitness or use) other than those specifically set forth in this Agreement;

6.4.1.3 finds that Purchaser has provided adequate assurance of future performance under any Contracts and Assumed Leases and otherwise approves the assumption of such Contracts, if any, and Assumed Leases and assignment to Purchaser;

6.4.1.4 finds that Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and is entitled to the protections thereof;

6.4.1.5 finds that the sale of the Assets to Purchaser pursuant to the terms of this Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the states in which Seller is incorporated and any other applicable non-bankruptcy laws;

6.4.1.6 enjoins all Persons from taking any actions against Purchaser or its affiliates to recover any claim which such Person has against everyone other than unrelated claims the Person may have against Purchaser;

6.4.1.7 provides that the Assets shall be conveyed free of any obligations of Seller relating to taxes, whether arising under law, by this Agreement, or otherwise;

6.4.1.8 provides that the provisions of the Sale Order are non-severable and mutually dependent;

150532791.3                                                                                                                    4842-3765-2569.v5

6.4.1.9 provides that Purchaser will not have any successor or transferee liability for liabilities of Seller or associated in any way with the Assets (whether under federal or state law or otherwise) as a result of the sale of the Assets; and

6.4.1.10 authorizes Seller to execute such other documents and instruments and take such other actions as may be reasonably necessary or appropriate to allow the consummation of the transactions contemplated hereby.

7. <u>CLOSING</u>.

7.1 <u>Closing Date</u>.  Subject to the satisfaction or waiver by the appropriate Party of the Conditions set forth in Article 6, the consummation of the transaction contemplated hereby (the "**Closing**") will take place at the office of Purchaser's counsel in Omaha, Nebraska, on February 28, 2019 (the "**Closing Date**") following the entry of a non-appealable Sale Order (in a form reasonably acceptable to Purchaser), pursuant to which the Seller is authorized to transfer the Assets to the Purchaser pursuant to this Agreement, and free and clear of all liens, claims, rights and interests of all persons and entities.   The Closing may be performed "by mail" so as not to require the physical presence of the parties at the applicable location.  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title, and interest of Seller in the Assets to be acquired by Purchaser hereunder shall be deemed to have passed to Purchaser and the assumption of all of the Assumed Liabilities shall be deemed to have occurred as of 12:01 a.m. central time on the Closing Date.

7.2 <u>Seller's Obligations at the Closing</u>.  At the Closing, Seller will do, or cause to be done, the following:

7.2.1    <u>Closing Documents</u>.  Seller shall execute, acknowledge (if necessary) and deliver originals of the following documents:

7.2.1.1 A bill of sale in the form and substance as reasonably satisfactory to Purchaser;

7.2.1.2 An assignment and assumption agreement in form and substance as reasonably satisfactory to Purchaser;

7.2.1.3 A copy of the Sale Order;

7.2.1.4 Copies of UCC termination statements from Access Bank and Sysco Lincoln;

7.2.1.5 [deleted];

7.2.1.6 an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Section 6.1 have been satisfied;

7.2.1.7 A Certificate of Non-Foreign Status; and

9

4842-3765-2569.v5

7.2.1.8 Such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments or conveyance and transfer, and such other documents that are not inconsistent with the terms of this Agreement, in form and substance reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all of Seller's right, title and interest of Seller in, to or under any or all of the Purchased Assets or to evidence or consummate the transactions contemplated by this Agreement.

7.2.2   Possession.  Seller will deliver possession of the business and the Assets.

7.3 Purchaser's Obligations at the Closing.  At the Closing, Purchaser will do, or cause to be done, the following:

7.3.1   Closing Documents.  At Closing, Purchaser will pay the Purchase Price to the parties set forth in Section 3.1 in accordance with the Sale Order.  Notwithstanding the foregoing, the Inventory Payment Amount shall be calculated and paid in accordance with Section 9.3 and the AR Payment shall be calculated and paid in accordance with Section 9.4.

7.4 Escrow.  The delivery of the documents and the payment of the sums to be delivered and paid at the Closing shall be accomplished through an escrow between the parties.

8.   RISK OF LOSS, DAMAGE, CONDEMNATION.

8.1 Risk of Loss.  Risk of loss for damage to the Assets, or any part thereof, by fire or other casualty from the Effective Date through the Closing will be on Seller, except for any damage or liabilities caused by Purchaser, its agents, representatives, invitees, employees or contractors.

8.2 Damage.  If, prior to the Closing, all or a material portion of the Assets is damaged by fire or any other cause whatsoever, Seller shall promptly give Purchaser written notice of such damage.

8.2.1   Minor Damage.  If the cost for repairing such damage is One Million Dollars ($1,000,000.00) or less (as determined by Seller's independent insurer), then Purchaser shall have the right at Closing to receive the amount of the deductible plus all insurance proceeds received by Seller as a result of such loss, or an assignment of Seller's rights to such insurance proceeds, and this Agreement shall continue in full force and effect with no reduction in the Purchase Price and Seller shall have no further liability or obligation to repair such damage or to replace the Assets.

8.3 Condemnation.  In the event that any condemnation proceedings are instituted, or notice of intent to condemn is given, prior to the Closing, the Closing shall proceed, without reduction of the Purchase Price, and the right to collect any condemnation award or compensation for such condemnation shall be assigned by Seller to Purchaser at Closing.

9.   REMEDIES AND ADDITIONAL COVENANTS.

9.1 Seller Default.  In the event Seller breaches any of its representations or warranties (other than breaches of representations or warranties resulting from (i) changes in Seller's knowledge and/or (ii) conditions or events outside of Seller's reasonable control) or fails to perform

any of its covenants in any material respect, and such breach or failure shall continue for a period of ten (10) Business Days after notice thereof from Purchaser, then Purchaser's sole and exclusive remedies shall be either (a) to file an action to obtain specific performance of Seller's obligation to deliver the Assets or (b) to terminate this Agreement by giving written notice thereof to Seller prior to or at the Closing, in which event the Deposit shall be returned to Purchaser, and, after the return to Purchaser of the Deposit, neither Seller nor Purchaser will have any further rights or obligations under this Agreement, except for any obligations that expressly survive termination. By written notice to Seller within ten (10) Business Days after the expiration of the ten (10) Business Day period set forth above, Purchaser shall elect whether to proceed under clause (a) or clause (b) above; if Purchaser fails timely to provide such notice, Purchaser shall conclusively be deemed to have elected to proceed under clause (b) above.  In no event whatsoever shall Purchaser be entitled to any damages, rights or remedies against Seller as a result of any default of Seller hereunder, other than as specifically set forth in this Agreement.

9.2 <u>Purchaser Default</u>.  The parties acknowledge and agree that Seller should be entitled to compensation for any detriment suffered if Purchaser breaches any of its representations or warranties or fails to perform any of its covenants in any material respect but agree that it would be extremely difficult to ascertain the extent of the actual detriment Seller would suffer as a result of such breach and/or failure.  Consequently, if Purchaser breaches any of its representations or warranties (other than breaches of representations or warranties resulting from (i) changes in Purchaser's knowledge and/or (ii) conditions or events outside of Purchaser's reasonable control), fails to perform any of its covenants in any material respect, or otherwise defaults in its obligations hereunder, and such breach, failure or other default shall continue for a period of ten (10) Business Days after notice thereof from Seller (it being agreed, however, that such notice and cure period shall not be applicable to (a) Purchaser's failure timely to deliver the Deposit the Bank or (b) Purchaser's failure timely to consummate this Agreement), then Seller shall be entitled to terminate this Agreement by giving written notice thereof to Purchaser prior to or at the Closing, in which event the Deposit shall be paid to Seller as fixed, agreed and liquidated damages, and, after the payment of the Deposit to Seller, neither Seller nor Purchaser will have any further rights or obligations under this Agreement, except for any obligations that expressly survive termination. In no event whatsoever shall Seller be entitled to any damages, rights or remedies against Purchaser as a result of any default of Purchaser hereunder, other than as specifically set forth in this Section.

9.3 <u>Inventory Payment</u>.  Promptly following Closing, the Chief Executive Officer of Seller shall conduct a physical count ("**Count**") of the Inventory of Seller as of the Closing.  Access Bank, Purchaser, and their respective representatives shall be entitled to be present and observe the Count.  The resulting quantity of Saleable Inventory determined by the Count shall be used to calculate the Inventory Payment Amount.  Purchaser shall pay the Inventory Payment Amount to Access Bank within three (3) business days following the completion of the Count.

9.4 <u>Accounts Receivable</u>.  For a period of ninety (90) days following Closing (the "**Collection Period**"), Purchaser shall use commercially reasonable efforts to collect the current franchisee accounts receivable (the "**True-Up Receivables**").  Within five (5) business days following the conclusion of the Collection Period, Purchaser shall deliver to the bankruptcy estate of Seller its good faith calculation of the amount of True-Up Receivables collected during the Collection Period (the "**Collected Receivables**"), together with a cash payment equal to 34% of the Collected Receivables, up to a maximum of $15,000 (the "**AR Payment**").

10. <u>BROKERAGE COMMISSION</u>.

10.1    <u>Indemnity</u>.  Each party hereby indemnifies and agrees to hold the other party harmless from any broker commission, liability, damage, cost, or expense (including, without limitation, reasonable attorneys' fees) paid or incurred by the other party.  Notwithstanding anything to the contrary contained in this Agreement, the indemnities set forth in this Section shall survive the Closing.

11. <u>NOTICES</u>.

11.1    <u>Written Notice</u>.  All notices, demands and requests which may be given or which are required to be given by either party to the other party under this Agreement must be in writing.

11.2    <u>Method of Transmittal</u>.  All notices, demands, requests or other communications required or permitted to be given hereunder must be sent (i) by United States certified mail, postage fully prepaid, return receipt requested, (ii) by hand delivery, (iii) by Federal Express or a similar nationally recognized overnight courier service, or (iv) by e-mail with both telephonic confirmation and a confirmation copy delivered by another method set forth in this Section.  All such notices, demands, requests or other communications shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a Business Day or is required to be delivered on or before a specific day which is not a Business Day, the day of receipt or required delivery shall automatically be extended to the next Business Day.

11.3    <u>Addresses</u>.  The addresses for proper notice under this Agreement are as follows:

If to Purchaser:                                If to Seller:

Stephen J. George                          Brock Hubert
Panorama Point Partners, LLC       Eat Fit Go Healthy Foods, LLC
13030 Pierce Street, Suite 300        8877 S 137th Circle
Omaha, NE  68144                          Omaha, NE 68138
Stephen@panoramapoint.com        Brock.hubert@eatfitgo.com

with copy to:                                  With a copy to:

Brian J. Koenig                              Paul Hoffmann
Daniel McMahon                           Nicholas Zluticky
Koley Jessen P.C., L.L.O.              Stinson Leonard Street LLP
1125 S. 103rd St., Suite 800           1201 Walnut, Suite 2900
Omaha, NE 68124                          Kansas City, MO 64106
Brian.Koenig@koleyjessen.com     Paul.Hoffmann@stinson.com
Dan.McMahon@koleyjessen.com   Nicholas.Zluticky@stinson.com

4842-3765-2569.v5

Either party may from time to time by written notice to the other party designate a different address for notices within the United States of America.

12. <u>ASSIGNMENT</u>.

Neither party shall have the right to assign this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole and absolute discretion of the party whose consent has been requested; provided, however, that at Closing Purchaser shall have the right to assign this Agreement to any entity that controls, is controlled by or is under common control with, Purchaser.  Any attempted assignment of this Agreement in violation of the foregoing sentence shall, at the option of the non-assigning party, be void and without force or effect.

13. <u>MISCELLANEOUS</u>.

13.1   <u>Entire Agreement</u>.  This Agreement embodies the entire agreement between the parties and cannot be varied except by the written agreement of the parties and supersedes all prior agreements and undertakings.

13.2   <u>Modifications</u>.  This Agreement may not be modified except by the written agreement of the parties.

13.3   <u>Gender and Number</u>.  Words of any gender used in this Agreement will be construed to include any other gender and words in the singular number will be construed to include the plural, and vice versa, unless the context requires otherwise.

13.4   <u>Captions</u>.  The captions used in connection with the Articles, Sections and Subsections of this Agreement are for convenience only and will not be deemed to expand or limit the meaning of the language of this Agreement.

13.5   <u>Successors and Assigns</u>.  This Agreement will be binding upon and inure to the benefit of the parties hereto and, subject to Article 12, their respective legal representatives, successors and assigns.

13.6   <u>Controlling Law</u>.  This Agreement will be construed under, governed by and enforced in accordance with the laws of the State of Nebraska.

13.7   <u>Exhibits</u>.  All exhibits, attachments, annexed instruments and addenda referred to herein will be considered a part hereof for all purposes with the same force and effect as if copied verbatim herein.

13.8   <u>No Rule of Construction.</u>  Seller and Purchaser have each been represented by counsel in the negotiations and preparation of this Agreement; therefore, this Agreement will be deemed to be drafted by both Seller and Purchaser, and no rule of construction will be invoked respecting the authorship of this Agreement.

13.9   <u>Severability</u>.  In the event any one or more of the provisions contained in this Agreement (except the provisions relating to Seller's obligations to convey the Assets and Purchaser's obligation to pay the Purchase Price, the invalidity of either of which shall cause this

Agreement to be null and void) are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein, provided, however, that the parties hereto shall endeavor in good faith to rewrite the affected provision to make it (i) valid and (ii) consistent with the intent of the original provision.

13.10   <u>Time of Essence</u>.   Time is important to both Seller and Purchaser in the performance of this Agreement, and both parties have agreed that TIME IS OF THE ESSENCE with respect to any date set out in this Agreement.

13.11   <u>No Memorandum; Confidentiality</u>.   Purchaser and Seller agree not to record this Agreement or any memorandum hereof.   Purchaser agrees to hold the Property Information in strict confidence, and will not disclose such information to any person other than directors, officers, employees and agents of each, as well as to consultants, banks or other third parties working with Purchaser in connection with the transaction, in each case who need to know such information for the purpose of consummating this transaction.   This prohibition will not be applicable to disclosure of information required by applicable law, rule or regulation and will survive the termination of this Agreement for one (1) year, but will not survive a Closing to Purchaser.

13.12   <u>Press Releases</u>.   Prior to Closing, any release by Purchaser to the public of information with respect to the matters set forth in this Agreement will be made only in the form approved by Purchaser and Seller and their respective counsel.

13.13   <u>Attorneys' Fees and Costs</u>.   In the event either party is required to resort to litigation to enforce its rights under this Agreement, the prevailing party in such litigation will be entitled to collect from the other party all costs, expenses and attorneys' fees incurred in connection with such action.

13.14   <u>Counterparts and Expiration of Offer</u>.   This Agreement may be executed in multiple counterparts which shall together constitute a single document. Signed facsimile or .pdf copies of this Agreement shall be legally binding to the same extent as original documents. However, this Agreement shall not be effective unless and until all counterpart signatures have been obtained. An unsigned draft of this Agreement shall not be considered an offer by either party.

13.15   <u>Waiver of Jury Trial</u>.   EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE RELATIONSHIP OF SELLER AND PURCHASER HEREUNDER, PURCHASER'S OWNERSHIP OR USE OF THE PROPERTY, AND/OR ANY CLAIMS OF INJURY OR DAMAGE.

13.16   <u>Anti-Money Laundering</u>.   Purchaser hereby represents its compliance with all applicable anti-money laundering laws, including, without limitation, the USA Patriot Act, and the laws administered by the United States Treasury Department's Office of Foreign Assets Control, including, without limitation, Executive Order 13224 (the "**Executive Order**").   Purchaser further represents (a) that it is not, and it is not owned or controlled directly or indirectly by any person or

entity, on the SDN List published by the United States Treasury Department's Office of Foreign Assets Control and (b) that it is not a person otherwise identified by Governmental Authority as a person with whom a U.S. Person is prohibited from transacting business. As of the date hereof, a list of such designations and the text of the Executive Order are published under the internet website address www.ustreas.gov/offices/enforcement/ofac. Purchaser covenants and agrees to deliver to Seller any certification or other evidence requested from time to time by Seller in its reasonable discretion confirming Purchaser's compliance with this Section 13.16. Notwithstanding any other provision of this Agreement, the provisions of this Section 13.16 shall survive Closing.

13.17    <u>Defined Terms</u>. Whenever used in this Agreement, the following words and phrases shall have the respective meanings ascribed to them as follows.

13.17.1 "**Action**" means any claim, action, charge, complaint, cause of action, demand, remedy, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

13.17.2 "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

13.17.3 "**Assets**" means all of Seller's assets, properties, rights and interests of every kind, character and description, whether tangible or intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, whether owned, leased or licensed, wherever located, and whether or not reflected on the books and records of Seller, used in, held for use in connection with, or otherwise related to, the Business, including, without limitation, the Contracts and Seller's right, title and interest in, to and under those assets, properties, and rights set forth on <u>Exhibit A</u>. For the avoidance of doubt, "<u>Purchased Assets</u>" does not include any Excluded Assets.

13.17.4 "**Books and Records**" means all documents, files, books and records that are used, held for use or intended to be used in, or that arise out of, the Business, including those that are or that relate to products, services, marketing and advertising, Intellectual Property, personnel, customers and suppliers (including credit information), sales (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), correspondence (including all correspondence with any Governmental Authority), copies of Tax Returns, books of account, ledgers, financial and accounting records, financial statements, research and development and strategic plans.

13.17.5 "**Business Day**" means any day on which business is generally transacted by banks in the jurisdiction in which the Assets are situated. If the final date of any period which is set out in any paragraph of this Agreement falls upon a day which is not a Business Day, then, and in such event, the time of such period will be extended to the next Business Day.

4842-3765-2569.v5

150532791.3

13.17.6 "**Encumbrances**" means any lien, claim, liability, collateral assignment, right of setoff, escrow, encumbrance, option, right of first refusal, transfer restriction, lease, indenture, security agreement, easement, covenant, condition, restriction, servitude, proxy, voting trust or agreement or any other similar agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, known or unknown.

13.17.7 "**Governmental Authority**" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether national, international, multi-national, supra-national, foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

13.17.8 "**Intellectual Property**" means all intellectual property and proprietary rights, interests and protections of any kind, however arising, pursuant to the laws of any jurisdiction throughout the world, including the following: (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, archives, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) software and all software components (including, without limitation, any tools, utilities used to compile any code of such Software), (g) internet addresses, uniform resource locaters, domain names, websites and web pages, and (h) goodwill related to all of the foregoing.

13.17.9 "**Inventory**" means all inventory of any kind, character, nature or description, whatever its description, including without limitation, meals, UNFI snacks, beverages, store supplies, gear, food, chemicals, kitchen supplies, packaging supplies, and all other finished goods, work in process, supplies, raw materials, manufactured and purchased parts, scrap, containers, packaging materials, and spares.

13.17.10    "**Inventory Payment Amount**" means an amount equal to the lesser of (a) fifty percent (50%) of Seller's actual cost of Saleable Inventory, or (b) Sixty Thousand Dollars ($60,000.00).

13.17.11    "**Panorama Claim**" means a claim against Seller for an unsecured debt in an amount not less than $67,287.48 as of the Petition Date.

13.17.12    "**Saleable Inventory**" means Inventory of Seller on hand as of the Closing that is merchantable and fit for the purpose for which it was procured or manufactured, and that is not slow-moving, obsolete, damaged, or defective.

[signatures follow on next pages]

4842-3765-2569.v5

150532791.3

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above.

**SELLER**:

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

4842-3765-2569.v5
150532791.3

**PURCHASER:**

By: 
Name: Stephen J. George
Title:   President

4842-3765-2569.v5

## EXHIBIT A

**ALL ASSETS OF SELLER, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:**

**Ovens, Panel Refrigeration Systems, Refrigerators, Electronics, Computers, Televisions, Security Systems and Cameras, Walk in Coolers, Generators, POS Systems, Camera, Lighting, and Sound Equipment, Decorating Items, Plants for Decoration, Tenant Improvements, Signage, Equipment, Coolers, Supermarket Coolers, Kitchen Hood, Compressor, Vending Machine, 40 Gallon Tilt Skillets, Retherm Oven with DX Controls, Food, Raw Materials, Wood in Process, and the following:**

**Kitchen office**
- 5 - grey tables
- 2 - 2 shelf metal table
- 3 - microwaves
- 2 - printers
- 5 - Kitchen scale
- 3 - Industrial mixer
- 1 - rice cooker
- Misc pots and pans, kitchen utensils, office equipment
- 1-Catering warmer
- 1-Conduction cooktop
- 1-Vacuum marinator
- 2 - big file cabinets
- 4 - small file cabinets
- 1- Small safe
- 1- Food processor
- 1- Mini fridge
- 6 – office chairs

**Break room**
- 8 - tables
- 42 - chairs
- 2 - microwaves
- 1 - Coffee pot
- 1 - refrigerator
- Miscellaneous kitchen utensils
- First aid kits
- 3 - coat racks
- 1 - Metal table
- 1 - Revel system
- 1 - large room fan
- 2 - wire shelving racks

**Hot kitchen**
- 3 - metal tables
- 1 - Kitchen scale
- 1 - food processor
- 10 - large rice cookers
- 2 - tumble marinator
- 4 - crescor ovens
- 10 - burner range oven
- 2 - tilt skillets
- 1 - fire extinguisher

**Cold kitchen (production room)**
- 22 - metal tables
- 1 - dishwasher
- 3 - large wire shelving
- 1 - small wire shelf
- Numerous plastic tubs, sheets pans, catering pans, collindars, miscellaneous kitchen utensils (wisk, choppers etc)

**Warehouse**
- 5 - metal 2 shelve tables
- Label inventory
- Container inventor
- 59 - wire shelves
- Label dolly
- 2 - 4 shelf carts
- 57 - 3 shelf carts
- 7 - catering pan carts
- Numerous plastic crates
- Multiple cart bases
- 1- Coat rack
- Miscellaneous cleaning supplies (mops, brooms)
- 2 - Large industrial fridge
- 3 - Hand carts
- 1 - Commercial freezer
- 1 - Merchandiser fridge
- 1 - Large chest freezer
- 12 - warm catering boxes
- 2 - ladders
- Numerous plastic totes with lids
- Miscellaneous cleaning chemicals and supplies (toilet paper, scrubbers, sprays, etc)
- 4 - aluminum cabinets
- 10 – large plastic trash cans

4842-3765-2569.v5

**Distribution room**
- 19 - catering cooling carts
- 4- 3 shelf carts
- 2 -2 shelf carts
- 3 - metal tables
- 8  - Wire shelves

**Lounge**
- 1 - couch
- 1 - love seat
- 1 - coffee table
- 6 - grey tables
- 10 - office chairs
- Miscellaneous decorations
- 1 - Tv
- 1 - Phone
- 1 - Filing cabinet

**Cubicle room**
- 1- Large Merchandiser fridge
- 1 - 4 seat cubicle system
- 4 - small filing cabinets
- 2  - grey desk
- 1- Wireless router
- 6 – office chairs
- 4 - photography lights
- Misc. photo props
- 1- Step ladder
- 1- Aluminum bookshelf

**Filing room**
- 2 - large filing cabinets
- 3 - wire racks
- 1 - aluminum bookshelf
- Miscellaneous paper products, office supplies, gift cards, hats and clothing
- 1 - Printer
- 3 - laptops
- 1 – small Label maker
- 4 - Plastic file holders

**Greeting room**
- 2 - waiting room chairs
- 1 - Side table
- 1 - grey table
- 1 - small filing cabinet

4842-3765-2569.v5

- 1 - shelf
- 1 - Phone
- Miscellaneous decorations
- 1- Laptop w/ screen
- 1 - Shredder
- 1 - fitness ball

**Large Office**
- 3 – office chairs
- 1 - grey table
- 1 - standing table
- 1 - Small filing cabinet
- 1- Apple TV
- 1 - small shelf
- 1 - White board
- 1 - Mini fridge
- 1- Laptop
- 2 - monitors
- 1- Mini Safe
- 1- Wire paper holder
- 1 - shredder

**Conference room**
- 4 - tables
- 9 - chairs
- 1- Mini fridge
- 1 - White board
- 1 - Apple TV
- 1- Little filing cabinets

**Accounting room**
- 3 - grey tables
- 1 - large filing cabinet
- 2 - small filing cabinet
- 1 - shelf
- 1 - shredder

**Storage closet**
- 1 - chair
- 4 - wire racks
- Miscellaneous clothing
- 1 - small Safe
- 1 - Aluminum bookshelf
- 1 - Printer
- Miscellaneous point of sale stuff

4842-3765-2569.v5

- 6 - standing sign holders
- Miscellaneous photography gear
- 3 - metal trash cans

**Kats Office**
- 2 - grey tables
- 2 - medium filing cabinets
- 1 - chair
- 1 - monitor

**Break hallway**
- 1 - Microwave
- 1 - Mini Fridge
- 1 - Coffee pot
- 1- Keurig
- 1- Trash can
- 1- Juicer
- 1 - Bulletin board

**Old office**
- 2 - medium filing cabinets
- 2 - small filing cabinets
- 1 - monitor
- 2 - grey tables
- 2 - chairs
- 7 - trash cans

## <u>EXHIBIT B</u>

**SCHEDULE OF ASSUMED LEASES AND CURE AMOUNTS**

1.  180 Burke, LLC - none

2.  Waitt Aksarben 8, LLC - $3,931.45

3.  WC 370, LLC - $6,824.56

4.  Royce Grayhawk, LLC - $7,401.78

5.  GRI Corinth North, LLC - $3,190.00

6.  Hawthorne Plaza, LLC - $9,674.28

7.  M-III Olathe Station Property, LLC - $3,969.23

8.  Woodside Village North, LLC - $2,000.00

9.  Herbert J. Lavigne Family Foundation d/b/a 8877 South 137th Circle, LLC - none

# FORM OF SALE ORDER

PROPOSED ORDER

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT NEBRASKA

| | |
|---|---|
| In re: | Case No.  18-81127-TLS |
| EAT FIT GO HEALTHY FOODS, LLC, *et al.*,[1] | Chapter  11 |
| Debtors. | (Jointly Administered) |

**ORDER (I) APPROVING THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), having filed their *Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363, Federal Rule of Bankruptcy Procedure 6004, and Local Rule of Bankruptcy Procedure 6004-1, Authorizing and Approving the Sale of Substantially All Assets Free and Clear of Liens, Claims, Interests and Encumbrances* (Doc. 163) (the "Sale Motion"); and the Court having entered an *Amended Order Granting Motion for Order Approving Bidding Procedures* (Doc. 168) approving certain bidding procedures (the "Bidding Procedures Order") (Docs. 143 & 168); and Panorama Wellness, Inc. (the "Purchaser") having submitted a "Qualified Bid" for Debtors' "Assets" (as each term is defined in the Bidding Procedures Order) and being selected as the "Successful Bidder" for such assets (as defined in the Bidding Procedures Order); and Debtors and Purchaser having agreed

---

[1] The Debtors in these jointly administered cases are: 18-81127-TLS Eat Fit Go Healthy Foods, LLC; 18-81121-TLS Eat Fit Go Arizona Kitchen, LLC; 18-81122-TLS Eat Fit Go Georgia Kitchen, LLC; 18-81123-TLS Eat Fit Go Healthy Foods Des Moines, LLC; 18-81124-TLS Eat Fit Go Healthy Foods Kansas City, LLC; 18-81125-TLS Eat Fit Go Healthy Foods, Minnesota, LLC; 18-81126-TLS Eat Fit Go Healthy Foods Omaha, LLC; 18-81128-TLS Eat Fit Go Kansas City Kitchen, LLC; 18-81129-TLS Eat Fit Go Omaha Kitchen, LLC; 18-81130-TLS EFG Shared Services, LLC.

150731645.2

upon terms and conditions, as set forth in that certain Asset Purchase Agreement, dated February 15, 2019, and attached as Exhibit A (the "Purchase Agreement") for the Purchaser to acquire substantially all of Debtors' remaining assets; and the Debtors having received no higher and/or better bids than the transactions represented by the Purchase Agreement; and the Debtors having received confirmation with each counterparty to an executory contract or lease that is being assumed and assigned to Purchaser under the terms and conditions of the Purchase Agreement (the "Assumed Leases") regarding the assumption and assignment of each of the Assumed Contracts to the Purchaser, including the cure amounts associated therewith; and the Debtors having filed a *Request to Present Oral Testimony and Documents In Support of Motion for Order Pursuant to 11 U.S.C. 105(a), 363, Fed. R. Bankr. P. 6004, and Local R. Bankr. P. 6004-1, Authorizing and Approving the Sale of Substantially All Assets Free and Clear of Liens, Claims, Interests, and Encumbrances* (Doc. 187) (the "Debtors' Motion to Provide Sale Evidence"); and the Court having entered an Order granting Debtors' Motion to Provide Sale Evidence (Doc. No. ___); and the Declaration of Stephen George (Doc. No. 192) having been admitted; and no objections to the Sale Motion or the Purchase Agreement having been filed or otherwise presented; and a hearing having been held on February 19, 2019 (the "Sale Hearing") to consider the approval of the Purchase Agreement and the transactions set forth therein (the "Sale"); and upon all of the proceedings had before the Court and the Court having reviewed the Sale Motion, the Purchase Agreement, the evidence proffered in support of the Sale at the Sale Hearing, the lease communications, and all of the other transactions contemplated by the Purchase Agreement and this Order; and the Court having found that notice of the Sale Motion, the Bidding Procedures Order, the Purchase Agreement, the Sale, and all of the other transactions contemplated by the Purchase Agreement and this Order was properly, timely, adequate and sufficient under the circumstances; and the

2

Court having found and determined that the relief requested by Debtors at the Sale Hearing is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Sale Motion and in the evidence at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore:

**IT IS THEREFORE FOUND, ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:[2]**

1.      The Sale Motion is **GRANTED** as set forth herein, and the Sale, Claims Agreement and the other transactions contemplated by this Order and the Purchase Agreement are approved as set forth herein.   Entry into and performance under the Purchase Agreement and the consummation of the transactions contemplated thereby, including, without limitation, the Sale and the assumption and assignment of the Assumed Leases, is hereby authorized and approved. The terms of the Purchase Agreement (including the Purchase Price)[3] are hereby approved, and if there is any conflict between the terms of the Purchase Agreement and this Order, this Order shall govern.   The terms of the Claims Agreement are also hereby approved.

2.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and documents that Purchaser reasonably deems necessary or appropriate to

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  This Court has jurisdiction over all matters herein pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases and proceedings is proper in this District and this Court under 28 U.S.C. §§ 1408 and 1409.

[3] Unless otherwise noted, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

implement the Purchase Agreement and effectuate the transactions contemplated thereby and to take all further actions as may be necessary or appropriate to the performance of any other obligations contemplated by and under the Purchase Agreement.

## TRANSFER OF THE PURCHASED ASSETS FREE AND CLEAR

3.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, and in accordance with the Purchase Agreement, (a) the assets that are being purchased by Purchaser pursuant to the terms and conditions of the Purchase Agreement (the "Purchased Assets") shall (i) be transferred to Purchaser (and such transfers shall be legal, valid, and effective), and (ii) vest Purchaser with all right, title, and interest of Debtors in and to the Purchased Assets, and (b) the Purchased Assets shall be free and clear of all liens, claims, Encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, with all such liens, claims, Encumbrances, and other interests of any kind or nature whatsoever (including, without limitation, any and all liens, claims, Encumbrances, and other interests arising under or in connection with the Debtors' pre- and post-petition financing facilities) to attach to the cash proceeds of the Sale (and not the Assumed Liabilities), in the order of their priority, with the same validity, force, and effect that they now have against the Purchased Assets (subject to any rights, claims, and defenses the Debtors or any parties in interest may possess with respect thereto).  Absent such relief Purchaser would not have entered into the Purchase Agreement and would not consummate the transactions contemplated herein.

4.      Except as expressly provided for in the Purchase Agreement or this Order, all persons and entities holding liens, claims, Encumbrances, and/or other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising

4

under or out of, in connection with, or in any way relating to, Seller, the Purchased Assets, the use or operation of the Purchased Assets prior to the Closing Date, Debtors' business or the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assumed Leases, are forever barred, estopped, and permanently enjoined from asserting against Purchaser, its successors and permitted assigns, its property and the Purchased Assets, such persons' or entities' liens, claims, Encumbrances, or other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability.

5.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to Purchaser in accordance with the Purchase Agreement and this Order.

6.      Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all liens, claims, Encumbrances, and other interests of any kind or nature whatsoever in and against the Purchased Assets.

7.      On the Closing Date, all persons or entities in possession of any of the Purchased Assets are directed to promptly surrender possession of such Purchased Assets to Purchaser.  Seller agrees to exercise commercially reasonable efforts to assist the Purchaser in assuring that all persons or entities that are currently, or on the Closing Date may be, in possession of any Purchased Assets (or any portion thereof) surrender possession of such Purchased Assets to either (a) Seller before the Closing or (b) Purchaser after the Closing.

8.      Following the Closing Date, none of the Debtors, their affiliates, or any creditor or holder of any lien, claim, Encumbrance, or other interest of any kind or nature whatsoever shall interfere with Purchaser's title to, or use and enjoyment of, the Purchased Assets, based on, or

related to, any such lien, claim, Encumbrance, or other interest, or based on any actions the Debtors may take in the above-captioned cases or otherwise.

9.      Access Bank shall be paid directly the Purchase Price payment allocated to Access Bank pursuant to Section 3 of the Purchase Agreement.  The Debtors, Access Bank, Sardor (Sam) Vakhidov ("Vakhidov"), Aaron McKeever ("McKeever") and Live Well Enterprises, LLC ("Live Well") have entered into a separate Agreement ("Claims Agreement") which shall be effective only upon entry of this Order and closing of the Sale, pursuant to which Access Bank, Vakhidov, McKeever and Live Well shall withdraw or release their respective claims against the Debtors' estates and the Debtors shall release any claims against Access Bank, Vakhidov, McKeever and Live Well and in addition, the Debtors shall convey and transfer to Access Bank the Vakhidov and McKeever Avoidance Actions (as defined in the Claims Agreement).  A copy of the Claims Agreement is attached to this Order as Exhibit "A" and by this reference incorporated herein.

## ASSUMPTION AND ASSIGNMENT OF THE ASSUMED LEASES

10.      Except as otherwise expressly provided in the Purchase Agreement or this Order, upon the Closing Date, pursuant to the lease communications and sections 105(a), 363, and 365 of the Bankruptcy Code, Seller is authorized to assume each of the Assumed Leases free and clear of all liens, claims, Encumbrances, and other interests of any kind or nature whatsoever.  Upon assignment to Purchaser, the Assumed Leases shall be valid and binding, in full force and effect, and enforceable by Purchaser in accordance with their respective terms.  Purchaser has provided adequate assurance of future performance under any and all Contracts and Assumed Leases.

11.      To the extent that there are Cure Amounts specified in the lease communications, the Cure Amounts shall be paid by Purchaser from the Purchase Price proceeds, as set forth in Section 3.1.6 of the Purchase Agreement.

12.     The Assumed Leases shall remain in full force and effect, and no default shall exist under any of the Assumed Leases, nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default, notwithstanding any provision in the Assumed Leases or other restrictions prohibiting their assignment or transfer.  To the extent that the Assumed Leases constitute unexpired leases under section 365 of the Bankruptcy Code, all requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors of such Assumed Leases have been satisfied.  Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, (a) Purchaser shall be fully and irrevocably vested with all right, title, and interest of the applicable Debtor in and under the Assumed Leases, (b) Purchaser shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assumed Leases, and (c) the applicable Debtor shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Leases.

13.     There shall be no right to payment, termination, modification, acceleration (including acceleration of any purchase option contained in any Assumed Lease) or cancellation, assignment fees, increases, or any other fees charged to the Debtors and/or Purchaser affiliated with each Assumed Lease as a result of the execution and delivery by Purchaser of the Purchase Agreement or any related documents, the consummation of the Sale, or the compliance by Purchaser with any provisions in the Purchase Agreement.

14.     Any provision in any Assumed Lease that prohibits or conditions the assignment of such Assumed Lease or allows the counterparty to such Assumed Lease to impose any penalty, fee, rent increase, profit sharing arrangement, or other condition on renewal or extension, or to modify any term or condition upon the assignment of such Assumed Lease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect in connection with the Sale.

7

Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assumed Leases are forever barred and permanently enjoined from raising or asserting against the Debtors and/or Purchaser any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assumed Leases and existing as of and including the Closing Date, or under the Purchase Agreement or arising by reason of the consummation of the transactions contemplated by the APA, including, without limitation, the Sale and the assumption and assignment of the Assumed Leases.

15.     Any and all contracts, leases, and agreements that are not Assumed Leases pursuant to the Purchase Agreement shall be deemed to be rejected, cancelled, and /or terminated effective as of the Closing Date.

## NO SUCCESSOR OR TRANSFEREE LIABILITY

16.     Other than as expressly set forth in the Purchase Agreement, none of Purchaser, its present or contemplated members, partners, officers, directors or shareholders, its successors or permitted assigns, or any of the foregoing's respective affiliates, agents, officials, personnel, representatives, or advisors, shall have any liability for any claim assertable against the Debtors or their estates or related to the Purchased Assets.  Purchaser shall not be deemed, as a result of any action taken in connection with the Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby, or in connection with the transfer of the Purchased Assets (a) to be a legal successor, or otherwise be deemed a successor to the Debtors, (b) to have, de facto or otherwise, merged with or into the Debtors, or (c) to be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the foregoing, Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, without limitation, under any theory of successor

8

or transferee liability, <u>de facto</u> merger or continuity, environmental, tax, labor and employment, products, or antitrust liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

17.    Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding, against Purchaser, its past, present, or contemplated members, partners, officers, directors or shareholders, or its successors or permitted assigns, or their respective assets, including, without limitation, the Purchased Assets, with respect to any claim against the Debtors.

18.    Except for the Assumed Liabilities or as may be expressly provided for in the Purchase Agreement or this Order, Purchaser shall not have any obligation or responsibility for any liability of Seller or its estate arising under or related to the Purchased Assets or otherwise.

19.    Without limiting the generality of the foregoing, none of Purchaser, its affiliates, its past, present or contemplated members, partners, officers, directors or shareholders, or the Purchased Assets, shall have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, Encumbrances, or other interests relating to any U.S. federal, state, or local income tax liabilities, including, without limitation, any such tax liabilities that are attributable to the recapture of an excess loss account under Treasury Regulation Section 1.1502-19 (or any similar provision of state or local tax law), that the Debtors are or may be obligated for or incur in connection with consummation of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assumed Leases.

150731645.2

## GOOD FAITH OF PURCHASER

20.    The transactions contemplated by the Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assumed Leases, were undertaken by Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and were negotiated by the parties at arm's length, and accordingly, (a) may not be avoided under section 363(n) of the Bankruptcy Code, and further, (b) the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions contemplated by the Purchase Agreement shall not affect the validity of such transactions, unless such authorization is duly stayed pending such appeal.

## NO FRAUDULENT TRANSFER

21.    The consideration (including the Purchase Price) provided by Purchaser for the Purchased Assets pursuant to the Purchase Agreement is (a) fair and reasonable, (b) is the highest and best offer for the Purchased Assets, (c) will provide a greater recovery for the Debtors' creditors and estates than would be provided by any other practical available alternative, and (d) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States and each state, territory, possession, and the District of Columbia.

## RELATED RELIEF

22.    Within two (2) business days following Closing, Debtors shall send Sysco Lincoln an authenticated demand to file a termination statement of Sysco Lincoln's UCC financing statement regarding Debtors pursuant to Neb. UCC § 9-513 if no such termination statement has been filed.  Pursuant to Neb. UCC § 9-513, if, within twenty (20) days, Sysco Lincoln fails to

10

either terminate the filing or send a termination statement to Debtors that the Debtors can file, Debtors shall file a UCC-3 termination statement of the financing statement.

23.     Debtors shall use the portion of the Purchase Price proceeds payable to Debtors in accordance with the terms of the Purchase Agreement (but not any proceeds payable to Access Bank) to pay any and all administrative claims owned or held by Debtors' trade vendors, including administrative expense claims arising under 11 U.S.C. § 503(b), whether or not such trade vendors have filed an administrative claim to date.  Neither Purchaser nor Access Bank has any liability or obligation for payment of any such administrative claims.

24.     No governmental (federal, state, and municipal) approvals are necessary to consummate the Sale.

25.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and obtaining a stay prior to the Closing Date or risk its appeal being foreclosed as moot.

26.     Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to (a) enforce any of its remedies under the Purchase Agreement or any other sale-related document, and (b) the extent necessary to implement the terms of the Purchase Agreement and this Order.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

27.     The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon the Debtors, the estates, all creditors, all holders of equity interests in any of the Debtors, all holders of any Claims, all counterparties to each Assumed Lease, all interested parties

11

in the above-captioned bankruptcies and their respective successors and assigns, Purchaser and its successors and permitted assigns, and any trustees, if any subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases.

28.     No law of any state or other jurisdiction relating to bulk sales or similar laws shall apply in any way to the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assumed Leases, the Sale Motion, and this Order.  As the assignment, transfer and/or sale of the Purchased Assets: (a) is in exchange for the Purchase Price, no withholding of U.S. federal income tax pursuant to Sections 1441 or 1442 of the Internal Revenue Code is required, and (b) constitutes a casual sale or occasional sale, it is exempt from Nebraska sales and use tax.

29.     No order concerning the distribution of the Sale proceeds, no distribution of the Sale proceeds, and no allocation in connection with either of the foregoing shall affect or have an effect on (a) Purchaser's tax basis, allocation, or other tax position regarding the Purchased Assets, or (b) how Purchaser accounts for the Purchased Assets in financial statements, tax matters, or otherwise.

30.     The failure to specifically include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement and its exhibits and any ancillary documents be authorized and approved in their entirety.

31.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court; _provided_ that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates nor

12

modifies the terms of the Purchase Agreement applicable to Access Bank, including the Purchase Price proceeds payable to Access Bank pursuant to the Purchase Agreement nor has a material adverse effect on the Agreement identified in Paragraph 9 above.  Any such proposed modification, amendment, or supplement that does have a material adverse effect on the Debtors' estates or modifies the terms of the Purchase Agreement applicable to Access Bank or has a material adverse effect on the Agreement referenced in Paragraph 9 above shall be subject to further order of the Court, on five (5) days' prior notice.

32.     Upon the closing of the Sale, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets and Assumed Leases, or a bill of sale transferring good and marketable title in and to the Purchased Assets and Leases, to Purchaser pursuant to the terms of the Purchase Agreement.

33.     The provisions of this Order are non-severable and mutually dependent on each other.

34.     This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the Purchase Agreement, all exhibits and ancillary documents, any amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, in all respects.


Dated:   February __, 2019           _____
                                     THE HONORABLE THOMAS L. SALADINO
                                     UNITED STATES BANKRUPTCY JUDGE

13

## AGREEMENT

This Agreement is by and among (i) Eat Fit Go Omaha Kitchen, LLC, Eat Fit Go Kansas City Kitchen, LLC, Eat Fit Go Georgia Kitchen, LLC, Eat Fit Go Arizona Kitchen, LLC, Eat Fit Go Healthy Foods - Des Moines, LLC, Eat Fit Go Healthy Foods - Kansas City, LLC, EFG Shared Services, LLC (No Rev), Eat Fit Go Healthy Foods - Omaha, LLC, and Eat Fit Go Healthy Foods - Minnesota, LLC (together, the "Debtors"); (ii) Sardor (Sam) Vakhidov ("Vakhidov"); (iii) Aaron McKeever ("McKeever"); (iv) Live Well Enterprises, LLC ("Live Well"); and (v) Access Bank, a Nebraska state bank ("Access Bank")(each, a "Party").

## PRELIMINARY STATEMENT

A.    On July 31, 2018 (the "Petition Date"), each of the Debtors filed Chapter 11 petitions with the United States Bankruptcy Court for the District of Nebraska (the "Bankruptcy Court").

B.    The Debtors' individual Chapter 11 cases (the "Chapter 11 Cases") are jointly administered under Case No. 18-81127-TLS.

C.    Vakhidov has asserted claims against one or more of the Debtors by filing proofs of claim docketed by the Bankruptcy Court as (i) Claim Number 60; (ii) Claim Number 62; (iii) Claim Number 64; and (iv) Claim Number 67 (collectively, the "Vakhidov Proofs of Claim").

D.    McKeever has asserted claims against one or more of the Debtors by filing proofs of claim docketed by the Bankruptcy Court as (i) Claim Number 59-1; and (ii) Claim Number 61-1 (collectively, the "McKeever Proofs of Claim").

E.    Live Well has asserted claims against one or more of the Debtors by filing proofs of claim docketed by the Bankruptcy Court as (i) Claim Number 56; and (ii) Claim Number 57 (collectively, the "Live Well Proofs of Claim").

F.    Access Bank has asserted claims against one or more of the Debtors by filing proofs of claim docketed by the Bankruptcy Court as (i) Claim Number 49; (ii) Claim Number 50; and (ii) Claim Number 51 (collectively, the "Access Bank Proofs of Claim").

G.    Additionally, Live Well has filed a motion (Doc. 41) ("Live Well's Administrative Expense Claim Motion") seeking, inter alia, allowance and payment of an administrative expense claim pursuant to 11 U.S.C. § 503(b)(1)(A) with priority as provided in 11 U.S.C. § 507(a)(2) in the amount equal to the rental arising under a certain lease agreement from and after the Petition Date ("Live Well's Administrative Expense Claim").

H.    The Debtors have objected to Live Well's Administrative Expense Claim Motion.

I.    The Debtors' have filed a motion seeking authority to sell substantially all of their assets (Doc. 163) (the "Sale Motion") pursuant to an Asset Purchase Agreement (the "APA"), by and among the Debtors and Panorama Wellness, Inc.

J.    Pursuant to Section 1.2.6 of the APA, claims and actions, whether known or unknown, that Debtors have or may have against Vakhidov and/or McKeever (the "Vakhidov and McKeever Litigation Claims") are not being acquired by the Purchaser and are retained by the Debtors.

K.     Prior to the Petition Date, Debtors and Access Bank entered into: (a) that certain Promissory Note dated as of February 7, 2017 with Eat Fit Go Healthy Foods – Minnesota, LLC as borrower, as modified; (b) that certain Business Loan Agreement dated February 7, 2017 with Eat Fit Go Healthy Foods – Minnesota, LLC as borrower; and (c) a number of commercial security agreements and guarantees (collectively, together with all promissory notes, related security and other ancillary documents, instruments, and agreements, the "Access Credit Agreements").

L.     Pursuant to the Access Credit Agreements, Access Bank asserts liens and security interests upon substantially all of the Debtors' assets including any claim (and/or the proceeds therefrom) that assets constituting Access Bank's collateral were conveyed in one or more transactions to Vakhidov and/or McKeever and are subject to avoidance pursuant to 11 U.S.C. §§ 548 and/or 544 (the "Vakhidov and McKeever Avoidance Actions").

M.     The Debtors, Access Bank, Vakhidov, McKeever and Live Well (each, a "Party" and collectively, the "Parties") desire to facilitate a consensual Order granting the Sale Motion through this Agreement.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     <u>Representations and Warranties</u>.     Each Party represents and warrants to and covenants as follows:

Each Party (including the Debtors at such time as the Bankruptcy Court enters its Order approving this Agreement), has all requisite power and authority (if Party is an entity) or legal capacity (if Party is a natural person) to enter into this Agreement and to perform its, his or her obligations hereunder. The execution and delivery of this Agreement by Party and the consummation by Party of the transactions contemplated hereby (including the Debtors at such time as the Bankruptcy Court enters its Order approving this Agreement), have been duly authorized by all necessary action, if any, on the part of Party. This Agreement has been duly executed and delivered by Party and constitutes a valid and binding obligation of Party, enforceable against each Party in accordance with its terms, subject only to the effect, if any, of (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to rights of creditors generally and (ii) rules of law and equity governing specific performance, injunctive relief and other equitable remedies.

2.     <u>Effective Date</u>.     This Agreement shall be effective (the "Effective Date") only upon Closing of the APA after and subject to entry of an Order granting the Sale Motion and approving and authorizing the Debtors' execution and implementation of this Agreement (the "Approval Order") which Order shall, pursuant to Fed.R.Bankr. P. 6004(h), waive the stay of the effectiveness of the Approval Order. In the event the Closing of the APA after entry of the Approval Order shall not occur, for any reason, this Agreement shall be null and void.

2

3.       Releases.   Upon the Effective Date,

i.    Live Well's Administrative Expense Claim, shall be deemed released and both Live Well's Administrative Expense Claim Motion and the Live Well Proofs of Claim shall be deemed withdrawn and Live Well shall be deemed to have released and discharged each of the Debtors fully, finally and forever from any and all claims, causes of action, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that Live Well has, whether known or unknown, against any of the Debtors.

ii.   The Vakhidov Proofs of Claim shall be deemed withdrawn and Vakhidov shall be deemed to have released and discharged each of the Debtors fully, finally and forever from any and all claims, causes of action, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that Vakhidov has, whether known or unknown, against any of the Debtors.

iii.  The McKeever Proofs of Claim shall be deemed withdrawn and McKeever shall be deemed to have released and discharged each of the Debtors fully, finally and forever from any and all claims, causes of action, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that McKeever has, whether known or unknown, against any of the Debtors.

iv.  The Access Bank Proofs of Claim shall be deemed withdrawn and Access Bank shall not be entitled to any further distributions from the Debtors' estates provided, however, Access Bank shall be entitled to proceed with enforcement against any guarantors of the indebtedness and obligations evidenced by the Access Bank Proofs of Claim, including the guarantors Vakhidov, McKeever and Live Well and/or to enforce any security interests, liens, or assignments granted to Access Bank against any real estate or personal property pledged, granted or assigned to Access Bank as collateral for the indebtedness and obligations evidenced by the Access Bank Proofs of Claim, including but not limited to the Vakhidov and McKeever Avoidance Actions, but excluding any other property of the Debtors' estates. Vakhidov, McKeever and Live Well do hereby consent to Access Bank withdrawing such Access Bank Proofs of Claim and agreeing not to receive any further distributions from the Debtors' estates and do hereby reaffirm their continuing liability pursuant to their respective Guarantees granted to Access Bank for the indebtedness and obligations evidenced by the Access Bank Proofs of Claim and do hereby reaffirm any security interests or liens granted by Vakhidov, McKeever or Live Well to Access Bank to secure the payment and performance of such indebtedness and obligations.

v.   Except as to Vakhidov and McKeever Avoidance Actions, each of the Debtors shall be deemed to have released and discharged each of McKeever, Vakhidov and LiveWell fully, finally and forever from any and all claims, causes of action, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that any Debtor has, whether known or unknown, against Vakhidov and/or McKeever and/or Live Well.

3

vi.    Each of the Debtors shall be deemed to have released and discharged Access Bank fully, finally and forever from any and all claims, causes of action, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that any Debtor has, whether known or unknown, against Access Bank.

vii. The Vakhidov and McKeever Avoidance Actions shall be deemed conveyed and transferred by Debtors to Access Bank free and clear of all liens claims and encumbrances, provided, however, Access Bank agrees that any recovery by Access Bank on the Vakhidov and McKeever Avoidance Actions shall be limited to such amount as may be necessary to pay in full the indebtedness and obligations evidenced by the Access Bank Proofs of Claim, including interest which continues to accrue thereon.

4.     Document Execution; Counterparts; Electronic Transmissions.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  An executed signature page of this Agreement that is an Electronic Transmission shall be as effective as delivery of a manually executed counterpart thereof.  *Electronic Transmission*" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or any system used to receive or transmit faxes electronically. This Agreement embodies the entire agreement between the parties and cannot be varied except by the written agreement of the parties and supersedes all prior agreements and undertakings. This Agreement may not be modified except by the written agreement of the parties. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns. This Agreement will be construed under, governed by and enforced in accordance with the laws of the State of Nebraska.

EAT FIT GO OMAHA KITCHEN, LLC

By: _____
Its: _____CEO_____

EAT FIT GO KANSAS CITY KITCHEN, LLC

By: _____
Its: _____CEO_____

EAT FIT GO GEORGIA KITCHEN, LLC

By: _____
Its: _____CEO_____

EAT FIT GO ARIZONA KITCHEN, LLC

4

By: _____
Its: _____
CEO

EAT FIT GO HEALTHY FOODS - DES MOINES, LLC

By: _____
Its: _____
CEO

EAT FIT GO HEALTHY FOODS - KANSAS CITY, LLC

By: _____
Its: _____
CEO

EFG SHARED SERVICES, LLC (NO REV)

By: _____
Its: _____
CEO

EAT FIT GO HEALTHY FOODS - OMAHA, LLC

By: _____
Its: _____
CEO

EAT FIT GO HEALTHY FOODS - MINNESOTA, LLC

By: _____
Its: _____
CEO

ACCESS BANK

By: _____
Its: _Commercial banking officer_

LIVE WELL ENTERPRISES, LLC

By: _____
Its: _____

5

4828-7675-6104.1
1507318852

By: _____
Its: _____

EAT FIT GO HEALTHY FOODS - DES MOINES, LLC


By: _____
Its: _____

EAT FIT GO HEALTHY FOODS - KANSAS CITY, LLC


By: _____
Its: _____


EFG SHARED SERVICES, LLC (NO REV)


By: _____
Its: _____

EAT FIT GO HEALTHY FOODS - OMAHA, LLC


By: _____
Its: _____

EAT FIT GO HEALTHY FOODS - MINNESOTA, LLC


By: _____
Its: _____

ACCESS BANK


By: _____
Its: _____

LIVE WELL ENTERPRISES, LLC


By: _____
Its: _____

5

4828-7675-6104.1
150731885.2

SARDOR (SAM) VAKHIDOV

AARON MCKEEVER

4828-7675-6104.1
150731885.2

SARDOR (SAM) VAKHIDOV

AARON MCKEEVER

6